UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN WARD | : | CIVIL ACTION NO. |
| *Plaintiff* | : | 3:01CV1908(AVC) |
| | : | |
| v. | : | |
| | : | |
| ROBERT MURPHY, et al. | : | |
| *Defendants* | : | NOVEMBER 10, 2003 |

## STATE DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The defendants Kristine D. Ragaglia, Commissioner of DCF, Sandra Liquindoli, a hotline social worker investigator, Robert Murphy, a social worker investigator, Ralph Arnone, a program supervisor, Roger Lima,[1] a case aide, and Edward Federici, a treatment social worker (hereinafter the "state defendants") file this brief on behalf of their motion for summary judgment. All of these individuals were employed by DCF at the time of the incident alleged in the plaintiff's complaint.

## INTRODUCTION

The plaintiff, John Ward, who has appeared pro se in this case, is the father of a minor child, Donna Ward (b. 10/6/99). When Donna was a new-born infant, hospital personnel at Danbury Hospital made a report of child neglect to the State of Connecticut, Department of Children and Families (hereinafter "DCF" or the "Department"). As a result of that report and further investigation, the child was removed from the care of her parents on an administrative 96 hour hold on October 18, 1999. See Conn. Gen. Stat. Sec. 17a-101g ( c). Immediately after that action, the Department filed a motion for order of temporary custody and a petition alleging that the minor child was a neglected child. See Conn.

---

[1] This defendant's correct name is Rogerio F. Lima. For the sake of clarity, this memorandum will refer to this defendant as he is named in the complaint.

Gen. Stat. Sec. 46b-129 ( b). The trial court (Eveleigh, J.) on October 19, 2003, granted the motion for order of temporary custody, finding that the child was in immediate physical danger from her surroundings and that custody needed to be immediately assumed to safeguard the welfare of the child. On November 3, 1999, after a hearing, the trial court (Eveleigh, J.) vacated the order of temporary custody. However, the court ordered that plaintiff and the child's biological mother, Patty M, accept comprehensive mental health, parenting and medical services and monitoring from the Department. Eventually, after services were provided for a period of time, the neglect petition was withdrawn.

The central claim of the plaintiff is that there was a massive conspiracy to deprive him of his civil rights, which extended not only to the DCF Commissioner and employees named above, but to the Danbury Police Department, the Visiting Nurse Association, individual medical providers at Danbury Hospital, and service providers from Catholic Family Services. In his original complaint, the plaintiff alleged that the conspiracy extended to the Office of the Attorney General, Attorney General Richard Blumenthal and the Assistant Attorney General assigned to the case, Assistant Attorney General Kelly Flint, the child's court-appointed attorney, Attorney Amy Klein, and the state judiciary, including Judge Eveleigh and Antoinette Beale, the clerk of the court. The plaintiff withdrew the action as to the Office of the Attorney General, Attorney General Richard Blumenthal and the Assistant Attorney General Kelly Flint[2] and the child's attorney. By decision of August 19, 2002, this Court dismissed the action as against the judge, the court clerk and the state judicial department, concluding, inter alia, that the individuals were protected by judicial immunity, the state was protected by sovereign immunity and the plaintiff lacked standing to seek equitable relief. (Dkt. No. 77) For the reasons articulated below, the

---

[2] The Office of the Attorney General, Attorney General Blumenthal and Assistant Attorney General Flint filed a motion to dismiss. This Court never adjudicated the motion in light of the plaintiff's withdrawal of the action against these parties.

2

remaining State of Connecticut defendants in their individual and official capacities are entitled to judgment in their favor.

**FACTUAL SUMMATION**

In October of 1999, Sandra Liquindoli was employed by the State of Connecticut, Department of Children and Families and was statutorily required as part of her duties to investigate reports of abuse or neglect that were made to the Department's telephone hotline. See Conn. Gen. Stat. Secs. 17a-101, 17a-101g. (Exhibit A., Liquindoli Aff. Para. 1) On October 10, 1999, Ms. Liquindoli was assigned to investigate a report made by Angela Crooke, a case manager at Danbury Hospital. Ms. Crooke reported to that Dr. Etan Kilchevsky was concerned about the welfare and safety of a new born infant, Donna Ward, who was born on October 6, 1999 and discharged from the hospital on Friday, October 8, 1999. The child reportedly had a low birth weight and jaundice. (Exhibit A., Liquindoli Aff. Para. 2; see Exhibits G, H) It was reported that Dr. Kilchevsky, after he learned that the father had not kept an appointment with the visiting nurse, attempted to call the father over the weekend with no answer. At the request of Danbury Hospital, the VNA in Danbury had contacted the plaintiff to re-schedule the home visit. Reportedly, the father called at 6:54 am on October 10, 1999 to cancel the nursing visit for that day without any explanation. (Exhibit J, Kilchevsky Aff. Para. 2, 3, 4 & 5 [to be provided]. Sandra Liquindoli learned that the VNA unsuccessfully attempted to visit the home. (Exhibit A., Liquindoli Aff. Para. 3; see Exhibits G, H)

On October 10, 1999, Sandra Liquindoli arrived at the plaintiff's apartment in Danbury, Connecticut. She was accompanied by a visiting nurse, Virginia Lourenco, and two members of the Danbury Police Department. Her purpose was to investigate the situation and make sure the child was safe in light of the concerns expressed by Danbury Hospital. Plaintiff refused to answer the door. The plaintiff spoke to the officers through the door stating that the police had no legal ground to make him

open the door or for him to cooperate. He repeatedly requested a warrant. One of the officers present at the scene observed through the window that the mother was present in the home. (Exhibit A., Liquindoli Aff. Para. 4) The plaintiff refused to allow Ms. Liquindoli to talk to the child's mother. After refusing to allow the child to be examined by the nurse, the plaintiff offered to take the child to the hospital for examination. Sandra Liquindoli called Dr. Kilchevsky, who told her that he would examine the child and that he was concerned for the child because she had jaundice and untreated jaundice can lead to dehydration and brain damage. (Exhibit J, Kilchevsky Aff. Para. 6, 8 & 9 [to be provided]. He also stated that he was concerned that the mother was not capable of caring for the child as she appeared to be extremely slow and might not be able to determine if the child was in distress. (Exhibit A., Liquindoli Aff. Para. 5; Exhibit J, Kilchevsky Aff. Para. 8)

The plaintiff then stated he had changed his mind and was unwilling to bring the child to the hospital. Finally, the plaintiff allowed Ms. Lourenco to conduct a brief examination in the hallway of the apartment complex. Based upon the examination, it was Sandra Liquindoli's understanding that the child did not require any medical intervention at that time. Dr. Kilchevsky was informed of the examination and did not feel that further intervention was required that evening. He did recommend that further investigation of the family was needed and that the child have a follow-up examination within three days. (Exhibit A, Liquindoli Aff. Para. 6; Exhibit J, Kilchevsky Aff. Para. 8 [to be provided];see Exhibit H) Sandra Liquindoli did not have any further involvement in the investigation of regarding Donna Ward. (Exhibit A., Liquindoli Aff. Para. 7)

On October 12, 1999, Robert Murphy, who was employed by the Department of Children and Families in the Danbury office as an investigative social worker, was assigned to follow-up on the investigation that was commenced by Sandra Liquindoli. At the beginning of his involvement in this investigation he reviewed the information that was already received by the Department. In reviewing

4

that information he learned that Dr. Etan Kilchevsky was concerned because an infant child, Donna Ward (d.o.b. 10/6/99), was born with jaundice and had lost 5% to 8% of her body weight since birth. Dr. Kilchevsky reported the concern that the child could suffer dehydration and possible brain damage if the jaundice and weight loss conditions were not addressed. (Exhibit B, Murphy Aff. Para. 2)

Robert Murphy made repeated unsuccessful efforts to contact the plaintiff between October 13, 1999 and October 18, 1999, when, accompanied by case aide Roger Lima, Robert Murphy made a home visit to the plaintiff's residence. (Exhibit B, Murphy Aff. Para. 6) The plaintiff was home and told him through the door that he refused to speak to any agents of the government. Robert Murphy explained that he was there to follow up to check on the health and well-being of Donna Ward. The plaintiff turned on an audio recorder and stated that DCF would have to talk to his attorney. Robert Murphy asked him who his attorney was and he told Mr. Murphy that DCF was responsible for providing him an attorney. (Exhibit B, Murphy Aff. Para. 7)

Robert Murphy returned to the home with several members of the Danbury Police Department. By this time it was early evening on October 18, 1999. The police incident report noted the plaintiff's disturbed behavior: "An ambulance had been called to stand by in the area as we did not know what circumstances would arise out of this scenario. Ward was displaying what could best be described as a survivalist attitude and we feared he may have weapons. It was determined to use the ambulance to transport the baby to the hospital. All the officers present felt uneasy about Ward and had a fear for our safety from him, and the safety of the baby. A presence was maintained at the front and rear of the residence until the baby and all civilian personnel were out of the area." (Exhibit B, Murphy Aff. Para. 8; Exhibit I)

In October of 1999, Ralph Arnone was employed by the State of Connecticut, Department of Children and Families ("DCF") as a Program Supervisor in the Danbury office. In the capacity as a

Program Supervisor he had managerial responsibility over Robert Murphy and was authorized to invoke a "96 hour hold", which allows the Department to remove a child to ensure his or her safety. See Conn. Gen. Stat. Sec. 17a-101g ( c). (Exhibit C, Arnone Aff. Para. 1). As the above-described events at the home of the plaintiff unfolded, Investigator Murphy kept Ralph Arnone apprised via his cell phone. (Exhibit C, Arnone Aff. Para. 6) It was during this time that Ralph Arnone was becoming increasingly concerned over the apparent psychological decompensation of the plaintiff. Mr. Murphy's description of the plaintiff's behavior indicated to Ralph Arnone that the plaintiff was acting in an inappropriate and paranoid manner. In addition, Ralph Arnone was concerned by the plaintiff's assertion of desiring no outside help to address the needs of his newborn. It was the plaintiff's apparent deteriorating psychological condition combined with his self-asserted position as primary caregiver to his newborn that warranted an assessment that Donna Ward was in imminent risk of physical harm and neglect. In addition, Ralph Arnone was concerned regarding the medical issues of the infant based upon the reports of Danbury Hospital staff. It was significant that the plaintiff had declined to accept outside services and therefore the new-born infant was not visible to the community. Thus, if she was in distress, there would be no way for DCF or an agency outside the home to intervene. (Exhibit C, Arnone Aff. Para. 7)

In reaching the decision to invoke the "96 hour hold", Ralph Arnone reviewed and relied upon information provided to him by Robert Murphy and other information collected by DCF personnel. Ralph Arnone had no reason to doubt the accuracy of this information. (Exhibit C, Arnone Aff. Para. 11).

Once the "96 hour hold" was served by Mr. Murphy, the plaintiff was given another opportunity to cooperate by providing information regarding Donna's medical status and, if appropriate, to allow a medical examination of her so that the child would not have to be removed from his care. The plaintiff refused to cooperate. (Exhibit B, Murphy Aff. Para. 10). He told Robert Murphy that the state would

6

not take his daughter from his arms and that Robert Murphy would have to pick the infant up from the couch. He placed Donna on the couch. Mr. Murphy picked up the child from the couch while the plaintiff filmed the scene with his video camera. (Exhibit B, Murphy Aff. Para. 9)

The child was transported by ambulance to Danbury Hospital, where she was examined. There was no evidence of abuse or neglect. Thereafter, the child was briefly hospitalized because of feeding problems. (Exhibit B, Murphy Aff. Para. 11)

On October 19, 1999, pursuant to DCF's ongoing duty to investigate the need to maintain custody, Robert Murphy interviewed the mother, who stated that she had been diagnosed with obsessive-compulsive disorder, major depression, anorexia and anxiety disorder. (Exhibit B, Murphy Aff. Para. 12)  She also reported that the plaintiff was verbally and emotionally abusive to her. Psychiatric social worker Nancy Turton Creal, who is a licensed clinical social worker with extensive experience in the field, accompanied Mr. Murphy and made an assessment of the mother. Ms. Turton Creal concluded, among other things, that: (1) the mother's psychiatric disorders "are very likely to impede mother's ability to meet the daily demands of an infant", (2) the "additional stress of caring for a child is likely to exacerbate symptoms related to her mental health issues, possibly causing confusion, disorganization and an inability to recognize signs of distress in a child" and (3) although the mother claimed that her eating disorder was in remission, this did not appear to be the case and, if the eating disorder was unchecked and untreated as appeared to be the case, "the stress of caring for an infant is likely to increase symptoms that can be dangerous to Mother's health and place the child at risk." (Exhibit B, Murphy Aff. Para. 13).

On October 20, 1999, Robert Murphy spoke by telephone to Ginny Cameron of the Danbury Hospital Community Center for Behavioral health. He learned that the plaintiff has a diagnosis of personality disorder and anxiety disorder.  (Exhibit B, Murphy Aff. Para. 14).

7

On October 20, 1999, Robert Murphy spoke by telephone to Danbury Hospital Social Worker Joan Mills. The plaintiff was described by Ms. Mills as paranoid, suspicious and uncooperative. He refused a referral to the Healthy Families Program, under which the family could have obtained support services. Ms. Mills reported her concern that the infant may not receive proper medical attention under her parents' care. (Exhibit B, Murphy Aff. Para. 15)

After consultation with his superiors at DCF and at their direction, Robert Murphy filed a motion for temporary custody of Donna and a neglect petition in the Superior Court for Juvenile Matters in Danbury. (Exhibit B, Murphy Aff. Para. 16) From Robert Murphy's perspective, he believed the child was in great risk if she was returned to the home for a number of reasons. First, she was a new born infant who, by virtue of her young age, required a high degree of care and attention. Second, Dr. Kilchevsky had informed DCF that the child was medically vulnerable due to jaundice and low birth weight, a condition that the doctor told DCF could lead to dehydration and brain damage. The degree of medical risk at the point at which she was removed was unclear to Robert Murphy because of the father's refusal to provide information to clarify the situation or to allow her to be examined by a physician. Third, because she was an infant and the father had refused medical support services, against the recommendation of Danbury Hospital, Donna was home alone with one or both of her parents and was not visible to the community. Thus, if she was in distress there would be no way for DCF or an outside agency to timely learn of the problem and, if necessary, to intervene and provide assistance. Fourth, Robert Murphy learned from his interview of the mother that she was the caretaker for the child while the father was out of the home. (Exhibit B, Murphy Aff Para 17). Dr. Kilchevsky expressed the opinion that she would not be able, due to her own limitations, to recognize if the child was in distress and to take appropriate action. Fifth, the psychiatric social worker, Ms. Turton Creal, who assessed the mother, opined that the child would be at significant risk in the care of the mother due to her mental

8

health condition. In addition, Robert Murphy's observations of the plaintiff's behavior convinced him that the plaintiff suffered from significant mental illness that Mr. Murphy believed had a direct impact on his ability to safely parent the child. Robert Murphy also thought that it was significant that the mother disclosed that the plaintiff was emotionally abusive to her. (Exhibit B, Murphy Aff. Para. 17)

On October 21, 1999, the trial court (Eveleigh J.) granted the motion for an order of temporary custody, finding that the child's safety would be jeopardized if she remained in the home. (Exhibit B, Murphy Aff. Para. 18) The trial court appointed counsel for the father, mother and child. (Exhibit B, Murphy Aff. Para. 19) On or about October 29, 1999, the case was transferred to a treatment social worker, Edward Federici. (Exhibit B, Murphy Aff. Para. 20)

On November 3, 1999, the order of temporary custody was vacated by Judge Eveleigh. However, the court issued a series of detailed orders to ensure the safety of the child. These included the following. The parents were required to "[a]ccept and cooperate with in-home support services referred by DCF and make progress toward identified goals" and follow the recommendations of service providers: intensive family preservation and VNA. The court ordered that the parents "[k]eep all appointments set by or with DCF." The court ordered that the parents cooperate with DCF home visits to be scheduled by prior arrangement of the parties. The court ordered that the parents participate in individual and parenting counseling. The parents were ordered to sign releases authorizing DCF to communicate with service providers. The parents were ordered to consistently and timely meet and address the child's physical, educational, medical or emotional needs. They were directed to make all necessary child-care arrangements to ensure that the child is adequately supervised and cared for by appropriate caretakers. They were directed to immediately advise DCF of any changes in the composition of the household. (Exhibit B, Murphy Aff. Para. 21).

When the motion for temporary custody was in litigation in the Juvenile Session of Superior Court, Robert Murphy learned of a letter dated October 22, 1999 addressed to the plaintiff's attorney, Attorney Richard Banks. The letter reflected that the child had a normal examination on October 14, 1999. Robert Murphy did not know of this examination prior to the temporary removal of the child. The plaintiff refused to share with Robert Murphy information regarding the child's medical care prior to the child's removal. (Exhibit B, Murphy Aff. Para. 22).

On November 9, 1999, Robert Murphy made a home visit to the plaintiff's home because Mr. Federici, the assigned treatment social worker, was ill on that date. Aside from that visit, his involvement in the case ended on or about November 4, 1999. (Exhibit B, Murphy Aff. Para. 23).

Ralph Arnone's and Robert Murphy's actions were motivated by their concern for the welfare of the child in accordance with their duties as a DCF employees. At no time did they conspire with anyone else for any improper or illegal purpose. They did not falsely imprison or defame or slander the plaintiff. (Exhibits B & C).

Roger Lima who was employed as a case aid had no decision making role in this case and limited contact with the family. (Exhibit D). Edward Federici was the treatment social worker assigned to the case and was not involved with the removal of the child or the filing of the neglect petitions. He attended court hearings on behalf of the Department and complied with the juvenile court's orders to provide services to and monitor the family. (Exhibit E). (See also the defendants' statement of material facts filed pursuant to Local Rule 56(a)1 and supporting exhibits.)

## ARGUMENT

### SUMMARY JUDGMENT STANDARD

"Summary Judgment is appropriate where "there is no genuine issue of material fact and the … the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c), i.e., "where the

record taken as a whole could not lead a rational trier of fact to find for the non-moving party." (citations omitted) *Kia P. v. McIntyre et. al,* 235 F.3d 749, 755 (2000).

In order to defeat a summary judgment motion that is properly supported by affidavits, depositions, and documents as envisioned by Fed. R. Civ. P. 56(e), the opposing party is required to come forward with materials, setting forth specific facts showing that there is a genuine issue of material fact to be tried. A court must view the evidence in the light most favorable to the party against whom the motion is made. *Metromedia Co. v. Fugazy,* 983 F.2d 350, 361 (2d Cir. 1992, cert. denied 508 U.S. 952, 124 L.Ed. 2d 662, 113 S.Ct. 24445 (1993). The opposing party cannot defeat the motion by relying on the allegations in his or her pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. *Kia P., supra* at 763; *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2nd Cir. 1996).

A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir. 1992) (internal quotation marks omitted). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). "The non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. at 587 (quoting Fed. R. Civ. P. 56(e)). Bare polemics cannot defeat real evidence and, conclusory allegations unsupported by demonstrable facts will not suffice to create a genuine issue. See *Kulak v. City of New York,* 88 F.3d 63, 71 (2nd Cir. 1996). A "material" fact has been defined adequately and simply as a fact which will make a difference in the result of the case. *Curtis v. United States,* 168 F.Supp. 213, 216 (Ct. Cl.), cert. denied, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81. Factual disputes that are irrelevant or

11

unnecessary will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).

In keeping with the case law which holds that the summary judgment standard mirrors the standard for a directed verdict *(see, Anderson v. Liberty Lobby, Inc., supra,* at 250, 2511 it is clear that once the defendant moves for summary judgment, the Court must evaluate whether there is sufficient proof of a material fact, creating a genuine triable issue. The mere existence of a scintilla of evidence in support of the plaintiff's position would be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *See Celotex Corp. v. Catrett,* 477 U.S. 325, 106 S.Ct. 2548 (1986). If the undisputed facts reveal that there is an absence of proof as to any essential element on which the opponent of summary judgment has the burden of proof, any factual dispute as to the other elements becomes immaterial and cannot defeat the motion. *Gottlieb v. County of Orange, supra,* 518.

## I.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY WITH REGARD TO ALL FEDERAL CLAIMS.

The Supreme Court of the United States has continually emphasized the need for qualified immunity to protect federal and state government officials from harassing lawsuits arising from the performance of their discretionary functions. See *Behrens v. Pelletier,* 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Court has also confirmed that the defense is meant not only to avoid liability, but to avoid standing trial and the burdens of pre-trial matters such as discovery. *Behrens, supra,* at 839; *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985); *Harlow, supra,* at 817, 2738. The Court in *Behrens* explained that the adoption of a purely "objective" standard for the defense of qualified

12

immunity in *Harlow* was designed to defeat insubstantial claims without resort to trial. *Behrens, supra,* at 838. It necessarily follows, that a motion for summary judgment based upon the defense of qualified immunity is an appropriate vehicle to defeat a claim of constitutional violations against officials who were performing their governmental duties. *See, Gottlieb v. County of Orange, supra.*

The Second Circuit has held, consistent with the holdings in *Harlow* and *Anderson v. Creighton* cited above, that:

> The qualified immunity defense may be upheld as a matter of law when the evidence is such that, even when it is viewed in the light most favorable to the plaintiffs and with all permissible inferences drawn in their favor, no rational jury could fail to conclude that it was objectively reasonable for the defendant to believe that she was acting in a fashion that did not violate such a right. (citations omitted).

*Gottlieb, supra,* at 518.

Once a defendant has raised the defense of qualified immunity, the plaintiff has the burden of convincing the court that immunity does not apply because the law was clearly established at the time of the defendant's actions. *Davis v. Scherer,* 468 U.S. 183, 197, 104 S.Ct. 3012, 3021 (1984). The plaintiff must show that the existence of the constitutional right the defendant allegedly violated was unequivocal and unquestioned at the time of the defendant's actions. *Mitchell, supra,* at 530-531, 2817-18 *Harlow, supra,* at 818, 2738; *Wilkinson v. Russell et al,* 182 F. 3d 89 (1999); *Sec & Law Enforcement Emp., Dist. C.82 v. Carey,* 737 F.2d 187, 210 (2d Cir. 1988). The contours of the rights allegedly violated must be sufficiently particularized and clear that a reasonable official would realize that his or her actions violated that right. *Anderson v. Creighton, supra,* at 639, 3039. Whether or not a right is deemed clearly established at the time the defendants acted depends upon the following three factors: (1) was the right defined with "reasonable specificity", (2) does the decisional law of the Supreme Court and the applicable Circuit Court support the existence of the right, and (3) under pre-existing law would a reasonable official have understood that his or her acts violated a federally protected right. *Jermosen* v.

13

*Smith*, 945 F.2d 548, 550 (2d Cir. 1991), cert. denied, 503 U.S. 962, 112 S. Ct. 1565, 118 L.Ed.2d 211 (1992).

In the case at hand, the plaintiff appears to be claiming that his rights to an attorney, to not to be intruded upon by outside officials or agencies and to family integrity and custody of his daughter were violated.

The plaintiff appears to claim that one or more of the defendants were obligated to provide him an attorney during the investigation and prior to the neglect petition being filed. In Connecticut, neglect and order of temporary custody proceedings in the Juvenile Session of Superior Court are in the nature of civil proceedings. See *In Re Juvenile Appeal (85-2)*, 3 Conn. App. 184, 189 (1985); *In Re Christopher A.*, 22 Conn. App. 656, 663 (1990). However, the Sixth Amendment, the basis of the plaintiff's claim, as well as article first, § 8, of the Connecticut constitution is strictly limited to criminal defendants. *State* v. *Anonymous*, 179 Conn. 155, 159 (1979); *In Re Noel M.*, 23 Conn. App. 410, 221 (1990). See *In re Lauren R.*, 49 Conn.App. 763, 778 (1998). Even if the Sixth Amendment was applicable to this case, the right to counsel would only attach at the first appearance in court. See *Deshawn E.* v. *Safir*, 156 F. 3d 340 (2nd Cir. 1998). In this case, the plaintiff, the respondent mother and the minor child were all appointed counsel by Judge Eveleigh by the first court date. The plaintiff has failed to allege a violation of any constitutional right to an attorney that would implicate a U.S.C. § 1983 claim.

In relation to plaintiff's complaints regarding the intrusions into his home during the investigation, there is no constitutional right to be free of a child welfare investigation. *Brown* v. *Town of East Haddam*, 2000 U.S. LEXIS 8802 (2nd Cir. 2000). Therefore, plaintiff has failed to state a claim upon which relief could be granted under U.S.C. § 1983.

In relation to the removal of Donna, to a certain extent, the claimed rights to family integrity and custody of one's child have been defined by our decisional law with "reasonable specificity", in that

social workers should be aware that they may not remove children from their parents' custody without a reasonable basis to believe such a removal is necessary for the child's well-being. *Tennenbaum v. Williams,* 193 F. 3d 581, 596 (2d. Cir. 1999) *cert. denied* 529 U.S. 1098 (2000), citing *Wilkinson v. Russell,* 182 F.3d 89, 107 (2d Cir. 1999), *Robison v. Via,* 821 F. 2d 913, 921 (2d Cir. 1987).

However, the Supreme Court and Circuit Court decisions which have assessed the propriety of emergency removals on the part of child protection workers, do not support the plaintiff's claim that his right to privacy and custody of his child were violated under the facts of this case, in that limits have been placed upon those rights in the context of child protection cases:

> To be sure, in 1981, when the Robison children were taken into custody, it was clearly established that a parent's interest in the custody of his or her children was a constitutionally protected "liberty" of which he or she could not be deprived without due process, which would generally require a predeprivation hearing. *See Stanley v. Illinois,* 405 U.S. 645, 649-58, 31 L. Ed. 2d 551, 92 S. Ct. 1208 (1972). However, it was, and remains, equally well established that officials may temporarily deprive a parent of custody in "emergency" circumstances "without parental consent or a *prior* court order." *Duchesne v. Sugarman,* 566 F.2d at 826 (emphasis in original); *see also Lossman v. Pekarske,* 707 F.2d 288, 291 (7th Cir. 1983) ("When a child's safety is threatened, that is justification enough for action first and hearing afterward."); *Sims v. State Department of Public Welfare,* 438 F. Supp. 1179, 1192 (S.D. Tex. 1977) (three-judge court) (child can be taken into custody without a hearing if there exists an "immediate threat to the safety of the child"), *rev'd on other issues sub nom. Moore v. Sims,* 442 U.S. 415, 60 L. Ed. 2d 994, 99 S. Ct. 2371 (1979); *Newton v. Burgin,* 363 F. Supp. 782 (W.D.N.C. 1973) (three-judge court) (upholding statute providing that child may be taken into custody without a hearing if child is in danger or subject to serious neglect, or if it is in child's best interest), *aff'd,* 414 U.S. 1139, 94 S. Ct. 889, 39 L. Ed. 2d 96 (1974).

*Robison, supra.*

Under the third prong of *Jermonsen, supra* the DCF employees dealing with the plaintiff would not have had any reason to believe that the existing law did not permit them to act to protect Donna Ward under the factual circumstances with which they were faced. "[E]ven if the contours of the plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the acts complained of, the defendant may enjoy qualified immunity if it was objectively reasonable for him

15

to believe that his acts did not violate those rights. *See, e.g., Malley v. Briggs*, 106 S. Ct. at 1096." *Halperin v. Kissinger*, 257 U.S. App. D.C. 35, 807 F.2d 180, 189 (D.C.Cir.1986) (Scalia, *J.*, sitting by designation). Under this third route to qualified immunity the focus of inquiry is on the particular facts of the case. Where the defendants "adduce[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right. *Halperin, supra. Robison, supra.*

In the present case, the allegations in the complaint combined with the Affidavits submitted in support of this Motion for Summary Judgment, establish the qualified immunity of the Defendants because it was objectively reasonable for them to believe they did not violate any federal rights when they removed Donna. They were faced with a newborn infant, whom a physician had reported was at risk for dehydration and brain damage, and an uncooperative parent, who was rejecting all outside assistance for his child and would not disclose whether the child had been or would be seen for follow-up medical care. The aim of qualified immunity is to ensure that discretionary decision making is not paralyzed by the fear of lawsuits. See *Doe v. Conn. Dept. of Children & Youth Services*, 712 F. Supp. 277 (D.Conn. 1989), Affd, 911 F 2d 868 (1990). The decision to remove the child and to keep the child until protective orders could be put in place was reasonable and the defendants are entitled to qualified immunity.

## A.    COMMISSIONER KRISTINE D. RAGAGLIA

"In this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Sec. 1983. *McKinnon v. Patterson*, 568 F. 2d 930, 934 (2nd Cir. 1977), cert. denied, 434 U.S. 1087, 98 S. Ct. 1282, 55 L.Ed. 2d 792 (1978); see generally *AlJundi* v.

*Estate of Rockefeller*, 885 F.2d 1060, 1065-66 (2d Cir. 1989)." *Moffit* v. *Town of Brookfield*, 950 F.2d 880, 886 (2nd Cir. 1991). When monetary damages are sought, the general doctrine of respondeat superior does not suffice and a showing of some personal responsibility of the defendant is required. See *Monell* v. *Department of Social Services of the City of New York*, 436 U.S. 658, 691, 56 L.Ed. 2d 611, 98 S.Ct. 2018 (1977). See also *Wright* v. *Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *Williams* v. *Smith*, 781 F. 2d 319, 323-24 (2d Cir. 1986).

Here, Commissioner Ragaglia had no personal involvement in the removal of the minor child, the decision to file petitions or any aspect of DCF's involvement with the plaintiff or his family. At no time did she instruct her subordinates who were professionally involved with this family to discriminate against the plaintiff or enter into any arrangement or conspiracy with any person or entity to engage in discrimination. (Exhibit F)

The plaintiff also appears to allege that the training of DCF employees is deficient in some fashion. (Plaintiff's Complaint, p. 39) DCF employees must undergo mandatory training both before they begin their duties and then on a yearly basis. Although the Commissioner does not personally conduct the training, the DCF Training Academy provides a comprehensive curriculum aimed at achieving the highest professional standards in social work. All courses offered are required to support the development of cultural competence in trainees which includes the understanding of issues relating to disabilities described under the Americans With Disabilities Act. (Exhibit F) The plaintiff's allegations in relation to the issue of training are insufficient to support a finding of personal responsibility of the Commissioner or causal connection between the nature of the training provided and the conduct of the defendants in this case. See, *Estate of Smith v. Town of West Hartford,* 186 F. Supp. 2d 146, 156 (D. Conn. 2002); *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983).

B.  **INVESTIGATIVE SOCIAL WORKER SANDRA LIQUINDOLI AND CASE AIDE ROGER LIMA**

There is no constitutional right to be free of a child welfare investigation. *Brown* v. *Town of East Haddam*, 2000 U.S. LEXIS 8802 (2nd Cir. 2000). Indeed, DCF has a public duty to investigate reports of child abuse or neglect. See Conn. Gen. Stat. Sec. 17a-101 (a). Based upon a report from Danbury Hospital, Sandra Liquindoli was assigned to investigate possible neglect of Donna Ward. Sandra Liquindoli visited the plaintiff's home on October 10, 1999. The plaintiff refused to cooperate and then allowed a brief examination of the child in the hallway of the apartment complex by a visiting nurse. It was determined that on that date the child did not require immediate medical attention or intervention. (Exhibit A). Sandra Liquindoli is entitled to qualified immunity because she was acting within the scope of her duties as a DCF investigator and she acted in good faith in proceeding with the investigation, as there is no clearly established right to be free from a child welfare investigation. *Brown, supra; Wilkinson v. Russell, et. Al*, 182 F. 3d 89, 97 (2d Cir. 1999).

Sandra Liquindoli is also entitled to qualified immunity because after her investigation she took no further action and had no further involvement in the case. She had no personal involvement in the later actions of the Department, including the removal of the child and the filing of any legal petitions or motions. (Exhibit A) Accordingly, she is entitled to qualified immunity. *McKinnon, supra.*

Mr. Lima had de minimus involvement with the plaintiff and his family. (Exhibit D) At the direction of his supervisor, he accompanied Robert Murphy on a visit to the home on October 18, 1999 and observed one visit between the parents and Donna after she was in DCF custody. He did not play any decision making role in the events as they unfolded. He did not physically remove the child. He did not conduct an interview of the plaintiff. He did not participate in a conspiracy against the plaintiff or