# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOHN WARD

    plaintiff

VS

ROBERT MURPHY, ET AL

    defendants

CIVIL ACTION #:
3:01CV1908(AVC)

NOVEMBER 10, 2003

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' DANBURY POLICE DEPARTMENT, ROBERT PAQUETTE-CHIEF OF POLICE, SARGENT SHAUN MCCOLGAN, OFFICER ROBERT MADORE, CAPTAIN JAMES MCNAMARA, SARGENT PETER GANTERT, AND THE CITY OF DANBURY MOTION TO DISMISS

The undersigned defendants hereby move to dismiss the plaintiff's amended complaint pursuant to Federal FRCP 12(b)(6), as the claims made against the undersigned defendants fail to state a claim upon which relief can be granted.

In the most recent complaint, in Count 1b, the plaintiff alleges that Officer Madore of the Danbury Police Department interfered with a contractual relationship. Count 1c alleges false imprisonment and unlawful arrest by Officer Madore. Count 9a alleges that Officer McColgan committed an unlawful entry, search and false imprisonment. Counts 9b and 9c allege denial of due process and intentional infliction of emotional distress by Officer McColgan. Counts 10a, 10b, and 10c allege unlawful entry and false imprisonment by

Officer Gantert, denial of due process by Officer Gantert, and intentional infliction of emotional stress by Officer Gantert.  Counts 11a, 11b, and 11c allege unlawful entry, search, and false imprisonment, denial of due process, and intentional infliction of emotional distress by Officer McNamara.  Count 12 alleges that Chief Paquette denied the plaintiff due process.  Count 13 alleges that the City of Danbury entered into an agreement with DCF to discriminate against the plaintiff because of a disability.  It appears that those are all the claims brought as against the City of Danbury, it's Police Department, and it's employees.  The defendants reserve the right to file additional motions to dismiss if it is argued by the plaintiff that there are additional counts sounding as against those entities and/or individuals.

## I. COUNTS 1C, 10A, AND 11A, SOUNDING IN FALSE ARREST AND FALSE IMPRISONMENT MUST BE STRICKEN

The plaintiff claims in Counts 1c, 10a, and 11a that actions taken by officers of the City of Danbury constitute the basis for a cause of action for false arrest and false imprisonment.  The plaintiff, however, has failed to allege a cause of action for false imprisonment.  In addition, the facts of this incident do not constitute false imprisonment and/or false arrest.

False imprisonment has been defined as the ". . . unlawful restraint by one person of the physical liberty of another. . .", <u>Rivera v. Double A Transportation, Inc.</u>, 248 Conn. 21, 32 (1999) citing <u>Felix v. Hall/Brooke Sanitarium</u>, 140 Conn. 496, 499 (1953). A person is not liable for false imprisonment unless his act was done for the purpose of confinement or with knowledge that such confinement will, to a substantial certainty, result from it. <u>Rivera</u>, <u>supra</u>, at 32. A required element of the tort of false arrest is that the arrest of the plaintiff was unlawful. The plaintiff has the burden of proof on this issue. <u>Beinhorn v. Saraceno</u>, 23 Conn. 487 (1990).

The applicable law for false arrest and false imprisonment are identical. <u>Outlaw v. City of Meriden</u>, 33 Conn. App. 387 (1996). In order to prevail, a plaintiff must allege and prove that his physical liberty was unlawfully restrained by the defendants. <u>Id</u> at 392. In the instant action, the plaintiff was not arrested and accordingly, there cannot be a claim for false arrest. (See police report attached hereto and marked as Exhibit A). In fact, the plaintiff claims the threat of force was used to force him out of his home and that constituted the false and arrest and false imprisonment. Clearly, this is the opposite of false arrest and false imprisonment. The plaintiff was not confined and the motion for summary judgment should be granted with regards to Counts 1c, 10a, and 11a.

3

## II. COUNTS 9C, 10C, AND 11C, SHOULD FAIL BECAUSE THE PLAINTIFF FAILED TO ALLEGE THE APPROPRIATE ELEMENTS OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In Counts 9c, 10c, and 11c, the plaintiff alleges that Officers McColgan, Gantert, and McNamara intentionally inflicted emotional distress by torturing the plaintiff into compliance with their desire that the plaintiff participate in a DCF investigation.

In order for a plaintiff to prevail in a case for liability under intentional infliction of emotional distress, four elements must be established. It must be shown that: ". . . (1) that the actor intended to inflict emotional distress when he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. Petyan v. Ellis, 200 Conn. 243, 253 (1986). Whether a defendant's conduct is sufficient to satisfy the requirements that it be extreme and outrageous is initially a question for the court to determine. Bell v. Board of Education, 55 Conn. App. 400, 410 (1999). Only where reasonable minds disagree does it become an issue for a jury. Id. Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by

4

decent society.  Patyn v. Ellis, supra, 200 Conn. 254 N.5.  Liability has been found only when the conduct has been so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.  Appleton v. Board of Education of Town of Stonington, 254 Conn. 205 (2000).  Generally, intentional infliction of mental distress occurs when the recitation of the facts to an average member of the community would arouse resentment against the actor and lead him to exclaim "outrageous".  Id. at 211.

In the instant action, the plaintiff has not pleaded elements of intentional infliction of emotional distress.  In addition, it is the court that first determines whether or not the defendant's conduct was outrageous and extreme.  Clearly in the instant action the conduct of the police officers was not outrageous and extreme.  Accordingly, the claims sounding in intentional infliction of emotional distress must be stricken.

### III.    COUNT 1B SOUNDING IN INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP AS AGAINST OFFICER MADORE MUST ALSO BE STRICKEN.

A claim for tortious interference with a contractual relationship requires the plaintiff to establish:

1. the existence of a contractual or beneficial relationship;

2.  the defendant's knowledge of that relationship;

3.  the defendant's intent to interfere with that relationship;

4.  the interference was tortious;

5.  a loss suffered by the plaintiff that was caused by the defendant's tortious conduct.  Collum v. Chapin, 40 Conn. App. 449, 452 (1996).  It is an essential element of the tort of unlawful interference with a contractual relationship that the plaintiff suffers actual loss.  See Taylor v. Suger Hollow Park, Inc., 1 Conn. App. 38, 39 (1983).  Therefore, in order to survive a motion for summary judgment, the plaintiff must allege an actual loss resulting from the improper interference with her contract.  Herman v. Endriss, 187 Conn. 374, 377 (1982).  The tort is not complete unless there has been actual damage suffered.  Goldman v. Fineberg, 130 Conn. 671, 675 (1944).

In reading Count 1b of the complaint, it is quite clear that the plaintiff has not alleged the five requirements necessary for interference with a contractual relationship.  In addition, the plaintiff has not alleged any "actual loss" and accordingly, Count 1b should be stricken.

**IV.   COUNTS 9B, 10B, 11B, AND 12 ALLEGING VIOLATIONS OF DUE PROCESS BY MEMBERS OF THE DANBURY POLICE DEPARTMENT SHOULD BE STRICKEN**

To state a valid due process claim, a plaintiff must establish

1.  the conduct complained of was committed by a person acting under color of state law; and

2.  that his conduct deprived the person of rights, privileges and immunities secured by the Constitution or laws of the United States.  Parrott v. Taylor, 451 US 527, 535 (1981).  Despite the important role of substantive due process in securing our fundamental liberties, that guaranty does not entail a body of constitutional law imposing liability whenever someone cloaked with the state authority causes harm.  County of Sacramento v. Lewis, 523 US 848 (1998).  Substantive due process has been held to protect against only the most arbitrary and conscious shocking government intrusions into the personal

realm that our nation built.  Due process attempts to balance the respect for liberty of the individual as struck between that liberty and the demands of organized society.  Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 US 883, 850 (1992).  In order to violate due process, the governmental conduct at issue must shock the conscious, County of Sacramento v. Lewis, supra, 523 US 846 and egregiously transcend the decencies of civilized conduct.  Rochin v. California, 342 US 165 (1952).

In applying the allegations of the above referenced counts to the instant action, it is quite clear that the allegations do not shock the conscious and egregiously transcend the decencies of civilized conduct.

Accordingly, it is requestfully requested that the above referenced counts be stricken.

## V.  COUNT 13 SHOULD FAIL BECAUSE THE PLAINTIFF HAS FAILED TO ALLEGE A SUFFICIENT CLAIM FOR A VIOLATION OF HIS EQUAL PROTECTION RIGHTS

Count 13 of the complaint drafted against the City of Danbury alleges that the City of Danbury intentionally failed to bring it's policies into compliance with the ADA requirements that they not enter into arrangements with other public agencies which

discriminate against the disabled and intentionally fail to perform a self-evaluation of it's policies. Laws do not violate equal protection clause if they are rationally related to a legitimate governmental interest. Bernal v. Fainter, 467 U.S. 216, 220 (1984). The purpose of the Eagle Protection Clause is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination. Sioux City Bridge Company v. Dakota County, 260 U.S. 441 (1923). In order to prevail on an equal protection claim, the plaintiff must allege and prove a discriminatory intent. Greenwich Citizen's Committee v. Counties of Warren and Washington Industries Developmental Agency, 77 F.3rd. 25, 30 (1996 2DCir 1996). In the instant action, there is no allegation or proof of a discriminatory intent.

## VI. CONCLUSION

In conclusion, it is respectfully requested that all the counts against the City of Danbury, the Police Department, and it's officers be dismissed.

RESPECTFULLY SUBMITTED

DEFENDANTS
DANBURY POLICE DEPARTMENT
ROBERT PAQUETTE-CHIEF OF POLICE
SARGENT SHAUN MCCOLGAN
OFFICER ROBERT MADORE
CAPTAIN JAMES MCNAMARA
SARGENT PETER GANTERT
CITY OF DANBURY

_____
MICHAEL F. O'CONNOR, ESQUIRE
FEDERAL BAR NO CT 08694
WILLIAMS, WALSH & O'CONNOR, LLC
110 WASHINGTON AVE 2ND FLR
NORTH HAVEN CT 06473
TEL 203 234 6333
FAX 203 234 6330

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing MOTION FOR SUMMARY JUDGMENT

was mailed, first class, postage prepaid, to the following counsel of record, this 12th day of

November, 2003, to :

JOHN WARD, PRO SE
18 GARAMELLA BLVD
DANBURY CT 06810
TEL 203 790 4920

10

MICHAEL F MCKENNA
CAROLYN SIGNORELLI
ATTORNEY GENERAL'S OFC
55 ELM ST
HARTFORD CT 06106
TEL 860 5160
FAX 860 808 5384

JOHN ESSEX TUCKER
ASST ATTY GENERAL
MACKENZIE HALL
110 SHERMAN ST
HARTFORD CT 06105
TEL 860 808 5480

HEIDI M CILANO
GARIE J MULCAHEY
BAI POLLOCK BLUEWEISS
& MULCAHEY PC
PARK CITY PLAZA
10 MIDDLE ST STE 820
POB 1978
BRIDGEPORT CT 06604
TEL 203 366 7991
FAX 203 366 4723

STEPHEN P FOGERTY
ROBERT AVERY RHODES
HALLORAN & SAGE LLP
315 POST RD WEST
WESTPORT CT 06880
TEL 203 227 2855
FAX 203 227 6992

MICHAEL F. O'CONNOR

# EXHIBIT A

# DANBURY POLICE DEPARTMENT
## Incident Report

| INCIDENT NO | INCIDENT DATE | TIME | NKID CODE | TYPE OF INCIDENT | | | | Report Type | |
|---|---|---|---|---|---|---|---|---|---|
| 99-25875 | 10/10/99-Sun | 14:25 | | Assist Other Agency | | | | Macdore | |

| DATE OF REPORT | LOCATION OF INCIDENT | ST NO | | STREET NAME | | INVESTIGATING OFFICER | | BADGE |
|---|---|---|---|---|---|---|---|---|
| 10/11/99 | Pg# 1 | 1 | | Radaniram Rd. | | P.O. Robert | | 537 |

STATUS CODE  C - Complainant  A-Arrestee  I-Interviewed  J-Juvenile  M-Missing  S-Suspect  V-Victim  W-Witness  O-Other

| STATUS | LAST NAME | FIRST (MI) | SEX | RACE | DOB | STREET | CITY | ST | REG# | APT NO/LOCATION | ST |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C | Liquindoli | Sandra | F | W | 07/09/67 | 215 Long Lane. | Plainville | CT | | 200 | |
| O | Lourenco | Virginia | F | W | 02/25/48 | 4 Liberty St | Danbury | CT | | | |
| O | Ward | John | M | W | 10/3/99 = baby old (baby) | 7 Radaniram Rd #200 | Danbury | CT | | | |
| | | | | | 10/3/99 = Dawn Ward | | | | | | |

| STATUS | LAST NAME | FIRST (MI) | STATUTE-1 | OFFENSE-1 | STATUTE-2 | OFFENSE-2 | STATUTE-3 | OFFENSE-3 |
|---|---|---|---|---|---|---|---|---|
| O | Liquindoli | Sandra | | | | | | |
| O | Lourenco | Virginia | | | | | | |
| O | Ward | John | | | | | | |
| | | | | | | | | |

**DETAILS**

On the above date and time, I was dispatched to Danbury Police Headquarters to meet with The Department of Children and Family Services. Upon arrival I met the complainant, who stated we had to go Brookside Condos Unit #200 to check on the well being of a 4 day old baby. Prior to going to that location we had to meet with Virginia Lourenco who is a Registered Nurse working with the Visiting Nurses Association at North St. Shopping Center. After meeting Mrs. Lourenco we proceeded to Brookside Condos Unit #200. According To Mrs. Liquindoli who works for DCF Mr. Ward and his Girlfriend had a baby four days ago and when they were discharged from the hospital the baby had Jaundice and some fluid in the lungs. Mrs. Lourenco was scheduled to visit the baby on Sunday morning and when she arrived at Mr. Wards residence, he would not allow her to come in and check the baby. Mrs. Lourenco then notified the baby's doctor, a Etan Kilchevsky who then notified DCF. The doctor stated the baby needed to be examined to determine if the baby would need more medical treatment or medication. This officer went to the door of #200 and asked, a male voice from inside asked who was there and I replied "Danbury Police". The male then walked away from the door and would not answer this officer when I would call for him. Through the door I explained to Mr. Ward that we needed to check on the well being of his child and it would only take a couple of minutes, then we would be on our way. Mr. Ward Stated he did not want anyone in his house and would not open the door. This officer then explained to Mr. Ward that if he would not open the door we would have to force entry to his house to determine if the baby was ok. Mr. Ward then stated to get a warrant

| INVESTIGATING OFFICER'S SIGNATURE | BADGE # | DISTRIBUTION (FOR USE BY SHIFT COMM ONLY) | FOLLOW-UP ACTIONS BY | |
|---|---|---|---|---|
| *[signature]* | 537 | | | |
| REVIEWED/TITLE/DATE | SHIFT COMM | | PAGE 1 OF 2 | |
| *[signature]* | | | 9:25:30 AM | |

10/11/99

# DANBURY POLICE DEPARTMENT

## Incident Report

| INCIDENT NO | INCIDENT DATE | TIME | MED CODE | TYPE OF INCIDENT | | Report Type | | Initial |
|---|---|---|---|---|---|---|---|---|
| 99-25675 | 10/10/99-Sun | 14.25 | | | | | | BADGE |
| DATE OF REPORT | LOCATION OF INCIDENT | ST NO | | Assist Other Agency | INVESTIGATING OFFICER | | | 537 |
| 10/11/99 | 7 | | | | P.O. Robert | Madore | | APT INDICATOR |
| | | | | STREET NAME | | | | 200 |
| | | | | Padanaram Rd. | | | | |

because he would not open the door for us. This officer then contacted dispatch and requested that a sergeant be sent to my location for assistance. While waiting for Sgt. Salazar's arrival I went around to the back of Mr. Ward's residence and could see him standing in the Kitchen, after getting his attention I again tried to explain to Mr. Ward that we needed to see the baby to make sure it was all right. Mr. Ward then stated he would not open the door for us unless we had a warrant. This officer then explained to Mr. Ward that he was going to end up getting arrested if he did not cooperate with us, and then Mr. Ward walked away from the rear door. When I made it back to the front of the house Mr. Ward came out the front door with the baby in his arms. Mr. Ward then stated that if we needed to examine the baby, that we could do it in the hallway, but he would not allow us to enter his home. Mrs. Lourenco stated that she would not examine the baby in the hall because it was not a good environment. After several minutes and several phone calls to doctor Kilchevsky, the baby was given a brief examination in the hall. The baby's color was normal and had clear lungs, the baby's weight was 8 pounds 1 ounce. Mr. Ward agreed to have the baby examined by Thursday October 14,1999 by the doctor of his choice. DCF will be doing a follow up on Tuesday October 12, 1999 with Mr. Ward.

| INVESTIGATING OFFICER'S SIGNATURE | BADGE # | DISTRIBUTION (FOR USE BY SHIFT COMM ONLY) | FOLLOW-UP ACTIONS BY |
|---|---|---|---|
| | 537 | | |
| REVIEWED FIELD SUPV | SHIFT COMM | | PAGE 2 OF 2 |

© 1995 Hand & Running Computer Designs

NAT1/99    9:25:30 AM

# Incident Report

| INCIDENT NO | INCIDENT DATE | ST NO | TIME | INCID CODE | TYPE OF INCIDENT | | Report Type |
|---|---|---|---|---|---|---|---|
| 99-26287 | 10/18/99-Mon | | 2020 00 | | ASSIST OTHER AGENCY - DCF | | |

| DATE OF REPORT | LOCATION OF INCIDENT |
|---|---|
| 10/29/99 | 7 PADANARAM RD/ BROOKSIDE CONDOS |

STREET NAME

| | INVESTIGATING OFFICER | | ST | BADGE |
|---|---|---|---|---|
| | D/ Sgt Shaun | McColgan | | 492 |

APT HSE/LOCATION

STATUS CODE: C- Complainant  A-Arrestee  I-Interviewed  J-Juvenile  M-Missing  S-Suspect  V-Victim  W-Witness  O-Other

| STATUS | LAST NAME | FIRST (M.I.) | SEX | RACE | DOB | PHONE | STREET | CITY | ST | REG # | ST |
|---|---|---|---|---|---|---|---|---|---|---|---|
| C | MURPHY | BOB | | | | 207-5119 | DCF- DANBURY REG. OFF. | DANBURY | CT | | |
| O | WARD | JOHN | | | | UNK | 7 PADANARAM RD.#200 | DANBURY | CT | | |
| J | WARD | DONNA | | | 10/06/99 | | 7 PADANARAM RD.#200 | DANBURY | CT | | |

| STATUTE-1 | OFFENSE-1 | STATUTE-2 | OFFENSE-2 | STATUTE-3 | OFFENSE-3 |
|---|---|---|---|---|---|

| STATUS | LAST NAME | FIRST (M.I.) |
|---|---|---|
| C | MURPHY | BOB |
| O | WARD | JOHN |
| J | WARD | DONNA |

| STATUTE-1 | OFFENSE-1 | STATUTE-2 | OFFENSE-2 | STATUTE-3 | OFFENSE-3 |
|---|---|---|---|---|---|

## DETAILS

REF. CASE # 99-25875 OF 10/10/99

Bob Murphy of DCF came to HQ and requested our assistance with checking the well-being of a Donna Ward, a two-week old baby. I was familiar with the case from the previous report Murphy said he had gone back to the residence every day since 10/11, trying to check on the health of the baby. He had been unable to make contact at any time. Murphy said either nobody answered the door or the male voice inside, that he recognized as John Ward's , stated he would not open the door to any government agent without a warrant. Knowing the information from the previous case report, and upon hearing the recent details from Murphy, it was decided to accompany him to the residence with Youth Bureau detectives and uniform officers. I consulted with Capt McNamara, the shift commander. He was on duty during the previous incident and he told me that Sgt. Salazar had voiced concern about Mr. Ward and his actions. We all arrived together at unit 200 at 2121hrs. Murphy knocked at the door and a male voice answered. He asked if we had a arrant and Murphy said no. The voice said it would not answer the door without a warrant. At that time I informed him who I was and that DCF was going to invoke a 96 hour hold on the baby if he didn't open the door. I also told him we would use force if necessary to get into the apartment to check on the baby. There was no reply, only the sound of very loud music that was turned up as I tried to talk through the door. At this time the field supervisor, Sgt Gantert, requested the fire department to respond with a door spreader. Officers remained at the front and back doors waiting. Voices could be heard from inside from time to time. I heard a voice that I later identified as John Ward's, saying he knew we were waiting outside and he didn't care if waited all night because he would not open the door

| INVESTIGATING OFFICER'S SIGNATURE | BADGE # | DISTRIBUTION (FOR USE BY SHIFT COMMANDER) | FOLLOW-UP ACTIONS BY |
|---|---|---|---|
| [signature] | 492 | | |

| REVIEWED/FILED SUPV | SHIFT COMM | | PAGE 1 of 2 |
|---|---|---|---|

SEMS: Hard 1 Routine Computer Bergos   12/4/85   9:58:44 PM

# Incident Report

| INCIDENT NO | INCIDENT DATE | TIME | UCR2 CODE | TYPE OF INCIDENT | | | Report Type | Initial |
|---|---|---|---|---|---|---|---|---|
| 99-26287 | 10/18/99-Mon | 2020:00 | | ASSIST OTHER AGENCY- DCF | | | | BADGE 492 |
| DATE OF REPORT 10/29/99 | LOCATION OF INCIDENT | ST IND | | STREET NAME 7 PADANARAM RD/ BROOKSIDE CONDOS | INVESTIGATING OFFICER Dt/Sgt Shaun | McColgan | APT #/LOCATION |  |

without a warrant. When the fire department showed up I again went to the front door and announced that we were about to force open the door. Ward asked again if we had a warrant and I said yes. He then said hold on, then opened the door. He was holding a video camera and taping us. He was given a copy of the 96 hour hold. The baby was inside with a woman I can only identify as Angela. Another woman was on the couch and Ward referred to her as mother. Ward taped everything anyone said. I explained as nicely as possible the circumstances for us being there. He was requested to bring the baby to the emergency room for a check-up and answer some questions from DCF. If this was done the hold would not be invoked. Ward refused to answer any questions, asking that a lawyer be provided for him. I explained that we were not there to arrest him, as long as he allowed the baby to be checked out by the hospital. and refused to talk. After about ten minutes, at least, Ward took the baby from Angela, who was now begging him to talk to us, kissed the baby on the head, and laid it down on the couch next to him. The other woman tried asking him to talk to us and Ward repeatedly told her, "Mom, don't talk to them or say anything." Murphy then handed me some papers he was holding and picked up the baby. Angela kept trying to get Ward to speak to us but he refused. He said something like, "they're going to do what they're going to do and we can't stop them." "If they want to take the baby, let them." I found his demeanor to be strange as he was offering no resistance to our taking away his child yet had been so adamant about not letting us into his home. He constantly videoed everything we said and did. I made several attempts to get pedigree information on the occupants but was refused all information. Ward also refused to allow the other two females to talk to us and it was clear they did not want to disobey him.

An ambulance had been called to stand by in the area as we did not know what circumstances would arise out of this scenario. Ward was displaying what could best be described as a survivalist attitude and we feared he may have weapons. It was determined to use the ambulance to transport the baby to the hospital. All the officers present felt uneasy about Ward and had a fear for our safety from him, and the safety of the baby. A presence was maintained at the front and rear of the residence until the baby and all civilian personnel were out of the area. Then we left at 2157 hours. Nothing further, report only.

| INVESTIGATING OFFICER'S SIGNATURE | BADGE # 492 | DISTRIBUTION/ (FOR USE BY SHFT COMM ONLY) | FOLLOW-UP ACTIONS BY |
|---|---|---|---|
| REVIEW'D FIELD SUPV | SHIFT COMM | | PAGE 2 OF 2 |

12/4/88    10:04:24 PM

C 1994 Ituod & Bernsten, espeiet Bridge