FILED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT 2004 JAN 26  P 2: 38

U.S. DISTRICT COURT
HARTFORD, CT.

| | | |
|---|---|---|
| John Ward | ) | |
|     Plaintiff | ) | Civil Action No.: |
| | ) |     **3:01CV1908(AVC)** |
| V. | ) | |
| | ) | |
| Robert Murphy, et.al. | ) | |
| | ) | |
|     Defendants | ) | January 23, 2004 |


## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
## OF DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
## AND DELAY OF PROCEEDINGS UNTIL THE
## STATE JUVENILE COURT DECIDES WHETHER TO OPEN THE
## JUVENILE COURT RECORD

**I. The DCF Defendants are precluded from making the assertion that they are immune because they were acting reasonably because of estoppel from Juvenile Court decisions.**

All the research for rebutting the State's motion for summary judgment is done. However, every time I try to put it all together I have to keep referring back to what was done by and in the Juvenile Court.

There is a big problem in answering their motion in that it is essentially asking this Court to re-try the issues of whether it was reasonable for them to seize Donna and file a petition alleging neglect/abuse. These issues may have already been adjudicated in the State of Connecticut Superior Court – Juvenile Matters, a competent and specialized court in these matters. Judicial estoppel and collateral estoppel (definitionally, *res judicata* is probably a little off the mark but

**ORAL ARGUMENT REQUESTED**
**TESTIMONY REQUIRED**

what do I know, I'm not an attorney) preclude this Federal Court from re-litigating questions of state law which were already decided in Juvenile Court or described in that court. The DCF made assertions and admissions which are binding on this Court and the DCF's motion for summary judgment simply asks Your Honor to hear the same arguments and rule differently. Estoppel should preclude you from doing so. Judicial economy should be considered and the possibility that Your Honor would come to severely different conclusions of law or interpretations of State statute.

Without directly attacking their reasons for seizing Donna and filing the petition of neglect and thereby causing the Court to have to make a ruling on these issues, I point out as an offer of proof that this delay will yield estoppel arguments and that the DCF offers no objective evidence of abuse or neglect such as an unexplained injury or diagnostic test which showed Donna in medical need. Every examination where DCF was present, Donna was declared well with no sign of abuse or neglect. Their "concerns" and characterizations are merely speculative of some vague possible future abuse or neglect and speculations about the abilities of parents with mental disabilities. They sling many vague characterizations which are not individually or as a pattern objective evidence of abuse or neglect. Their characterizations are rather an attempt to create smoke with no fire and raise being a suspicious acting parent to the level of objective evidence. The fact that Murphy, Lima and Arnone had to fabricate that Donna was, at the time of her seizure under a 96-hour hold, jaundiced and losing weight provides the necessary *scienter*.

(Party seeking the benefit of collateral estoppel bears the burden of establishing the identity of the issues and that the same issue was actually and necessarily determined in a prior litigation. **Yale-New Haven Hosp., Inc. v. Thompson**, 162 F.Supp.2d 54(D.Conn. 2001)). So I have to show that there were judgments and admissions in the Juvenile Court record by petitioning the Juvenile Court to open the record.

I do not have written decisions from the Juvenile Court because Judge Eveleigh did not issue written decisions on most motions. However, the decisions and reasoning are in the record (court file and transcript). I petitioned the Juvenile Court to open the record in November 2003 to gain access to the file and transcript and we have had two hearings on the matter, the last being 1/14/2004. The judge says she has 120 days to decide if she will open the record and how much will be opened. The record would be sent directly to Your Honor. I believe that she will grant that at least some of my request and the record will be opened. I tried to negotiate with the

State to see if there was a way to stipulate to what happened in Juvenile Court to preclude having the record opened but they haven't attempted to negotiate. See: Exhibits 247 and 248.

The DCF defendants also hint at some claim to judicial estoppel in their motion for summary judgment. They claim that the Juvenile Court made decisions and are hinting that because the judge in the juvenile court granted an Order of Temporary Custody [OTC] it proves there was a reasonable belief that my daughter was in danger and justifiably seized. That is incorrect. The judge later stated when he granted in part and denied in part, my motions to strike and dismiss, that there was an inference in the papers filed by Murphy that Donna was in fact jaundiced and losing weight and I was denying her attention for those medical conditions so she needed immediate removal to provide the treatment and protection. So the judge believed she was in immediate danger and granted the OTC based upon the fabrications by DCF.

Murphy, Lima and Arnone knew that was incorrect because, as Dr Kilchevsky states in his affidavit attached to the State's motion for summary judgment and as described by notes in the DCF file which has Murphy's compilation signatures (p.4, Running Narrative, Exhibit 157), they had absolute objective proof that she was not jaundiced, was healthy, was gaining weight excellently (if one uses the weights in the DCF file of 5-8% weight loss while in Hospital and two days later she weighed 8lbs, 2ozs, Donna gained a pound of weight from the time of discharge) was not jaundiced, was being cared for by an overprotective, affectionate parent (as described by DCF investigator Liquindoli, Exhibits 156 and 157), and had a neat home with visible baby supplies (Officer Madore's observations as described by Liquindoli). See: DCF running dialogue Exhibits 156-7. Murphy, Lima and Arnone had to fabricate that Donna was currently jaundiced and losing weight because they already knew that the police would not help them enter my home for a non-emergency such as their telling the DPD that they were seizing Donna because I refused to answer questions without an attorney present. See: running dialogue

The petition for neglect/abuse, supporting affidavits, memoranda, and motions which were used to adjudicate these matters are Exhibits: 27, 41, 42-48, 63, 64, 67, 68-75, and 82-90. Unless I specify otherwise, when I refer to an exhibit, I am referencing plaintiff's exhibits which were filed under seal with the Clerk at Hartford Federal District Court.

In any case, the State is trying to hint that there was a judgment by the specialized competent Juvenile Court that there was reasonable cause to seize Donna and file a petition of neglect. Just the opposite is true.

Judge Eveleigh was asked by me to strike and dismiss the petition and remove the OTC. The original OTC was granted without hearing and only on the basis of the petition and supporting affidavit and 96-hour hold paper. When I asked to have the OTC removed and Donna returned at the hearing held on 11/03/99 – Judge Eveleigh granted my motion because he found there was indication that Donna was in any danger being in my care – that's one fact/ruling on State statute for estoppel.

Judge Eveleigh later granted the motions to strike and dismiss in part and denied them in part. He ruled that all the "concerns" and characterizations which they currently claim in their motion for summary judgment were a reasonable basis for seizing Donna and filing a petition alleging neglect/abuse are not legally sufficient for such petition. The Juvenile Court ruled that the only thing in the petition and supporting affidavits which could be a cause of action was the inference by the DCF that Donna was in fact jaundiced and losing weight and I denied treatment for those conditions on 10/10/99. So the Juvenile Court made a judgment which ruled, as a matter of law, that what the DCF now claims was a reasonable belief to remove Donna and file the petition was not a sufficient cause of action but only the falsified allegation that Donna was jaundiced and losing weight and I was denying her treatment was a cause of action. He also ruled that the mere allegation that parents have mental health issues was not a basis for a petition alleging neglect or abuse – that's more fact/ruling on the State statutes and due process for estoppel.

I also motioned to have the Orders which were given during the pendency of the petition proceedings modified to remove the State's ability to have access to our mental health records and therapists. The court granted this motion because there was no showing that our mental health in any way caused or would cause Donna to be in danger of neglect – that's another fact/judicial ruling on the State statutes for estoppel purposes.

What these decisions by the Juvenile Court show are that there was no compelling need to seize Donna nor was there a reasonable basis to file the petition alleging neglect. (Language of child welfare statute (this section) authorizing summary assumption of temporary custody only when there is probable cause to believe that "the child is suffering from serious physical illness or serious physical injury or is in immediate physical danger from his surroundings, and that immediate removal from such surroundings is necessary to insure the child's safety" * * * limits scope of intervention in family matters by state to cases in which state interest is

4

compelling. **In re Juvenile Appeal** (83-CD) (1983) 455 A.2d 1313, 189 Conn. 276.)) If the Juvenile Court couldn't find all the DCF's allegations of discourtesy by me as sufficient to state a claim of abuse or neglect, then, as a matter of law, there wasn't a reasonable suspicion that Donna was in immediate danger and needed to be removed.

The only tool a parent or parent-to-be has to guard against abuse by the Hospital and agents of the DCF is speech and the right to use an attorney to speak for him. Violence and threats are not lawful. They punished us for speech – objecting to treatment/evaluation of ourselves, failing to speak when they requested it, and having an opinion that was at odds with their own. Their allegations of neglect or abuse amount to this – failure to agree with their political opinion of how *they* (the medical personnel and DCF) should be treated, respected and believed by parents. Their allegations at most amount to nothing more than, perhaps an emotional instability which in no way actually abused or neglected Donna. The court in **Suprenant v Commisssioner of Welfare**, 21 Conn.Supp. 154, 148 A.2d 669 (1958) dealt with people with some emotional instability and immaturity in the Juvenile Court and stated that these were not valid reasons to sustain a petition alleging neglect. To paraphrase **Suprenant** at 155 – The statute [**CGSA 17a-101g. Classification and evaluation of reports. Investigation. Referral to local law enforcement authority. Home visit. Removal of child in imminent risk of harm.**] defines with meticulous care the terms 'uncared-for child' and 'neglected child.' With those definitions in mind, the entire petition (excluding the inference that Donna was in fact in need of medical care and I denied it to her) and the allegations as stated in the current State's motion to dismiss and the testimony offered at the hearing in Juvenile court do not constitute enough evidence that a finding in the way of an ultimate fact that Donna was either 'uncared-for' or 'neglected' is not warranted and cannot be justified. Even if, *arguendo*, I was unreasonably stubborn and uncooperative with the DCF, and even if perhaps my actions reflected a kind of emotional instability or paranoia that can be found in many stable persons and politicians [See: Exhibit 5, attached letter from Congressman Henry Hyde], and even if my interpretations of the law and what the DCF could do were legally incorrect, the fact remains that the child never acquired the status of an uncared-for or neglected child within the meaning of the statutory definitions of those terms.

Murphy, Lima, and Arnone knew that Donna didn't meet the definition of uncared for or neglected so they fabricated a medical emergency and later tried to cover it up by flinging a lot

of characterizations of our mental health and stability with no objective facts or evidence of any activity which is not allowed to any non-disabled person or parent. Murphy put all these unsubstantial characterizations in the petition in order to, essentially, alarm the Juvenile Court into believing that there was some actual abuse or neglect going on. It worked. But it isn't the *process that is due* in such important matters of family life or in any way cause to break up my family the way they did.

There would also be no official immunity for Lima, Murphy and Arnone. (State child care workers did not have absolute immunity from liability in § 1983 action in connection with their emergency removal of child from parents for 96 hours under Connecticut statute authorizing removal without court order when there exists probable cause to believe child is in immediate physical danger from his surroundings; officials' function was not so intimately associated with adjudicative process as to be similarly immunized. **Doe v. Connecticut Dept. of Children and Youth Services**, 712 F.Supp. 277, affirmed 911 F.2d 868 (D.Conn.1989)).

The U.S.C.A. Const.Amend. 11 did not bar damages action against supervisor with Protective Services Division of Connecticut Department of Children and Youth Services where it was alleged that the supervisor, who was sued both in his personal and official capacities, acted to deprive parents of their right to a hearing prior to having custody of minor child taken from them and that supervisor acted arbitrarily and wantonly. **Langton v. Maloney**, 527 F.Supp. 538 (D.C.Conn.1981)

### a. DCF Commissioner Ragaglia.

Some history. Anyone living from 1960 until 1999 would have seen the sea change in the way the State deals with child abuse and neglect cases. Cases such as little Lisa Steinberg, who was beaten to death by her adoptive father, was the tragic end of a long history of reports of abuse with no action taken. See, generally: **Investigating Child Abuse: The Fourth Amendment and Investigatory Home Visits**, 89 Colum.L.Rev. 1034(1989). Cases such as this and others have caused the Federal government to create and enforce mandated reporting laws through the use of withholding funds for states which do not have a *multidisciplinary approach* to reports of abuse or neglect. See: **Exhibit 202 -- 42 USCA SEC 13001 thru 13041**[1]. The

---

[1] **42 USCA SEC 13001 6 and 7** "The Congress finds that *** multidisciplinary child abuse investigation and prosecution programs have been developed that increase the reporting of child abuse cases, reduce the trauma to the child victim, and increase the successful prosecution of child abuse offenders; *** and such programs have

Congress decided to deputize all DCF investigators as criminal law enforcement investigators and to require that information gathered from civil child protection investigations be turned over to the criminal investigators to use in a *multidisciplinary approach* to prosecuting child abuse and neglect. Connecticut's legislature was free to not accept the federal funding and not create and enforce these types of laws. The legislature agreed with the federal government and deputized the DCF and others into criminal law enforcement agents. See: **CGSA 17a-101a, 101b, 106, and 106a (see: exhibit 195)**. Under these Federal and State statutes, all reports of abuse and virtually all reports of neglect are required to be cross-investigated by the DCF and the police. Whenever a parent talks to a DCF investigator, he is talking to the prosecutor's office!!! And it is only getting more adversarial between parents and those who are supposedly trying to help children. See: Exhibit 225 – Morrissey, Siobhan, October 17, 2003. BLAMING MOM. Women Convicted for Bullied Son's Suicide, Stillborn Child. *ABA JOURNAL eREport*

Anyway, DCF Commissioner Ragaglia enforced and supported the policies which caused Murphy, Lima, and Arnone to overreact and falsify allegations of immediate danger to Donna and to file the petition. Murphy wasn't required to fabricate an immediate danger to Donna but he was acting the way the DCF pressures its investigators to act. Ragaglia knew that the DCF was using a heavy hand and failed to stop it. I have an article around here somewhere which quotes her as wanting to ease this heavy-handed treatment. So she knew the kinds of illegal tactics DCF investigators were using yet failed to stop it. No-one is ever disciplined for abusing a parent under the guise of protecting a child yet, as AAG Signorelli informs me, DCF investigators are fired for the appearance of under-reaction to reports of abuse when a child dies or is injured. She also informs me the DCF exacts a heavy emotional toll on caseworkers who don't remove children.

It is, therefore, Ragaglia's failure to enact reasonable policies and punishing caseworkers acting reasonably which caused Murphy, Lima, and Arnone to feel they could get away with what they did.


**II. The Hospital Defendants may be precluded from making the assertion that they are immune because they were acting reasonably under mandated reporter requirements because of estoppel from Juvenile Court decisions.**

---

proven effective, and with targeted Federal assistance, could be duplicated in many jurisdictions throughout the country." – **Id. (emphasis added)**

Even though the Hospital defendants were not a party to the Juvenile Court proceedings, they may also be held to some estoppel as to being able to argue that they had a good faith intent when they made their referrals and reports to the DCF Hotline.

The Hospital defendants do not have good faith immunity based on **CGSA Sec. 17a-101e.**[2] "Good faith" meaning that the report was made not in retaliation for my complaining about abuse or because I didn't want to be their patient or because they failed to tell us parents that there was anything wrong with Donna and Kilchevsky was attempting to cover up his mistake of not telling us that there was something abnormal about Donna's condition and his fear that there was something wrong with Donna and he entrusted defective parents to take care of a fragile child. And "good faith" meaning that they weren't also attempting to circumvent federal antidiscrimination laws such as the Americans with Disabilities Act. (Supremacy clause prevented Pennsylvania Child Protective Services Law (PCPSL) from immunizing defendants from liability resulting from a violation of federal law. U.S.C.A. Const. Art. 6, cl. 2; 23 Pa.C.S.A. § 6318. **Caswell v BJ's Wholesale Co**, 5 F.Supp.2d 312(ED Pa, 1998)).

The Hospital defendants claim that I need an expert witness to show that Donna was not jaundiced or losing weight appropriately. That is simply not necessary because Donna was not jaundiced and losing weight inappropriately according to all the Hospital employees and a jury will determine that those conditions were fabrications.

There is a huge lynchpin fact which has so far not been disputed by Kilchevsky in the exhibits or in answer to this complaint. When you know this fact it explains a lot of what went on before and after Donna's discharge and the way many of the parties acted. One would assume that if Donna was in any kind of medically fragile state Kilchevsky would have told the parents. It would be assumed that parents would want their child follow-up examined if they knew their child had any conditions and a refusal to have the child examined would seem odd.

The lynchpin fact: **Dr Kilchevsky never told us parents that Donna was anything other than well!!!**

_____

[2] CGSA Sec. 17a-101e. **Employers prohibited from discrimination against witness in child abuse proceeding.** " ... (b) Any person, institution or agency which, in good faith, makes the report pursuant to sections 17a-101a to 17a-101d, inclusive, and section 17a-103 shall be immune from any liability, civil or criminal, which might otherwise be incurred or imposed and shall have the same immunity with respect to any judicial proceeding which results from such report provided such person did not perpetrate or cause such abuse or neglect. (c) Any person who knowingly makes a false report of child abuse or neglect pursuant to sections 17a-101a to 17a-101d, inclusive, and section 17a-103, shall be fined not more than two thousand dollars or imprisoned not more than one year or both.

Dr Kilchevsky only saw us for about ten minutes on 10/8/99 just prior to discharge. He said I should or could bring Donna to the Hospital's Pediatrics clinic, no appointment necessary, for "a quick look" on Tuesday or Wednesday, 10/12 or 10/13 just to see how she was doing. He said, "It's just something I like to do." He did not indicate that there was anything medically necessary about the "quick look." A full exam was scheduled for 10/14 at 9:00am at the same clinic. Breastfed babies are seen at one week and bottle fed babies are seen at two weeks as a routine but not as a necessity.

Kilchevsky left the room and consulted with Mills who informed him that an OB/GYN wanted home services for me to evaluate my home and me for parental fitness (see: exhibit CD-3). Kilchevsky withheld this vital information from me and came back into the room and told me, "I'll save you some time and send a nurse to do the checkup at your home on Sunday." As best as I can recall his statement. I agreed because, if you know anything about the Hospital's clinics it's that to come in for any unscheduled reason can turn into a multi-hour wait – especially with a crying baby and feeding and diapers, etc. I had used the VNA a year before after an operation I had. I liked the VNA.

Either Donna wasn't jaundiced or she was so mildly jaundiced that there was no possibility that she would develop jaundice. Her weight loss while breastfeeding was so normal and not within danger levels that when I mentioned it to the nurse the morning of discharge, she claimed that it was an excellent small amount of weight loss and that nothing would have to be done about it unless Donna lost about 11-15 ounces (for a baby born her weight). Donna was not on a trajectory to losing that much weight.

When Kilchevsky examined Donna at discharge I commented to him about what the nurse had said about the 3 ounce weight loss eight hours before. I said I was pleased at how little weight Donna had lost and how well she seemed to be breastfeeding. He expressed no disagreement or shock at my statements. If Kilchevsky had anything negative to say about her condition that was his opportunity to speak up. We were together, I was discussing Donna's condition, that's what we were there for.

Exhibit 1-1 is a State form filled out by Kilchevsky and he indicates that he did not tell the parents that there was any jaundice or weight loss. He also states that she had a 3 ounce (2.5%) weight loss in Hospital – not 5-8% or one pound as Murphy claims in Exhibit 65. He also doesn't indicate any weight loss or jaundice problems to us on Exhibit 3 – the discharge

instructions to the parents.    Kilchevsky's statement in his affidavit that Donna lost 5-8% of weight while in the Hospital is not supported by his own writing in Exhibit 1-1 where he says she lost 3ozs.  His statement is more like a carnival side-show guesser's weight estimate rather than a scientist/neonatologist.  Moreover, if he was concerned about weight loss he would have re-weighed her, warned us parents, or given the standard advice if the weight loss became severe – supplement with formula.  He did none of those.

Looking at Exhibits 1-1 and 3 are very telling about the motives of Kilchevsky.  Exhibit 1-1 is countersigned by a nurse – i.e. he can't lie to us parents that Donna was jaundiced or losing weight inappropriately because he would have to point out and explain how she was jaundiced looking and losing weight and normal parents would be skeptical of such an assertion about an obviously non-jaundiced child.  He also couldn't lie on that form because he would be asking the countersigning pediatric nurse to agree with an obviously wrong medical opinion. And we know that the countersigning nurse believed that Donna was a "well newborn" because that's her signature and statement on Exhibit 1-8 second notation from the bottom stating that Donna was a "well newborn."  Exhibit 1-1 is never seen by the parents because it is an inter-agency referral form – so he can lie on that one because no-one countersigns it.  He has to give a medical necessity reason for the State to pay for the VNA visit.  He can't just say we don't like his opinions about us so we want to perform a parental fitness evaluation.

The nurse who evaluated Donna that morning found that jaundice and weight loss were not risk factors in her case.  See: 1-9 and 1-10.  All the other doctors, including Kilchevsky, and nurses found Donna well.  See:  1-17 where five different nurses found Donna well with no jaundice over the two days she was in the Hospital up to and including two hours before Kilchevsky discharged her.   They also noted good mother-daughter bonding and good breastfeeding.  There was no indication that Donna would all of a sudden stop eating or that we would take the baby home and ignore it.  Exhibit 1-5 states that Donna was a "well newborn" according to Dr James, Kilchevsky's neonatology partner.  Kilchevsky himself describes Donna as "normal" on the same exhibit.  He states, in order to make the record reflect his need for the false nurse visit, "mildly icteric [yellow]".

In order for a statement of opinion to amount to a fraudulent representation, the jury must find that the opinion was made with the intention, design and purpose of deceiving and that defendants did not believe the opinion so expressed; and in the case of such a statement of

opinion, the law considers the state of mind of defendants to constitute an existing fact. **Karp v. Cooley**, 349 F.Supp. 827 (S.D.Tex. 1972).

Donna was not jaundiced when she was discharged from the Hospital. Whatever condition Kilchevsky claims she has was not enough to even mention to the parents. The ONLY one who noted in the record that Donna was jaundiced was Dr Kilchevsky. Of the 10 or so nurses who examined Donna over the two days she was in the Hospital, none said she had jaundice despite being asked if she looked well by me or Patricia. Parents are given information about jaundice (Exhibit 79-1 and another one I can't find right now) at the Women's Health Clinic of the Hosptial [WHC] and in books and at BABY Care Basics classes given at the Hospital and which Mills knew we attended. Parents are told to examine their child for jaundice and report it to the doctor if it occurs. That's because any large amount of jaundice is easy to spot on a white child – no expert necessary. I have seen jaundiced adults and you don't need to be a physician to see that a person is not jaundiced or seriously jaundiced. Mills stated in her referral call to the DCF on 10/7/99 when Donna was one day old, that Donna was well and we were acting appropriately as parents. See: Exhibit CD-3. She also states that there was going to be a nurse visit ordered by an OB/GYN, not a pediatrician. So it was decided before Kilchevsky even saw Donna that they were going to perform a home parental fitness evaluation via the nurse even though she had no jaundice or diagnosed weight loss as of that time. Another significant fact is that if a child becomes jaundiced it is in the first two or three days of life and it takes a week or two for it to go away. See: Exhibit 12. It would be impossible for Donna to become jaundiced after two days and then after two more days have no more jaundice. The jaundice builds quickly and dissipates slowly. A jury will decide that Donna was not jaundiced at discharge.

It isn't just my and Patricia's testimony that neither Kilchevsky or anyone else at the Hospital told us that Donna was jaundiced and losing weight inappropriately – it's Murphy's testimony. On page 4 of Exhibit 157 Murphy states that Patricia didn't understand that the DCF was there on the weekend for jaundice and weight loss. That's because when I told her that the Hospital had claimed that Donna was jaundiced, she was as shocked and confused as I was when I heard the allegation. We were both in the Hospital for the two days after Donna's birth and two physicians and ten or so nurses had all represented that Donna looked well and she looked well to us competent parents. Patricia's reaction to the jaundice allegation was not that of a parent

who didn't care but of a parent who had been deceived by the doctor.

Contrary to the DCF's running narrative, Patricia was not at my apartment on 10/10/99 when they claim she was seen there. The videotape shows who was in the apartment – me, Donna and Angela. Patricia was not there and could not have been interviewed by the DCF even if they wanted to interview her. I later told Patricia about the *very strange* visit by the DPD, DCF and VNA. I told her that Kilchevsky ordered my home inspected. Then Officer Madore told me there was a report that Donna was having difficulty breathing. Then the reason became that Donna was a little jaundiced while in the Hospital. And finally that Kilchevsky told me that he ordered them to my home because we refused to talk to the social worker at the Hospital.

None of these reasons made sense to me or Patricia except the one that Kilchevsky wanted my home inspected. That was the culmination of a several-week long harassment by Mills and her successful attempts to poison the staff at the Danbury Hospital and make me her patient. After over an hour of waiting for a reasonable explanation as to why those people were in the hall trying to arrest me, Sergeant Salazar suggested what I had originally suggested – take Donna to the Hospital and let Kilchevsky examine her (see: videotape). I agreed and then decided that since their explanations of jaundice and breathing problems didn't seem plausible, I said I would call Kilchevsky and find out what was going on.

I brought Donna inside and dialed the number Lourenco gave me. Kilchevsky answered the page and, as he indicates in Exhibit 1-11 and 1-12 he wanted DCF involved and he wanted my home inspected and my parental fitness evaluated by the VNA. He did not tell me that Donna was jaundiced and losing weight and his statement that he told me that she needed to be medically examined is false. He didn't want to examine Donna at the Hospital and he confirms that on Exhibit 1-12 where he bizarrely states that "we are not set for it [to examine a child at the Hospital]". The Hospital is a big building with hundreds of beds and examination rooms and doctors and nurses and antiseptic and electricity and such and he believed that the Hospital was not set up for an examination of an infant who was born there. He states in the records that he wanted the infant examined in the home and the reason for this was to do the home inspection and parental fitness evaluation.

I asked him why did he send the police, DCF and nurse to my home and he said it was because I didn't want to see the social worker at the Hospital. He didn't say he was concerned about Donna's health. I immediately fired him and the Hospital because he had been

12

participating with Mills and his false representation of the nurse visit at discharge was a huge violation of my trust. The people in the hallway heard me fire him. Madore recalls me sounding angry through the door of my apartment when I talked to Kilchevsky. Kilchevsky describes that I fired him but doesn't state the reason why which is proof that he knew he did something wrong.

It isn't just my testimony that Kilchevsky didn't tell me on the telephone that Donna needed to be examined.  It is DCF agents Liquindoli and Bell-Burton's testimonies as described in the first paragraph of page one of Exhibit 156.  I wouldn't have been quoted as saying that I didn't want to take Donna to the Hospital because it was my right if Kilchevsky hadn't admitted he was part of a discriminatory scheme with Mills and he had indicated that she needed to be examined.  When I came out of the apartment after telephoning Kilchevsky, I didn't bring Donna because Kilchevsky gave no medical reason for having Donna examined.  I don't recall ever saying that I wouldn't let them examine Donna.  I definitely offered, prior to this to have her examined in the warm hallway or in a warm car or at the Hospital.  When they were about to leave, I coerced them into examining Donna.  Lourenco thoroughly examined Donna and pronounced her well.

Part of the fraudulent representation by Kilchevsky is that he didn't tell anyone that he didn't tell the parents that Donna was jaundiced or losing weight inappropriately.  If he had admitted to *someone* that he made a mistake instead of leading everyone to believe that *I knew* Donna was medically fragile and refusing treatment for these conditions, it could be said that he wasn't intentionally making a false representation.  At least if he had admitted that he didn't tell us about jaundice, he could have mitigated the damage.  The DCF would have come to my door and said, "Doctor forgot to tell you she was jaundiced.  Could we take a look to rectify the mistake?"  Instead, the DCF and DPD came pounding on my door with the promise of throwing me in jail for child endangerment, breaking down my door, and putting my daughter in foster care – because they believed that Kilchevsky would tell a parent the true condition of their child and what kind of monster would deny their infant treatment for serious medical conditions.

I don't claim to be able to tell when someone is lying any better than anyone else and, statistically, only about 5% of the population can consistently tell when someone is lying. However, Lourenco's reaction when I asked her why she was there on 10/10/99 was memorable. Nurse Lourenco appeared to be lying or embarrassed about the reason for her visit.  She averted her eyes from mine and bowed slightly downwards to the point that I had to bow and sorta look

up to see her eyes when I asked her why she needed to see Donna. She then stated rather meekly that Donna was "a little jaundiced" while in the Hospital and she "might still be jaundiced." I was incredulous. Here they were threatening to break my door down and for a little jaundice which isn't treated anyway.

Lourenco later testified at the OTC revocation hearing on 11/3/99 that she was there to do a well-baby visit and to check for jaundice. She made no mention of weight loss, dehydration or other illness.

A jury will realize that VNA nurse Lourenco knew that Donna wasn't in any medical danger from jaundice and that she also knew that she wasn't in danger from dehydration or weight loss because by this point she had spoken with Kilchevsky and even she couldn't believe his reasons for the extreme intervention. She had so little belief in the weight loss reason that she couldn't believe it enough to even mention it to me. She was also intentionally withholding some information. I asked her why she needed to get into my home and she said she needed to see if I had baby supplies. I asked her whether I looked shabby or was wearing old dirty clothes when we were in the Hospital. She refused to give me an answer. DPD Officer Madore had told me, in her presence, that the reason for the visit was that Kilchevsky ordered my home inspected (searched). I wanted a reason why they didn't believe us when we told them we had everything we needed. See: State's videotape joint exhibit.

Madore will testify that he found Lourenco strangely reluctant to tell me what was believed to be wrong with Donna. After all, he claimed that he was told that Donna was having difficulty breathing due to fluid in the lungs and then that reason appeared to not be the reason he was told and the reason he was threatening to break down my door.

Lourenco's strange reluctance to tell me the reasons for her visit are also an indication of her being put in a position of not doing what she would normally do, which is to be forthright and open to a parent's questions. See: Exhibit 78-1 -- VNA Patient rights and responsibilities. She knew that the conditions which Kilchevsky described to her (mild jaundice and 3 ounces of weight loss) were not significant enough to be overreacting the way they were. She was being put in a position whereby the physician was using her to be uncooperative with a parent and siding with a physician and diagnosis she didn't really believe. She was being used by Kilchevsky and she didn't really know why. I have no doubt that when the VNA records are finally disclosed, there will be evidence of Lourenco's knowledge that Kilchevsky was using her

inappropriately. Lourenco's reluctance to tell me the medical reasons she needed to examine Donna is proof that, in her medical experience, she couldn't truthfully or reasonably believe what Kilchevsky was alleging about Donna's condition. Because of their failure to engage in discovery, there is a deafening silence from Lourenco and I am sure that she will contradict Kilchevsky's allegation that Donna was jaundiced and losing weight in any dangerous or abnormal manner.

What this means is that Liquindoli and Lourenco knew by the time they arrived at my door that whatever the emergency reasons given by the Hospital, they were not the real reasons for which Kilchevsky wanted the nurse visit. Liquindoli leaves out of her narrative that Kilchevsky ordered my home searched. See: Exhibits 156 and 157.

The Hospital defendants have refused to engage in discovery so I don't have the VNA records.

The above are examples of what happened because Dr Kilchevsky lied to us about the reasons for the nurse visit and then used the VNA and DCF to enforce his lie.

In the Hospital's current motion for summary judgment they essentially want me to show what evidence, other than my characterizations, do I have to show that Mills and the Hospital were trying to make me their patient or establish a physician patient relationship.

The above bizarre actions by Kilchevsky of sending the DCF to my home for a well child and ordering a home search (they call it inspection) indicate that I was diagnosed as needing further evaluation by Mills and the Hospital.

Mills and the Hospital wanted me to be their patient.

Exhibit 6-7. Social Worker Mills is referred by Jean Vulte to evaluate me and Patricia's mental stability due to my questioning Vulte's diagnosis that Patricia hadn't gained enough weight the week before. I had been to all but one of Patricia and Donna's medical appointments at Patricia's request and my desire to support her and Donna. Patricia wanted me as her advocate. So I asked questions and this was considered interference by Mills and Vulte.

Exhibit 6-8. Mills wanted to meet with us as a couple to evaluate us and our relationship. This was an evaluation of me against my will. She continued to ask me questions about my therapy I told her we didn't need her help and we had everything we needed. See also: CD-1. I tried to reassure her that her irrational beliefs in our abilities with objective evidence that we would be capable parents: I told her we went to appointments, took birthing and baby care

15

classes and had all necessary supplies and living arrangements to care for a child. At this point Mills decided to meet with the staff at the WHC and poison their opinion of our ability to be parents.

Exhibit 1-7 and 1-8. Mills notes that I didn't want to meet with her. I didn't want to be her patient and she wanted to evaluate me again. Also they wanted me to have VNA and Healthy Families services which are meant to treat/train parents. They had diagnosed that I needed these services due to risk factors of being a parent with mental health issues and uncooperative with their previous attempts to be evaluated and have services forced upon me. Healthy Families are used for evaluating, training and treating parents. See: Exhibit 5, section 'Big Sister' is Watching and Congressman Hyde's letter. See also: 78-3 – Family Teaching Summary by the VNA. The VNA visit is to train the parents how to be good parents. Mills and the Hospital diagnosed that I needed parent training because of risk factors even though I told them I didn't need it.

The next week I didn't go with Patricia to the WHC because I was busy with something. Mills unexpectedly invaded Patricia's medical appointment and threatened that since I wasn't cooperating with her attempt to evaluate me she would have to put Donna in foster care once she was born until such time as it could be determined if I was a fit parent and what my rights were.

Mills followed up her threat by, without telling us, calling the DCF to attempt to have me investigated. The DCF refused and gave her the idea that she had to find a way to show that I had actually abused or neglected Donna before they would investigate. The DCF also told her that both parents have equal custody to a child that parents have the right to decide who they want the child to live with.

This threat by Mills was reported immediately to me by Patricia and so I acceded to Mills' demands and allowed myself to be evaluated. I signed releases with my therapist so that she could discuss my parenting abilities with Mills. She spoke with Mills and gave us, and me in particular, expert opinion that I would make an excellent parent. See: Exhibit 22-2, notation 9/27/99.

Exhibits 6-11 and 22-4. Mills describes that they want to assist me (i.e. treat me). My complaints that the treatment was discriminatory were rejected by Mills. Despite my telling her that we didn't want or need her help any further, she said she would not leave us alone. This violates our patients' rights to refuse treatment. I showed no interest in having Healthy Families

services. See: Exhibit CD-2.

Exhibits 1-7, 1-8, CD-3, and 106. In retaliation for complaining about discriminatory treatment as defined under the ADA by Mills and for refusing to allow myself to continue to be evaluated as her patient and accept treatment of Healthy Families and in frustration or anger at my social/political opinion of her and the Hospital's services, Mills called and filed a report of suspected child abuse or neglect via telephone and writing.

She intentionally failed to tell the DCF that I had already been evaluated by her colleague and was given an excellent recommendation about my parenting skills as described in Exhibit 22-2. She intentionally failed to tell the DCF that I had taken Donna to over twenty-five pre-natal medical examinations including: regular check-ups, ultrasounds, nutritionist consultations, one emergency visit when her mother wasn't feeling fetal movements, one false labor, and I attended her birth and stayed in the Hospital for the two days she was there and attended every examination while she was in the Hospital. And I attended virtually every exam that Patricia had because she had to be there while Donna was pre-natal. She knew that I had attended all these medical appointments for Donna's medical health and then inflamed the DCF by telling them that I may not allow Donna to be treated in the future for some unspecified possible future illness.

Mills was refusing to follow the Hospital patients' rights and our written request to have all treatments and interventions explained to us and our right to refuse. See: Exhibit 30.

All the above evidence indicates that Mills and the Hospital made me their patient by including me in their evaluations and diagnosing me as needing treatment/services for purposes of malpractice claims.

17

## III. Conclusion.

This court should delay the current proceedings and deny motions for summary judgment by the Hospital and State defendants until such time as the Juvenile Court decides whether to open the record for collateral and judicial estoppel purposes.   Then this Court should grant a reasonable time to respond to the above motions for summary judgment.


Respectfully submitted by,

_____ Date: 1/23/04
John Ward, acting pro se and sui juris
18 Garamella Boulevard
Danbury, Connecticut 06810
(203) 790-4920


## CERTIFICATION

I certify that on this date I mailed via first class mail a copy of this memorandum to the Defendants' counsel of record:

| | |
|---|---|
| **Carolyn Signorelli – AAG**<br>55 Elm Street, P.O. Box 120<br>Hartford, CT 06141-0120<br>Tel:  (860) 808-5160<br>Fax:  (860) 808-5384<br>Carolyn.Signorelli@po.state.ct.us | **Stephen P. Fogerty**<br>Robert A. Rhodes<br>Halloran & Sage, LLP<br>315 Post Road West<br>Westport, Ct. 06880<br>203-227-2855, fax 203-227-6992 |
| **Heidi M. Cilano**<br>Bai, Pollock, Blueweiss & Mulcahey, P.C.<br>10 Middle Street<br>Bridgeport, Ct. 06604<br>203-3667991, fax:  203-366-4723 | |

January 23, 2004

_____
John Ward, Plaintiff pro se, sui juris
18 Garamella Boulevard
Danbury, Connecticut 06810
(203) 790-4920