FILED

2004 FEB 19 P 1:55

U.S. DISTRICT COURT
HARTFORD, CT.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| John Ward | ) | |
|       Plaintiff | ) | Civil Action No.: |
| | ) |    **3:01CV1908(AVC)** |
|       V. | ) | |
| | ) | |
| Robert Murphy, et.al. | ) | |
| | ) | |
|       Defendants | ) | February 17, 2004 |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
## OF DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
## AND DELAY OF PROCEEDINGS UNTIL THE
## STATE JUVENILE COURT DECIDES WHETHER TO OPEN THE
## JUVENILE COURT RECORD

### I. Preface.

a) This memorandum is incomplete and not done very well because I was limited in the amount of time I had to complete it. Your Honor's decision requiring me to complete this memorandum arrived on 2/10 with a requirement that I submit it by 2/13 – three days later. As a person who has never had legal training I am not capable of creating the required facts statement and memorandum in a competent way in such a short time. The research is done, it takes me forever to put it together coherently.

**ORAL ARGUMENT REQUESTED**
**TESTIMONY REQUIRED**

b) I would also request that if this Court has any input into whether this decision is to be published in F.Supp.2d that it not be published. My last case, **Ward v. Housatonic Area Regional Transit**, 154 F. Supp. 2d 339 (D. Conn. 2001), was published and there were parts of the decision dealing with *carriers* which I think are legally incorrect. We settled the case on the eve of trial and so I was unable to appeal the decision. My lack of legal expertise lost these points. I don't like that my lack of ability will cause an unfavorable precedent for the next person so I would prefer that any decisions in my case would remain unpublished and only referred to in later cases as unpublished but not precedent as so much of the F.Supp.2d is precedent.

c) Please refer to my previous memoranda denying the Hospital's motion to dismiss dated 2/10/03 and my memorandum addressing estoppel and these issues dated 1/23/04 as further argument. And please don't forget my complaint.

d) The Court should hear and treat the allegations in my complaint *nunc pro tunc* so that imperfections or new evidence arising during trial will be viewed as properly pleaded. This conforms to FRCP 15 (b) and was asked for in the *Wherefore* section at the end of my complaint. I also ask that the imperfection as to addressing the defendants whether it be in official or individual capacity be viewed as properly pleaded or allow me to amend my complaint to properly plead their capacities.

## II. Arguments.

When determining if the DCF Defendants were acting reasonably the Court should keep in mind that the rights of parents with mental disabilities need protection[1]. And that it isn't what the defendants believed were reasonable acts but what an objectionably reasonable person would do and not what their employers would allow them to do because of the culture of the entity or the prejudices of society. (For purposes of §1983 claim, whether an official protected by qualified immunity may be held personally liable for allegedly unlawful official action generally turns on objective legal reasonableness of action assessed in light of legal rules that were clearly established at time it was taken. 42 U.S.C.A. § 1983. **Ham v. Greene**, 729 A.2d 740, 248 Conn. 508, certiorari denied 120 S.Ct. 326, 528 U.S. 929, 145 L.Ed.2d 254. And. Subjective inquiry into personal belief of official asserting qualified immunity to § 1983 claim is rejected in favor of

---

[1]  **49 USC Sec. 12101. Findings and purpose.** -- Which defines dealing with government agencies and private entitities such as the Hospital as potentially risky activities for the disabled.

objective analysis of what a reasonable officer in defendant's position would believe. 42 U.S.C.A. § 1983.—**Id**.)

The mentally ill have been protected by the ADA (moderate scrutiny), Rehab Act of 1973 (moderate scrutiny), Article First, Section 20 of the Connecticut Constitution(strict scrutiny), and the Patients' Bill of Rights CGSA 17a-543 thru 550. These laws, their attendant regulation, affirmative action policies, and the legal and political battles to enforce them over the past century are not the end result to be achieved – they are merely mechanisms to get to a desired result. These laws are like Amendments 13, 14, 15 and 19 of the US Constitution, the end result of which is to remove the *badges of slavery or servitude*.

A slave cannot decide when to marry or to whom, or what will happen to his child when it's born. A slave doesn't have the right to accept or reject medical care, treatment or evaluation. A slave cannot question whether his or his child's medical care is abusive or complain about the medical care. The modern day overseer is the hospital social worker (defendant Mills) and physician (defendant Kilchevsky). The DCF, through Murphy, Lima and Arnone decided it likes that patients with mental disabilities wear the badge of slavery.

Patricia and I did what any non-slave would have the right to do for the maintenance of their family and the *pursuit of happiness*. We chose who we wanted to associate with. We decided when we wanted to procreate. We decided when we wanted treatment. We decided when we didn't want treatment. We decided how we wanted to treat each other. We complained when we wanted to complain about medical treatment. We expected to be told the truth when we asked questions and not have social workers making DCF referrals behind our backs in retaliation for complaining and making decisions. We decided where our child would live when we decided not to marry. We exercised our right to protect ourselves from criminal allegations such as were made by the DPD and DCF on 10/10 (Officer Madore said he was going to arrest me twice first for interfering with his investigation and then for child endangerment). I exercised my right not to answer questions when faced with the criminal investigator Murphy because of the previous threats of arrest, the threat of criminal prosecution made to Patricia on or about 10/15/99, and then the allegations Murphy made that I had horribly abused Donna by

withholding medical treatment for serious medical ailments and starvation.   (Abuse and neglect

are defined at **CGSA 46b-120.**[2])

---

[2]  **Sec. 46b-120.** (Formerly Sec. 51-301). Definitions. The terms used in this chapter shall, in its interpretation and in the interpretation of other statutes, be defined as follows: (1) "Child" means any person under sixteen years of age; (2) "youth" means any person sixteen to eighteen years of age; (3) "abused" means that a child or youth (A) has had physical injury or injuries inflicted upon him other than by accidental means, or (B) has injuries which are at variance with the history given of them, or (C) is in a condition which is the result of maltreatment such as, but not limited to, malnutrition, sexual molestation, deprivation of necessities, emotional maltreatment or cruel punishment; (4) a child may be found "mentally deficient" who, by reason of a deficiency of intelligence, which has existed from birth or from early age, requires, or will require, for his protection or for the protection of others, special care, supervision and control; (5) a child may be found "delinquent" (A) who has violated any federal or state law or municipal or local ordinance, other than an ordinance regulating behavior of a child in a family with service needs as defined in this section or (B) who has violated any order of the Superior Court; (6) a child or youth may be found "dependent" whose home is a suitable one for him, save for the financial inability of his parents, parent, guardian or other person maintaining such home, to provide the specialized care his condition requires; (7) a "family with service needs" means a family which includes a child who (A) has without just cause run away from his parental home or other properly authorized and lawful place of abode; (B) is beyond the control of his parent, parents, guardian or other custodian; (C) has engaged in indecent or immoral conduct; (D) is a truant or habitual truant or who, while in school, has been continuously and overtly defiant of school rules and regulations; or (E) is thirteen years of age or older and has engaged in sexual intercourse with another person and such other person is thirteen years of age or older and not more than two years older or younger than such child; (8) a child or youth may be found "neglected" who (A) has been abandoned or (B) is being denied proper care and attention, physically, educationally, emotionally or morally or (C) is being permitted to live under conditions, circumstances or associations injurious to his well-being, or (D) has been abused; (9) a child or youth may be found "uncared for" who is homeless or whose home cannot provide the specialized care which his physical, emotional or mental condition requires. For the purposes of this section the treatment of any child by an accredited Christian Science practitioner in lieu of treatment by a licensed practitioner of the healing arts, shall not of itself constitute neglect or maltreatment; (10) "delinquent act" means the violation of any federal or state law or municipal or local ordinance, other than an ordinance regulating the behavior of a child in a family with service needs, or the violation of any order of the Superior Court; (11) "serious juvenile offense" means (A) the violation by a child, including attempt or conspiracy to violate sections 21a-277, 21a-278, 29-33, 29-34, 29-35, 53-21, 53-80a, 53-202b, 53-202c, 53-390 to 53-392, inclusive, 53a-54a to 53a-57, inclusive, 53a-59 to 53a-60c, inclusive, 53a-70 to 53a-71, inclusive, 53a-72b, 53a-86, 53a-92 to 53a-94a, inclusive, 53a-95, 53a-101, 53a-102a, 53a-103a, 53a-111 to 53a-113, inclusive, subdivision (1) of subsection (a) of section 53a-122, subdivision (3) of subsection (a) of section 53a-123, 53a-134, 53a-135, 53a-166, 53a-167c, subsection (a) of section 53a-174, 53a-196a, 53a-211, 53a-212, 53a-216 or 53a-217b, or (B) running away, without just cause, from any secure placement other than home while referred as a delinquent child to the Office of Alternative Sanctions or committed as a delinquent child to the Commissioner of Children and Families for a serious juvenile offense; (12) "serious juvenile offender" means any child convicted as delinquent for commission of a serious juvenile offense; (13) "serious juvenile repeat offender" means any child charged with the commission of any felony if such child has previously been convicted delinquent at any age for two violations of any provision of title 21a, 29, 53 or 53a which is designated as a felony; (14) "alcohol-dependent child" means any child who has a psychoactive substance dependence on alcohol as that condition is defined in the most recent edition of the American Psychiatric Association's "Diagnostic and Statistical Manual of Mental Disorders"; (15) "drug-dependent child" means any child who has a psychoactive substance dependence on drugs as that condition is defined in the most recent edition of the American Psychiatric Association's "Diagnostic and Statistical Manual of Mental Disorders". No child shall be classified as drug dependent who is dependent (A) upon a morphine-type substance as an incident to current medical treatment of a demonstrable physical disorder other than drug dependence, or (B) upon amphetamine-type, ataractic, barbiturate-type, hallucinogenic or other stimulant and depressant substances as an incident to current medical treatment of a demonstrable physical or psychological disorder, or both, other than drug dependence.

Consider, as an example, an Assistant Attorney General who is a self-described *control freak*. She is a *natural master*[3]. By nature and nurture she has acquired the robes of a master. She commands deponents and her words cause the deponent to follow instructions. She is respected in court. She is overbearing towards her spouse and overwhelmingly sets out rules for her children and is praised as a good and strong example of a parent. When she goes to hospital to birth a child, the doctors don't question whether she has the best interests of her family in mind. The physician *recommends* and never *orders*. When she asks the reason for the procedure or intervention it is explained truthfully. Nothing is done behind her back. When she claims to have all necessary supplies she is believed. Should a government agent come to her house for an investigation, he respects her rights and would not consider fabricating evidence.

Consider that this same AAG meets misfortune. She is disbarred by virtue of being involved with someone engaged in criminal acts. She becomes ill and can't work for a long time. She moves into a small rental because of financial difficulties. She becomes depressed and seeks psychiatric help. She acquires the label of mental illness/disability. She's still a natural master but now she wears the badge of slavery because she has the label of mental illness and wears the robes of slave. When she goes to hospital to have a child she is treated as a slave. The overseers (social workers and physicians) don't grant her the right to make decisions as to her medical treatment. She is classified and relegated to the *high risk patient clinic.* When she asks the reasons for treatments or interventions she is lied to. When she complains about mistreatment she is labeled as difficult and a danger to herself and her child and she is retaliated against with referrals to the DCF behind her back. When a doctor or social worker thinks she needs a treatment, intervention or training -- it isn't a *recommendation* it's an *order*. She makes a very poor slave and it's explained to her that if she just allows her overseers to make her decisions then she'll be a good person and that it's her fault that they had to torture her the way they did and, of course, they claim no ownership to prejudices against the disabled.

---

[3]  See, generally: Aristotle, *Politics,* (@350 BC). In Book 1 Aristotle postulated that there are *natural masters* and *natural slaves.* A natural master was one who by nature and nurture was made a master and it is difficult if not impossible to make a natural master into a good slave because his independent personality and skills are not suited for being a follower or to be commanded. A natural slave is one who was made a slave by nature and nurture and if elevated to the position of a master, he has not the skills to control the slaves and the personality to make decisions. This is an simplified but accurate interpretation.

Modern courts have a modern way of describing the *badges of slavery*.[4]  Back in 1975 when **Schlesinger,** infra, was decided the courts realized that mental illness classifications implicated the modern day badge of slavery and required government agents to provide better procedural protections.

Before the DCF can invoke their obligations to act "in the best interest of the child" it must find a reasonable suspicion of abuse or neglect otherwise every family and every decision by a parent becomes up for review at the whim of whatever DCF agent is investigating. Every child could be removed from the home and given to whoever the DCF agent believes is most financially secure and stable in the Connecticut (citations furnished upon request). And only when child is at risk of harm does state's interest become compelling one, justifying even temporary removal of child from home. U.S.C.A. Const.Amends. 9, 14;  C.G.S.A. § 46b-129(b). **In re Juvenile Appeal** (83-CD), 455 A.2d 1313, 189 Conn. 276, 38 A.L.R.4th 736 (Conn. 1983)

Allowing allegations of mental disability or instability without any objective supporting evidence of parental unfitness to be considered a reasonable basis for removing a child from her family, would be a re-enforcement of the badges of slavery and diminish the rights of the class of parents labeled as mentally disabled.

Simply allowing the Hospital and DCF to say they were acting reasonably by seizing Donna when there was no evidence of some actual abuse or neglect and merely an allegation that

---

[4]    **Smith v Schlesinger**, 513 F.2d 462, 168 U.S.App.D.C. 204 (DC, 1975).  "Furthermore, the peculiar circumstances of a revocation [of a security clearance] based on an alleged mental illness, we think, requires special attention to procedural rights.  As the record in this case and others like it strongly suggest, conclusory psychiatric opinion tends to dominate the Criterion R determination.  We have criticized this expert dominance in other contexts and see no reason for not extending this concern to the present circumstances: in both cases, psychiatric judgments may disguise, wittingly or unwittingly, political or social biases of the psychiatrist; and excessive reliance on diagnoses will pre-empt the primary role of legal decision-makers.   For these reasons, there is a special need for procedural rules designed to promote the adversary process and to ensure that the factual basis of expert opinion is clearly and precisely delineated on the record.
        \*\*\*
        "A concluding word is in order.  This is our first exposure to the use of mental conditions to disqualify an individual from either government employment or a government license for private employment.  There is every reason to believe that consideration of mental illness for government employment is a daily occurrence.  In the area of security classifications alone, evidence in this record indicates that in 1969 one hundred and forty one individuals were officially presented with a Statement of Reasons denying a clearance on the basis of a mental condition.  Statistics compiled in 1971 by the National Institute of Mental Health indicate that 4 million Americans received mental health treatment in a private or organization setting.  Furthermore, the most reliable estimates are that more than 20 million citizens, 10 per cent of the population, suffer from some behavioral disorder.  Use of behavioral science knowledge to ascertain those not qualified for government service thus raises issues of extremely wide impact. \*\*\* Our discussion in this opinion should not be interpreted as expressing or intimating any opinion on the merits of these issues or on the propriety of judicial intervention into agency attempts to confront them."  **Id  at** 218 thru 221 (internal footnotes omitted).

the parents are overbearing, have mental illnesses, are uncooperative with DCF and police investigations, complain, don't want to sign consent for treatment forms[5], or are *slow* – is not the kind of process that is due for protecting parental rights of parents with mental disabilities.

Patricia is not *slow*. I assume that when she is described as "slow" they mean low IQ. Mills didn't describe her as slow or retarded in the medical records. Kilchevsky described her as "slow." I see her as average intelligence with a pretty good memory. I don't think she was ever diagnosed as retarded or slow. She has a high school diploma. Anyone who talks to her wouldn't say she is slow. When she takes the stand the jury will see she's not slow. Murphy didn't find her to be slow -- merely shy, nervous, needy. By the way, Murphy describes Patricia as nervous but fails to mention that he threatened to have the police intervene if she didn't cooperate. This threat, similar to the DCF's use of the police to threaten me with arrest several days before is intended to scare and intimidate his victims into cooperating and it worked with Patricia. It's intended to make his victims think that they can escape a criminal charge if they cooperate.

There is an allegation that Patricia wasn't bonding like a super mom. There is no objective evidence of non-bonding. No-one claimed that I wasn't bonded with Donna. The medical records indicate good bonding and good breastfeeding with Patricia. There was no description of anything she did which indicated that she wasn't bonded. Perhaps their allegation was simply that because Donna was to live primarily with the male parent that must mean that the female parent wasn't bonding well. Like all normal parents who decide not to marry, we made reasonable decisions as to who Donna would live with and give her a stable home. The Hospital and DCF wouldn't have felt the need to investigate if the male parent was out of the home rather than the female parent. This is well supported by the way the male parent in this case was treated before and after Donna was born.

So when deciding if Murphy, Lima and Arnone's actions were objectively reasonable you should consider the necessity of procedural safeguards that when removing a child because

---

[5] **"Quod approbo non reprobo.** What I approve I do not reject. I cannot approve and reject at the same time. I cannot take the benefit of an instrument, and at the same time repudiate it." *Black's Law dictionary* 6th edition (pronunciation omitted). When Patricia was admitted to the Hospital to give birth, I altered the consent for treatment forms to reflect our wishes to not receive social worker services and some other things. If she had signed the form or not objected to services then the Hospital would be claiming that they are immune simply because of the signing of the consent forms. Judge Judy, of television fame, would say something like, "If you didn't want the services then why didn't you make your wishes known – Judgment for the Plaintiff, pay the social worker."

the parent is labeled slow, mentally ill, with emotional problems, overbearing, overwhelming, or any other conclusory description; it couldn't be objectively reasonable if they decided that in order to obtain the voluntary cooperation of the DPD they had to fabricate an emergency (that violates several criminal statutes) based on medical need and allegation that the parents are horrible and refuse to treat their child for serious jaundice and starvation.

(Violation of state law neither gives plaintiffs a § 1983 claim nor deprives state actors of defense of qualified immunity to a proper § 1983 claim;  issue is whether officials were objectively reasonable in believing that they were acting in fashion that did not clearly violate established federally protected right.  42 U.S.C.A. § 1983.  **Doe v. Connecticut Dept. of Child and Youth Services**, 911 F.2d 868 (Conn, 1990)).

Murphy, Lima, and Arnone knew that they didn't have evidence of abuse or neglect enough to remove Donna so they fabricated a medical emergency in order to deprive me of Due Process.  (Language of child welfare statute authorizing summary assumption of temporary custody only when there is probable cause to believe that "the child is suffering from serious physical illness or serious physical injury or is in immediate physical danger from his surroundings, and that immediate removal from such surroundings is necessary to insure the child's safety" * * * limits scope of intervention in family matters by state to cases in which state interest is compelling.  **In re Juvenile Appeal** (83-CD) (1983) 455 A.2d 1313, 189 Conn. 276.))

Murphy testified at the juvenile court hearing on 11/3 that he knew we had the right to not use social workers and that we were acting within our rights.  In my previous memorandum denying the Hospital's motion to dismiss I cited enough malpractice cases which described how patients have the right to refuse treatment.

The ADA required the DCF to not enter an arrangement which discriminates[6] with an outside entity such as the Hospital.  The ADA is generally not applicable to judicial proceedings such as a petition alleging neglect (**In re Antony B.**, 735 A.2d 893 (Conn.App.,1999); **In re Maryia R.**, 9 NDLR P 345 (Conn.Super.,1997) and **In re Caresse B.**, 9 NDLR P 278

---

[6] **28 CFR §35.130**  General prohibitions against discrimination.
(b)(1)  A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability --
***
(v)  Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the public entity's program;

(Conn.Super.,1997)).   However, because of the DCF's obligations to have performed a self-evaluation of itself[7] and because the complaints as he heard them from Mills and Kilchevsky, were a prima facie case of discrimination against the disabled (as described in my memorandum PLAINTIFF'S MEMORANDUM OF LAW TO SUPPORT HIS MOTION TO DENY HOSPITAL AND VNA DEFENDANTS' MOTION TO DISMISS dated 2/10/03 which describes how the ADA and Connecticut Constitution Article First, Section 20 prohibit discrimination) -- It couldn't have been reasonable for him to seize Donna in order to perform the parental fitness evaluation which Kilchevsky ordered (see the video) when there was no objective evidence that we were unfit parents or that Donna was actually abused or neglected. This activity would have been providing significant assistance to the Hospital's intentional discrimination of forcing me into treatment I didn't want because of my mental illness and my objection to practices which were illegal under the ADA.

It could not be reasonable application of Due Process for Murphy, Lima and Arnone to threaten us parents three times with arrest, have so little proof of abuse or neglect that they had to fabricate a medical emergency to the police in order to intimidate me into participating in his investigation, punish me for asking for an attorney, seize Donna even though he knew she was well, not return Donna when she was again found well by the pediatrician he brought her to that night, refuse to return her when he finds out that the infant was taken by me to see a pediatrician whose name and address he had within a couple days of seizing her (citation furnished upon request), and then file an application for OTC and petition alleging neglect/abuse deceiving the juvenile court to believe that she was in fact jaundiced and losing weight and in need of medical care on 10/10 which facts he knew to be objectively untrue.

Their claim to proof that they were acting reasonably is that I failed to cooperate in Murphy's investigation – that I tried to defend myself by not cooperating and asking for an attorney[8].   The Legislature thinks it's a good idea to have an attorney when defending oneself

---

[7]  **28 CFR §35.105  Self-evaluation.** (a)  A public entity shall, within one year of the effective date of this part, evaluate its current services, policies, and practices, and the effects thereof, that do not or may not meet the requirements of this part and, to the extent modification of any such services, policies, and practices is required, the public entity shall proceed to make the necessary modifications.

[8]  **Article First, Section 15 of the Connecticut Constitution** guarantees "[e]very citizen has the right to bear arms in defense of himself and the State." Surely being a little uncooperative as a lesser form of self-defense would be acceptable and, of course Black's Law Dictionary has a Latin phrase for it: "**Quodcunque aliquis ob tutelam corporis sui fecerit, jure id fecisse videtur.** Whatever any one does in defense of his person, that he is considered to have done legally." – **Id.**

against charges of abuse and neglect.[9]  The Connecticut Courts adopted a more expansive rule which also specifically gives the parent the right to remain silent[10].  Defendant Arnone sent me a notice (Exhibit 48) less than two days after he seized Donna, stating that I had a right to an attorney and to remain silent.  The Supreme Court thinks it's a good idea to have an attorney. Murphy and Lima should have told me that I have the right to an attorney before they questioned me yet they specifically told me (through the DPD) that I didn't have a right to an attorney.  See: the video.

In **Lassiter v DSS**, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640(1981), **Matter of K.L.J.** 813 P.2d 276 (Alaska,1991), and **In re Ariel G.**, 2003 WL 22908094 (Md.App.,12/10/2003) the courts said it was a good idea to have an attorney in parental rights terminations and that if there is some question as to whether there was a possibility of a criminal complaint attached to the proceeding then an attorney might be required to be appointed under the US Constitution's Fourteenth and Sixth Amendment due process.  This Court should examine **Lassiter, KLJ,** and **Ariel,** supra and determine if, in light of those cases, **CGSA 46b-135, Connecticut PB 34-1,** Congress' decision to deputize all DCF investigators as criminal law enforcement investigators and to require that information gathered from civil child protection investigations be turned over to the criminal investigators to use in a *multidisciplinary approach* to prosecuting child abuse and neglect,[11] the Connecticut legislature's agreement with the federal government and deputizing of the DCF and others into criminal law enforcement agents[12] – Whether Murphy, Lima and Arnone were required to inform me of my right to remain silent on 10/10 and 10/18 and have all questioning with an attorney present.

---

[9]  **CGSA 46b-135. (Formerly Sec. 51-316). Right to counsel and cross-examination.** (a) At the commencement of any proceeding concerning the alleged delinquency of a child, the parent or parents or guardian and the child shall have the right to counsel and be so informed by the judge, and that if they are unable to afford counsel that counsel will be provided for them. Such counsel and such parent or parents or guardian or child shall have the rights of confrontation and cross-examination. (b) At the commencement of any proceeding on behalf of a neglected, uncared-for or dependent child or youth, the parent or parents or guardian of the child or youth shall have the right to counsel, and shall be so informed by the judge, and that if they are unable to afford counsel, counsel will be provided for them, and such counsel and such parent or guardian of the child or youth shall have the rights of confrontation and cross-examination.

[10]  Connecticut PB **Sec. 34-1. Right to Counsel and to Remain Silent.**  See:  Exhibit 196 for the full text of the section.

[11]  **Exhibit 202 -- 42 USCA SEC 13001 thru 13041**

[12]  **CGSA 17a-101a, 101b, 106, and 106a (see: exhibit 195).**

Under these Federal and State statutes, all reports of abuse and virtually all reports of neglect are required to be cross-investigated by the DCF and the police. Whenever a parent talks to a DCF investigator, he is talking to the prosecutor's office!!! And it is only getting more adversarial between parents and those who are supposedly trying to help children. See: Exhibit 225 – Morrissey, Siobhan, October 17, 2003. BLAMING MOM. Women Convicted for Bullied Son's Suicide, Stillborn Child. *ABA JOURNAL eREport*

The State appears to be making an argument that if Murphy had known the name of the pediatrician I had taken Donna to, Murphy would not have seized Donna or filed the petition of neglect. That simply appears untrue.

First of all, there was a *recommendation* by Kilchevsky that Donna be taken for a routine examination later in the week. *There is no indication or claim that Donna was about to become ill again.* This recommendation was not passed on to me by anyone. It's an unnecessary but routine matter that breastfed infants are seen a week after discharge and bottle fed infants are seen two weeks after discharge. I took her at a week because she was breastfed for a portion of the first week but not because she required it or because of some illness she had. Since she was bottle-fed it would have been more appropriate to have her seen after two weeks.

She wasn't sick or progressing other than normal and if I had decided instead to spend a couple weeks visiting out of state there wouldn't have been neglect, as a matter of law. Neglect can't be left to simply the political whim or greed of the physician.

When one looks long enough in *Black's Law Dictionary* one can find a Latin phrase for anything. Here's one: *Nihil præscribitur nisi quod possidetur* – There is no prescription for that which is not possessed.[13] What I mean is that whatever decisions are not neglect or abuse are left up to the wide latitude for decision-making which parents possess by virtue of their parental rights[14] and their duties as parents to provide medical care when necessary within the bounds of family wealth and convenience. Not taking a healthy child to a doctor for conditions which the

---

[13] Black's Law dictionary 6th edition.

[14] "The concept of parental rights does not escape definition, although its limits have no clear markings. It consists of all rights held by parents and not limited elsewhere by the law. In other words, unless some authoritative public policy states otherwise, parental rights extend to all facets of a child's life. Since only a finite number of prohibitions and regulations limit these rights, the safeguards provided by these rights remain largely intact." Termination of Parental Rights, 13 Conn.L.Rev. 709, 722-23 (1981) citing: Kleinfield, *The Balance of Power Among Infants, Their Parents and the State,* 5 Fam.. L.Q. 83, 107 (1971).

child does not possess is not neglect or abuse as a matter of law. Not soothing the irrational fears of doctors and social workers is not abuse or neglect, as a matter of law. Objecting to mistreatment by social workers is not abuse or neglect. Asking police, nurses, doctors and social workers to explain their reasons before consenting to: home searches, examining a child, or answering questions is not abuse or neglect. Asking that all further questions be done through an attorney is not abuse or neglect. These interests protected by these actions don't even diverge from that of the child because the child has a natural affinity and interest in being with a parent and to have her privacy protected from abusive government or private entities.

What the State argues implicitly and the Hospital forces on its new parents, in essence, is that a parent should not question or ask the reasons a doctor or social worker are treating their child or himself. They argue that a parent should not determine first if the social worker or physician is competent or acting in the child's best interest or patient's best interest. They, essentially argue that a parent should not do for a child what he would do for himself – that is, they believe that a parent with mental health issues should not attempt to protect his children as he would himself. They essentially say that parents should not perform their duty as parents and protect their child from incompetents. It violates what the medical profession says a parent should do. See: Exhibit 168 which is a checklist of things you should ask about the pediatrician you chose – the list was given to us at the WHC prior to Donna's birth. There are other exhibits I submitted (Exhibit 94 and others) which are articles by the Government and medical journals which tell parents how to pick a pediatrician and to go with your instincts and not pick the pediatrician if he is condescending and unwilling to answer questions.

Doctors would likely tell patients to be examined every day if they had the political might to force the insurance companies to pay for it. Newborns and mothers previously stayed a week in hospital because the insurance paid for it. When insurance companies stopped paying for it hospitals had what are referred to as "drive-thru births" where the baby is born and a few hours later mother and baby are discharged. Government decided to ban such practices. These choices of when to leave a hospital and when to have a healthy baby examined cannot be left to the discretion of the medical community because it is the family which decides when it is most convenient, affordable, and in the best interests of the family. Simply throwing all decision-making to the physicians makes every moral, political, educational, and spiritual decision superseded by the whim of the doctor. Note that Kilchevsky, Lourenco, Liquindoli, Officer

Madore, Sergeant Salazar, and Murphy never asked why I cancelled the nurse appointment. They either knew that she was not in need of a medical examination and the reasons for the nurse visit were for an evaluation of me or they didn't think that a parent had any right to input into the medical treatment of his infant.

My attorney at Juvenile Court told me long before the hearing which returned Donna to me that the foster parent brought her to Donna's pediatrician by chance before the OTC papers were filed in Juvenile Court. Dr Mani immediately identified her as already her patient. The foster parents told Murphy that Mani was already her patient. Murphy faxed a letter to Dr Mani asking for information about Donna's health and my parenting skills and whether she had missed any appointments on 10/22/99 – one day after he filed the OTC and petition alleging neglect. (See: Exhibits 146, 131 and 133). Murphy had the name, address and telephone number of the pediatrician I took her to on, before or the day after he filed the petition alleging neglect and request for OTC (less than 96 hours after he seized Donna).

Donna wasn't seized and kept by Murphy because I refused to disclose the name of her pediatrician as alleged by the State. Murphy's running narrative stated that Patricia told him that I had taken Donna to see a pediatrician for routine check-up before he seized her. She simply didn't know the name off hand. Angela told him that I had taken her to a pediatrician at the time he seized Donna. I faxed him a letter a couple days after Murphy seized Donna telling him that she needed a PKU test and to forward the results to me so that I could give them to her pediatrician. When Murphy seized Donna, the question of who was Donna's pediatrician was simply one of many questions with no importance emphasized except he did say that he wanted me to provide it as testimony against myself in a criminal investigation of whether the pediatrician thought that I had abused or neglected Donna. Virtually everything which is abuse or neglect under the CGS is criminal in nature especially since he was accusing me of withholding medical treatment for his fabricated allegation that Donna was currently seriously jaundiced and I was withholding medical treatment for that serious condition and she was being starved by me. See: Exhibit 40.

There are two Exhibits 66 which show that when I had my attorney contact the State's attorney about the petition, my attorney was told by the State that Donna was taken to Dr Mani. I or my attorney contacted Dr Mani and had her write a letter stating that Donna was seen by her. Dr Mani wrote the letter, dated 10/22 or one day after the petition was filed and I believe it was

given by my attorney that day (10/22) to the State and Murphy. See: Exhibit 66 and 66 – there are double but one has a fax stamp on it.

In any case Murphy had Patricia, Angela, Attorney Banks, Dr Mani, and the foster parent telling him that I had taken Donna to a pediatrician before and immediately after he requested the OTC and filed the petition on 10/21/99. Still, Murphy refused to return Donna to my care even though at every exam she was declared to be in excellent health with no signs of abuse or neglect and DCF Investigator Liquindoli's description of my care of Donna as "affectionate" and "overprotective." The conclusion a jury will come to is that Murphy didn't reasonably believe that Donna was in immediate danger being in my care – he just didn't like my political opinion of how to deal with government agents. That's not neglect or abuse of a child.

It appears that someone disappeared the copy of the letter from the DCF file. An obvious reason was that it proves that Murphy was denying me due process.

When Murphy, Lima and Arnone removed Donna under the 96-hour hold they took her to the Hospital where she was declared in excellent health with no signs of abuse or neglect.

After all this information that Murphy had that Donna was well and well cared for he refused to return her to my care because he wanted to torture me into participating in his investigation – not because he reasonably believed that she was in danger in my care. The DCF even called Dr Kilchevsky and left a message with his assistant that Donna was seen on 10/10 and was well (see: Exhibit 156 last entry on p5 of 23). Murphy was obligated to return her to my care under due process when all this information that she was well and was seen by Dr Mani was given to him. (citation about due process requiring DCF to return the child when reasonable suspicion evaporates furnished upon request – don't have time to find it right now).

There has to be some evidence which is more than merely speculative before Murphy could keep Donna and file a petition. He had none and we made motions in Juvenile Court to dismiss and strike and they were granted except for the fabrication that Donna was indeed jaundiced and losing weight on 10/10/99 and I refused to have her treated.

There's another simple way to produce evidence of whether Murphy knew that I had taken Donna to a pediatrician – ask the foster parents to testify. They are the ones who told Murphy that Donna was seen by Dr Mani. The name and current address of the foster parents have been withheld by the DCF so I can't contact her unless they disclose her name under discovery.

It should be noted that Kilchevsky ordered a staff person to call the DCF when he found that I had cancelled the VNA appointment on 10/10/99. See: Exhibit CD-4. The DCF operator couldn't find a complaint of immediate danger for abuse or neglect or even a complaint of abuse or neglect. The staff person debated for a while and the DCF operator told her that Kilchevsky could call back and further describe his report if he thought it was necessary but they weren't going to take action on his report. He later called back and had to jack up the seriousness of his complaint in order to entice the DCF to take immediate action. He told them he wanted the Police and DCF to search my home (see: Exhibit video of the 10/10 visit). It was described as an order to "inspect your home environment." And to be present and observe while the nurse evaluated my parental fitness. This indicates that his intent was not to simply check to see if Donna was well because he forgot to tell us parents that he had any concerns with jaundice or weight loss, but to have the police do a criminal check of me and the DCF to do the parental fitness check because I didn't want to participate in Mills' parental fitness evaluation in the Hospital. This second call to the DCF Hotline on 10/10/99 must have been recorded also but the DCF refuses to turn over the tape.

Kilchevsky jacked up the level of seriousness of his reasons to entice the DCF and police to go to my home on 10/10. Without more discovery it would be difficult to describe exactly how much he did to jack up the alarm level with the DPD and DCF and how much they believed and colluded. Murphy claims in Exhibit 65 that the report was that Donna had lost a pound of weight between 10/6 and 10/10. Officer Madore said the report was that Donna was having difficulty breathing. As I said in **PLAINTIFF'S RESPONSE TO DEFENDANTS' ORDERS FOR PROTECTION AND OBJECTIONS TO DISCOVERY** dated 12/16/03 there is even a form which deals with complaints where a plaintiff cannot fully determine the culpability of several defendants. See: FRCivP form 10 -- **Complaint for Negligence Where Plaintiff Is Unable To Determine Definitely Whether the Person Responsible Is C. D. or E. F. or Whether Both are Responsible and Where His Evidence May Justify a Finding of Willfulness or of Recklessness or of Negligence.**

Donna was born at 7lbs, 8ozs = 120ozs. Kilchevsky's own handwriting has her losing 3ozs = 2.5%. Murphy testified at juvenile court and put in his petition of neglect that Donna "could" have lost 5-8% from the time of birth until 10/10. Now Kilchevsky and Murphy are claiming that Donna "did" lose 5-8% *while still in the Hospital*. Murphy claims the report was

made that Donna lost 16ozs = 13.33% of weight between those dates. Murphy and Kilchevsky appear to be not telling the truth in some coordinated manner.

The nature of the report by Kilchevsky and Mills as they are portrayed by the State and Kilchevsky's affidavit is that it was a rather innocuous (that's probably not the best word) and straightforward report that a child needed medical attention. The report was far more serious.

Kilchevsky portrayed us parents, as described by Murphy, as being so evil or of such low IQ that when we took our baby home from the Hospital we would stop feeding her. He portrayed us as not wanting to notice or incompetent to not notice that: she was no longer crying; she wasn't urinating or defecating; her eyes were "sinking into her skull", her weight was dropping rapidly; she was turning a deep yellow; she was dehydrating; and that she was trembling with brain seizures. If Kilchevsky did this it is a massively cruel way to describe us parents.

Kilchevsky confirmed that he wanted a parental fitness and criminal check of me shortly thereafter when I called him at the Hospital to find out why he sent the Police, DCF and VNA to my home. He didn't say she was possibly ill. He said it was because I didn't want to speak to the social workers at the Hospital. Kilchevsky wrote in Donna's medical records that he felt strongly that she needed to be examined because of jaundice. He didn't tell me that while in the Hospital or when I was talking to him on the telephone. He didn't want to have Donna examined at the Hospital. He wanted her seen in the home with the DCF and the police searching my home and observing the nurse giving me a parental fitness evaluation and training. The criteria for the evaluation and training are shown in Exhibit 78-3. He fails to explain in Exhibits 1-11 and 1-12 that it was because I didn't want to be treated/evaluated by the Hospital social workers and that because of that he wanted Donna seen in the home for a parental fitness evaluation and training. This would indicate his knowledge that what he was doing was against my wishes and contrary to our contract for services – scienter. See: Exhibit 1-11 and 1-12. See also: Exhibits 24 and 67 patient rights.

The ordered parental fitness evaluation was a continuation of Mills' and the Hospital's and Kilchevsky's forced requirement that I become their patient and that they had evaluated me up to that point and had decided that, because of my objections, I was ordered to be given continuing evaluation and treatment/training. This confirms their intent to make me a patient,

their having evaluated me as a patient and their treating me as a patient and, therefore, I had the rights of a patient.

The Hospital defendants believe that I need a medical expert to testify. In this case their own handwriting in the medical records contradict their assertions that Donna needed to be examined. Their appears to have been an attempt to come up with a reason for the visit *ex post facto*. The Hospital refuses to let me see Donna's original medical records to determine whether the ink in the writing is the same or written at the same time, etc.

In this case, Kilchevsky is claiming that Donna had conditions which were not hidden but, rather easily observed by laypersons. He claims she was jaundiced and lost a pound or 5-8% of weight – depending upon the version they trot out. Those conditions don't require an expert to disprove.

I was there during Kilchevsky's examination of Donna. Donna wasn't yellow mildly or otherwise. He didn't tell us parents that she was "mildly icteric" (see: Exhibit 1-5, right hand side of page, Kilchevsky's handwriting). He didn't tell us to supplement her feeding with formula, which is the usual recommendation if a child isn't feeding well (Exhibits: 79-1 and 167 – handouts given to us by the Hospital prior to Donna's birth as part of baby care training).. NO-ONE ELSE -- DOCTOR, NURSE, PARENT OR VISITOR – NOTICED THAT DONNA WAS YELLOW OR TURNING YELLOW AS IS THE CASE WITH JAUNDICE. I have seen jaundiced people before in my times in AA; it's an easy condition to spot. The Hospital believes that parents can spot jaundice and provides information to parents about how to spot it and what to do when they see it (Exhibits: 79-1 and 167 – handouts given to us by the Hospital prior to Donna's birth as part of baby care training).

I had, and knew how to use, an accurate baby scale (see: Exhibit CD-5, audiorecording of the VNA nurse visit on 10/10) and I weighed her every day she was home – Friday, Saturday and Sunday. She never lost 6-9.6ozs (5-8% of weight). She hadn't lost 5-8% of weight while in the Hospital. She never lost a pound. When she was thoroughly examined by nurse Lourenco at four days old, she had gained 9 ounces from her birth weight or 15-18.6ozs from the weight Kilchevsky claims she lost. Or 25ozs from the low of a pound weight loss if that's what he claimed she lost while in the Hospital. It's a simple thing to weigh a baby and it isn't difficult to add, subtract, multiply and calculate percentages and either Kilchevsky is not telling the truth or he can't do math.

Given that the claims of jaundice are so objectively measurable by any layperson with color vision and who has weighed items at a supermarket, a jury has to decide whether Kilchevsky's guess/claim that Donna lost weight and was jaundiced or whether he was incorrect and my objective observations were correct.

Kilchevsky vaguely claims that Donna was or may have been dehydrated – another objectively measurable condition which any layperson can observe. Donna wasn't dehydrated. I was dehydrated not more than six months before Donna was born  and went to the emergency room and had IV fluids administered.  Virtually any athlete would have experienced dehydration at some point.  When dehydrated, skin loses its elasticity and when you squeeze a limb or press a spot, it doesn't bounce back to flat quickly.  When diapering a baby you have to grasp limbs and lift.  If there were any dents or inelasticity it would have been easily and quickly spotted by any layperson, including me.

And, of course, all those other symptoms which he claimed Donna could have such as not crying because of weakness, not urinating and defecating, not eating, thrashing with seizures, and eyes "sinking into her skull" – are easily spotted.  Donna had no such highly visible symptoms.  These are not symptoms which are only revealed via X-ray or blood test.

I have some citations, which I can't find right now because of the shortness of time allotted for this memorandum, which clearly state that in malpractice cases such as this an expert witness is not necessary – partially because of the observable nature of the symptoms and some because they are more simply contract/practice obligations.

The Hospital wants me to re-tell again how it was obligated to me under malpractice. There are three principles:

First, the Hospital and Kilchevsky offered to examine Donna upon discharge and I accepted the offer.  A contract was therefore formed just as if I had taken my computer to the repairman.  He had obligations to tell me honestly everything that was wrong with Donna and any potential dangers he foresaw.  Instead, he led us to believe she had no adverse conditions or that we weren't behaving appropriately.  He described the nurse visit as a "quick look" at Donna and "something I like to do" and to save me the time and effort of taking her to the pediatrics clinic on Tuesday or Wednesday.  He didn't describe it as necessary.

The Hospital's own policy regarding jaundice, as described to me during Baby Care Basics class, was that if the infant had jaundice the doctor would tell us and what if anything

would need to be done.  Failure to inform me of jaundice violated the Hospital's own standard practice for jaundice.

I gave many citations and arguments about how a parent has the right to be informed of any adverse medical conditions which their child has.   See, generally: **DENY HOSPITAL AND VNA DEFENDANTS' MOTION TO DISMISS** dated February 10, 2003 at pp 9-13. (Right to consent to medical treatment for child resides in parent who has legal responsibility to maintain and support child; implicit in that right is right to be fully informed concerning child's condition and prognosis. **O'Keefe v. Orea**, 731 So.2d 680  Fla.App.1.Dist. (1998)).

Second, Patricia was the patient in the beginning.  She was pregnant and seeing the WHC for prenatal services.  I was her designated advocate (see: letter to WHC in Patricia's medical file which the Hospital refuses to turn over to Patricia or me).  She didn't need an advocate but it is a good practice to have an advocate (Exhibit 94, and other exhibits furnished upon request).  As Patricia's advocate Kilchevsky was supposed to tell me any problems he perceived with Patricia's parenting skills.  Also, more importantly, Mills made me a patient by forcing me to allow myself to be evaluated otherwise she would put my daughter in foster care until I was evaluated.  This is also similar to how when one person goes to a therapist and the therapist invites the spouse in for some couple therapy.  More money may or may not be charged but the spouse receives evaluation and treatment/advice.  A file may or may not be created for the spouse but a record is kept in the file or the initial patient as was done in our case.  The spouse becomes a patient just as surely as the original patient and so all contractual, legal, and medical standards/duty of care are due to the spouse.  The exhibits amply show that this happened in my case.

I went to birthing classes at the WHC as Patricia's partner and participated – I wasn't merely an observer.

Another aspect of this is that when Donna was born she became a patient.  The Hospital has the political approach that they believe in providing family support and family treatment. It's clear in their policies and the name they give to the maternity ward – *Family Birth Center* -- that they intend a whole family approach to child birth and heaven help the slave who disagrees with their political opinion.

Third, at some point I became viewed as an independent patient of the Hospital and Kilchevsky.  It was known that Donna was going to live with me.  The VNA nurse visit was

clearly scheduled for my home and Patricia was not asked to be there. I was the one supposed to be evaluated. My home environment was ordered searched. I was evaluated, deceptively ordered to be continued to be evaluated through a nurse parental fitness evaluation, and prescribed the treatment of parenting training against my wishes.

Despite what the Hospital defendants would like to believe, they made me a patient. I met all the criteria for a patient. The only way they could claim that I wasn't a patient is if they didn't prescribe some treatment/training for me and if they could show that they had objective evidence to view me as a child abuser and this medical necessity to provide protective services overrode their obligation to me as a patient and parent causing them to spy on me such as they would do if they admitted a baby with suspicious injuries and they set up a hidden camera to see if the parent was harming the child when staff was not present. No such objective evidence of abuse or neglect has been shown, they didn't report any illegal activities to the police, and they saw no objective reason they shouldn't discharge Donna to my care.


Finally, all the complaints that the Defendants had about me and their referrals to DCF and the petition of neglect/abuse in Juvenile Court appear to be based on my simply objecting to the way they were treating me, failing to speak upon demand, and generally having a different political opinion about how to raise a child and deal with medical service providers and government agents. Doesn't this implicate some First Amendment tort. The question not being whether their policies are intended to violate free speech but whether when *I* objected didn't they punish me and my family for that objection?

**III. Conclusion.**

This court should deny the State and Hospital defendants' motions for summary judgment and hear oral arguments on my motion.

This court should treat my allegations, complaint and memoranda as if the issues I raise were fully and properly pleaded should my arguments not perfectly describe the counts in my complaint.

This court should allow or order me to cause my complaint to be amended so that it properly reflects the allegations and causes of action and names parties in their individual or official capacities as necessary.

Respectfully submitted by,

_____ Date: 2/17/04
John Ward, acting pro se and sui juris
18 Garamella Boulevard
Danbury, Connecticut 06810
(203) 790-4920

# CERTIFICATION

I certify that on this date I mailed via first class mail a copy of this memorandum to the Defendants' counsel of record:

| | |
|---|---|
| **Carolyn Signorelli** – AAG<br>55 Elm Street, P.O. Box 120<br>Hartford, CT 06141-0120<br>Tel:  (860) 808-5160<br>Fax:  (860) 808-5384<br>Carolyn.Signorelli@po.state.ct.us | **Stephen P. Fogerty**<br>Robert A. Rhodes<br>Halloran & Sage, LLP<br>315 Post Road West<br>Westport, Ct. 06880<br>203-227-2855, fax 203-227-6992 |
| **Heidi M. Cilano**<br>Bai, Pollock, Blueweiss & Mulcahey, P.C.<br>10 Middle Street<br>Bridgeport, Ct. 06604<br>203-3667991,  fax:  203-366-4723 | |

February 17, 2004

John Ward, Plaintiff pro se, sui juris
18 Garamella Boulevard
Danbury, Connecticut 06810
(203) 790-4920