UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN WARD | : | CIVIL ACTION NO. |
| *Plaintiff* | : | 3:01CV1908(AVC) |
| | : | |
| v. | : | |
| | : | |
| ROBERT MURPHY, et al. | : | |
| *Defendants* | : | MARCH 9, 2004 |

**STATE DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

The defendants Kristine D. Ragaglia, Commissioner of DCF, Sandra Liquindoli, a hotline social worker investigator, Robert Murphy, a social worker investigator, Ralph Arnone, a program supervisor, Roger Lima, a case aide, and Edward Federici, a treatment social worker (hereinafter the "state defendants") file this response to the Plaintiff's Memorandum of Law in Support of Denying the Defendants' Motions for Summary Judgment filed on February 17, 2004 and respectfully request that the court grant the State Defendants' Motion for Summary Judgment filed November 12, 2003.

**SUMMATION OF UNDISPUTED FACTS:**

The following are the material facts which support a finding that the defendants are entitled to qualified immunity and granting of summary judgment, which the plaintiff has failed to dispute with any demonstrable facts or real evidence:

1) The Department of Children and Families, through its employees is statutorily required to investigate reports of abuse or neglect that were made to the Department's telephone hotline. See Conn. Gen. Stat. Secs. 17a-101, 17a-101g. (Exhibit A., Liquindoli Aff. Para. 1).

2) On October 10, 1999, Ms. Liquindoli was assigned to investigate a report made by Angela Crooke, a case manager at Danbury Hospital. Ms. Crooke reported to that Dr. Etan Kilchevsky was

concerned about the welfare and safety of a new born infant, Donna Ward, who was born on October 6, 1999 and discharged from the hospital on Friday, October 8, 1999. The child reportedly had a low birth weight and jaundice. (Exhibit A., Liquindoli Aff. Para. 2; see Exhibits G, H)  It was reported that the father had not kept an appointment with the VNA recommended by Danbury Hospital and previously agreed to by the father. (Exhibit A., Liquindoli Aff. Para. 3; see Exhibits G, H). The plaintiff admitted during his deposition that he had agreed to the VNA visit, but that he refused to allow the VNA nurse to come to his home. (Transcript of Plaintiff's Deposition, November 12, 2003 (hereinafter "Tr."): p. 32, l. 15-24).

     3) On October 10, 1999, Sandra Liquindoli arrived at the plaintiff's apartment accompanied by a visiting nurse, Virginia Lourenco, who was only permitted to conduct a brief examination of Donna Ward in the hallway of the apartment complex.  Based upon the examination, it was Sandra Liquindoli's understanding that the child did not require any immediate medical intervention.  Dr. Kilchevsky did recommend that further investigation of the family was needed and that the child have a follow-up examination within three days. (Exhibit A, Liquindoli Aff. Para. 6; Exhibit J, Kilchevsky Aff. Para. 8 ; see Exhibit H).

     4) On October 12, 1999, Robert Murphy, an investigative social worker, was assigned to follow-up on the investigation that had been commenced.  He reviewed the information that was already received by the Department and learned that Dr. Etan Kilchevsky was concerned because an infant child, Donna Ward (d.o.b. 10/6/99), was born with jaundice and had lost 5% to 8% of her body weight since birth.  Dr. Kilchevsky reported the concern that the child could suffer dehydration and possible brain damage if the jaundice and weight loss conditions were not addressed. (Exhibit B, Murphy Aff. Para. 2).

5) Robert Murphy made repeated unsuccessful efforts to contact the plaintiff between October 13, 1999 and October 18, 1999, when, accompanied by case aide Roger Lima, Robert Murphy made a home visit to the plaintiff's residence. (Exhibit B, Murphy Aff. Para. 6) The plaintiff was home and told him through the door that he refused to speak to any agents of the government. Robert Murphy explained that he was there to follow up to check on the health and well-being of Donna Ward. The plaintiff turned on an audio recorder and stated that DCF would have to talk to his attorney. Robert Murphy asked him who his attorney was and he told Mr. Murphy that DCF was responsible for providing him an attorney. Mr. Murphy explained that it was not DCF's responsibility to provide him with an attorney at that time. (Exhibit B, Murphy Aff. Para. 7; See, video).

6) Ralph Arnone, Mr. Murphy's Program Supervisor, was authorized to invoke a "96 hour hold", which allows the Department to remove a child to ensure his or her safety. See Conn. Gen. Stat. Sec. 17a-101g ( c). (Exhibit C, Arnone Aff. Para. 1). Mr. Arnone was concerned regarding the medical issues of the infant based upon the reports of Danbury Hospital staff. It was significant that the plaintiff had declined to accept outside services and therefore the new-born infant was not visible to the community. Thus, if she was in distress, there would be no way for DCF or an agency outside the home to intervene. (Exhibit C, Arnone Aff. Para. 7)

7) Mr. Arnone issued the "96 hour hold" and once it was served by Mr. Murphy, the plaintiff was given another opportunity to cooperate by providing information regarding Donna's medical status and, if appropriate, to allow a medical examination of her so that the child would not have to be removed from his care. The plaintiff refused to cooperate. (Exhibit B, Murphy Aff. Para. 10; See video).

8) The plaintiff acknowledged during his deposition that Mr. Murphy explained to him the nature of the report he was investigating, which included Donna's alleged weight loss and jaundice and his

3

refusal to see the VNA; that Mr. Murphy told him if he answered the questions regarding his history, any mental disability, who Donna's pediatrician was, and whether she'd been seen by a pediatrician, DCF would not remove Donna from his custody.  The plaintiff testified that he would not answer the questions.  He testified that Angela told Mr. Murphy that Donna had been seen by a pediatrician.  The video tape reveals that when Angela attempted to communicate with Mr. Murphy, the plaintiff instructed her not to tell him anything. (Tr. p. 30 – 31, See video).

9) The plaintiff told Mr. Murphy that the state would not take his daughter from his arms and that Mr. Murphy would have to pick the infant up from the couch. He placed Donna on the couch. Mr. Murphy picked up the child from the couch while the plaintiff filmed the scene with his video camera. (Exhibit B, Murphy Aff. Para. 9; See video). The plaintiff does not dispute these facts.

8) The child was transported by ambulance to Danbury Hospital, where she was examined. There was no evidence of abuse or neglect.  The child was treated for thrush, a diaper rash and a scab on her shin.  Thereafter, the child was briefly hospitalized because of feeding problems.  (Exhibit B, Murphy Aff. Para. 11; Plaintiff's Exhibit 46: Social Worker Affidavit/Summary of Facts ¶ 15, attached hereto).

9) On October 19, 1999, pursuant to DCF's ongoing duty to investigate the need to maintain custody, Robert Murphy interviewed the mother, who stated that she had been diagnosed with obsessive-compulsive disorder, major depression, anorexia and anxiety disorder. (Exhibit B, Murphy Aff. Para. 12)  She also reported that the plaintiff was verbally and emotionally abusive to her. Psychiatric social worker Nancy Turton Creal, who is a licensed clinical social worker with extensive experience in the field, accompanied Mr. Murphy and made an assessment of the mother.  Ms. Turton Creal concluded, among other things, that:  (1) the mother's psychiatric disorders "are very likely to impede mother's ability to meet the daily demands of an infant", (2) the "additional stress of caring for a child is likely to exacerbate symptoms related to her mental health issues, possibly causing confusion,

4

disorganization and an inability to recognize signs of distress in a child" and (3) although the mother claimed that her eating disorder was in remission, this did not appear to be the case and, if the eating disorder was unchecked and untreated as appeared to be the case, "the stress of caring for an infant is likely to increase symptoms that can be dangerous to Mother's health and place the child at risk." (Exhibit B, Murphy Aff. Para. 13).

10) On October 20, 1999, Robert Murphy spoke by telephone to Ginny Cameron of the Danbury Hospital Community Center for Behavioral Health. He learned that the plaintiff has a diagnosis of personality disorder and anxiety disorder. (Exhibit B, Murphy Aff. Para. 14). The plaintiff testified during his deposition that his mental disability is mixed personality disorder, which covers borderline personality disorder, paranoid personality disorder; depression; alcoholism in remission; anxiety problems and panic attacks. (Tr.: p. 15 -16; p. 33, l. 20 – 23). The plaintiff testified that his disability prevents him from getting along with many people and navigating through systems and causes him to have an over exaggerated mistrust of different people and organizations. (Tr. p. 15-16).

11) On October 20, 1999, Robert Murphy spoke by telephone to Danbury Hospital Social Worker Joan Mills. Ms. Mills reported that the plaintiff refused a referral to the Healthy Families Program, under which the family could have obtained support services. Ms. Mills reported her concern that the infant may not receive proper medical attention under her parents' care. (Exhibit B, Murphy Aff. Para. 15).

12) On October 21, 1999, the trial court (Eveleigh J.) granted the motion for an order of temporary custody, finding that the child's safety would be jeopardized if she remained in the home. (Exhibit B, Murphy Aff. Para. 18). The trial court appointed counsel for the father, mother and child. (Exhibit B, Murphy Aff. Para. 19).

13) On November 3, 1999, the order of temporary custody was vacated by Judge Eveleigh. However, the court issued a series of detailed orders to ensure the safety of the child. These included the following. The parents were required to "[a]ccept and cooperate with in-home support services referred by DCF and make progress toward identified goals" and follow the recommendations of service providers: intensive family preservation and VNA.  The court ordered that the parents "[k]eep all appointments set by or with DCF."  The court ordered that the parents cooperate with DCF home visits to be scheduled by prior arrangement of the parties.  The court ordered that the parents participate in individual and parenting counseling. The parents were ordered to sign releases authorizing DCF to communicate with service providers. The parents were ordered to consistently and timely meet and address the child's physical, educational, medical or emotional needs.  They were directed to make all necessary child-care arrangements to ensure that the child is adequately supervised and cared for by appropriate caretakers.  They were directed to immediately advise DCF of any changes in the composition of the household. (Exhibit B, Murphy Aff. Para. 21; See also the defendants' statement of material facts filed November 12, 2003 pursuant to Local Rule 56(a)1 and supporting exhibits.)

**ARGUMENT**

I. **THE PLAINTIFF HAS FAILED TO MEET HIS BURDEN IN ORDER TO OVERCOME THE MOTION FOR SUMMARY JUDGMENT**

In order to defeat a summary judgment motion that is properly supported by affidavits, depositions, and documents as envisioned by Fed. R. Civ. P. 56(e), the opposing party is required to come forward with materials, setting forth specific facts showing that there is a genuine issue of material fact to be tried. *Metromedia Co.* v. *Fugazy*, 983 F.2d 350, 361 (2d Cir. 1992, cert. denied 508 U.S. 952, 124 L.Ed. 2d  662, 113 S.Ct. 24445 (1993).  Bare polemics cannot defeat real evidence and, conclusory

6

allegations unsupported by demonstrable facts will not suffice to create a genuine issue. See *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2nd Cir. 1996). . The mere existence of a scintilla of evidence in support of the plaintiff's position would be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *See Celotex Corp.* v. *Catrett,* 477 U.S. 325, 106 S.Ct. 2548 (1986).

The plaintiff has not come forth with any specific or demonstrable evidence in the form of affidavits from witnesses or other documentary evidence to dispute the facts as established by the state defendants' motion for summary judgment and supporting documentation.  As such, there is no genuine issue of material fact that would justify subjecting the state defendants to further litigation.

## II.     THE PLAINTIFF HAS FAILED TO COUNTER THE STATE DEFENDANTS' STATEMENT OF MATERIAL FACTS.

The plaintiff's memorandum of law attempts to counter the state defendants' motion for summary judgment by restating his complaint and providing the court with his own conclusory interpretation of events with no evidence to support his claims of constitutional violations, unreasonableness and intentional misconduct on the part of the state defendants.

The primary issue of material fact the plaintiff attempts to create focuses on whether or not there was a true medical emergency.  However, this is not a material issue of fact as it relates to the state defendants, because the plaintiff has not alleged or provided any factual evidence to dispute what information was provided to the state defendants by the hospital personnel, by the mother herself, and by the parents' mental health providers.  Moreover, Robert Murphy had a first hand opportunity to witness how the plaintiff behaved in relation to protecting his daughter's interests and how the plaintiff's mental health issues impacted his ability to treat his child's interests and well-being as paramount to his own needs to assert his autonomy and vindicate his rights against the authorities.  The fact that it was ultimately shown that Donna was not currently in need of emergency medical treatment, is not an issue

7

of material fact when assessing the reasonableness of the state defendants' actions at the time and their assessment of the ongoing risks her home environment posed to her.

"This Circuit has adopted a standard governing case workers which reflects the recognized need for unusual deference in the abuse investigation context. An investigation passes constitutional muster provided simply that case workers have a 'reasonable basis' for their findings of abuse. In applying a reasonableness standard in the abuse context, courts must be especially sensitive to the pressurized circumstances routinely confronting case workers, circumstances in which decisions between 'difficult alternatives' often need to be made on the basis of limited or conflicting information." *Wilkinson v. Russell et al*, 182 F. 3d 89, 104-105 (1999).

As the Second Circuit Court of Appeals has observed:

> Though a decision to remove a child from parental custody implicates the constitutional rights of the parents, it obliges protective services caseworkers to choose between difficult alternatives in the context of suspected child abuse. If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child and may be accused of infringing the child's rights. It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision, whichever way they make it.

*Van Emrik* v. *Chemung County Dept. for Social Services*, 911 F.2d 863, 866 (2d Cir. 1990). See *Defore* v. *Premore*, 86 F.3d 48, 49 (2d Cir. 1996) ("We can well understand the distress of parents that their child was in the custody of public officials . . . . But the proper means to challenge such assertions of public authority are by recourse to state courts to test continued public custody, not to seek to hold publicly employed caseworkers liable for damages.")

Furthermore, it is not necessary for the state to establish actual harm in order to intervene on a child's behalf as long as there is a reasonable basis to believe there is a threat of imminent harm or a "risk of harm":

> Our statutes clearly permit an adjudication of neglect based on a potential for harm or abuse to occur in the future. General Statutes § 17a-101 (a) provides: "The public policy of this state is: To protect children whose health and welfare *may* be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of *suspected* child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family." (Emphasis added) By its terms, § 17a-101 (a) connotes a responsibility on the state's behalf to act before the actual occurrence of injury or neglect has taken place.
>
> General Statutes § 46b-120 (8) provides that "a child or youth may be found 'neglected' who . . . (C) is being permitted to live under conditions, circumstances or associations injurious to his well-being . . . ." The department, pursuant to the statute, need not wait until a child is actually harmed before intervening to protect that child. General Statutes § 46b-129 (b) permits the removal of a child from the home by the department when "there is reasonable cause to believe that (1) the child . . . is in immediate physical danger from his surroundings and (2) that as a result of said conditions, the child's safety is endangered and immediate removal from such surroundings is necessary to ensure the child's safety . . . ." This statute clearly contemplates a situation where harm could occur but has not actually occurred.
>
> Our statutes clearly and explicitly recognize the state's authority to act before harm occurs to protect children whose health and welfare may be adversely affected and not just children whose welfare has been affected. The commissioner need not show, but need simply allege, that there is a potential for harm to occur.

*In re Michael D.* 58 Conn. App. 119, 123-24 (2000).

A "material" fact has been defined adequately and simply as a fact which will make a difference in the result of the case. *Curtis v. United States*, 168 F.Supp. 213, 216 (Ct. Cl.), cert. denied, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81. Factual disputes that are irrelevant or unnecessary will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). Therefore, the plaintiff's insistence that the state defendants acted unconstitutionally, with intent to cause him harm, because they had no proof that Donna was actually starving or dangerously jaundiced is not a material issue in this case.  The information Murphy and Arnone had been provided by the hospital and other community services, combined with the plaintiff's refusal to cooperate and clarify the

allegations at the cost of having his daughter taken from him, gave them ample support for their finding that Donna would be in imminent physical danger or at "risk of harm" if she remained with her parents.

      The plaintiff has not refuted or provided the court with any demonstrable evidence to create a genuine issue as to the truth of the following material facts which Murphy and Arnone had at their disposal when they decided to file a motion for temporary custody of Donna and a neglect petition in the Superior Court for Juvenile Matters in Danbury:  Donna was a new born infant who, by virtue of her young age, required a high degree of care and attention (see, *In re Carl O.*, 10 Conn. App. 428, 435-36, n. 3 (1987), cert. denied, 204 Conn. 802 (1987); Dr. Kilchevsky had informed DCF that the child was medically vulnerable due to jaundice and low birth weight, a condition that the doctor told DCF could lead to dehydration and brain damage; the degree of medical risk at the point at which she was removed was unclear to Robert Murphy because of the father's refusal to provide information to clarify the situation or to allow her to be examined by a physician;  because Donna was an infant and the father had refused medical support services, against the recommendation of Danbury Hospital, Donna was home alone with one or both of her parents and was not visible to the community, if she was in distress there would be no way for DCF or an outside agency to timely learn of the problem and, if necessary, to intervene and provide assistance;  Robert Murphy learned from his interview of the mother that she was the caretaker for the child while the father was out;  Dr. Kilchevsky expressed the opinion that the mother would not be able, due to her own limitations, to recognize if the child was in distress and to take appropriate action;  the psychiatric social worker, Ms. Turton Creal, who assessed the mother, opined that the child would be at significant risk in the care of the mother due to her mental health condition;  in addition, Robert Murphy's observations of the plaintiff's behavior convinced him that the plaintiff suffered from significant mental illness that Mr. Murphy believed had a direct impact on his ability to safely parent the child, i.e., the father's choice to turn the child over to DCF rather than answer his

questions; Robert Murphy also thought that it was significant that the mother disclosed that the plaintiff was emotionally abusive to her. (Exhibit B, Murphy Aff. Para's 16 & 17)

The fact that there was a brief examination of Donna in a hallway on October 10, 1999 at which time she appeared fine did not reduce the risk that the above described circumstances created. Nor did the fact that a friend of the plaintiff tried to tell Mr. Murphy that Donna had been seen by a pediatrician, where the plaintiff forbade her to disclose more details, provide sufficient information or assurances to DCF that Donna was safe with her parents. The plaintiff's assertion that Murphy knew prior to the removal that the child had been seen by a pediatrician is unsupported by any evidence in the record. The plaintiff's assumption that his attorney provided Mr. Murphy with a letter from Dr. Mani on October 22, 1999, was also unsupported by any evidence and is not material to the propriety of the removal or the overall assessment of the risk of harm the parents presented to Donna. (Exhibit B, Murphy Aff. Para. 22).

The plaintiff also accuses the state defendants of refusing to turn evidence over to him. (Memorandum p. 15). This discovery issue has been discussed with the plaintiff and he was advised that a tape recording of the follow-up call made by Dr. Kilchevsky to the DCF Hotline office was not made. (See attached Affidavit of Kenneth Mysogland). The plaintiff has failed to meet his burden to establish a genuine issue of material fact as to any of the elements he would be required to prove at trial. There is insufficient factual support for his assertions that the state defendants did not act in an objectively reasonable fashion or his speculation that there was some purposeful conspiracy to mistreat him due to his mental disability or lack of cooperation. Therefore, summary judgment must be granted.

11

**III.    THE PLAINTIFF HAS FAILED TO PROVIDE ANY LEGAL BASIS FOR HIS CLAIM THAT HE WAS ENTITLED TO REPRESENTATION AT STATE EXPENSE DURING THE CHILD PROTECTION INVESTIGATION.**

The plaintiff's memorandum of law focuses on his claim that his constitutional right to an attorney was violated in this case. As the state defendants previously pointed out in their memorandum of law in support of their motion for summary judgment, in Connecticut, neglect and order of temporary custody proceedings in the Juvenile Session of Superior Court are in the nature of civil proceedings. See *In Re Juvenile Appeal (85-2)*, 3 Conn. App. 184, 189 (1985); *In Re Christopher A*., 22 Conn. App. 656, 663 (1990). The right to counsel in child protection proceedings, including termination of parental rights, is a statutory right and not a constitutional one. *Lassiter v. Dept. of Social Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L. Ed. 2d 640 (1981). The Sixth Amendment, the basis of the plaintiff's claim, as well as article first, § 8, of the Connecticut constitution are strictly limited to criminal defendants. *State* v. *Anonymous*, 179 Conn. 155, 159 (1979); *In Re Noel M*., 23 Conn. App. 410, 221 (1990). See *In re Lauren R*., 49 Conn.App. 763, 778 (1998). Even if the Sixth Amendment was applicable to this case, the right to counsel would only attach at the first appearance in court. See *Deshawn E.* v. *Safir*, 156 F. 3d 340 (2nd Cir. 1998). In this case, the plaintiff, the respondent mother and the minor child were all appointed counsel by Judge Eveleigh by the first court date.

The plaintiff has failed to cite to any case law that counters the above analysis. His argument contains recitation to the law regarding the right to counsel once judicial intervention commences. (Plaintiff's Memorandum p. 10). However, none of those cases support a constitutional or statutory right to counsel at the time of the investigation and therefore the plaintiff cannot make out a § 1983 claim based upon the fact that Mr. Murphy did not provide him with an attorney during his investigation.

**IV.    CONCLUSION:**

The plaintiff has not countered factually or legally the state defendants' arguments in their motion for summary judgment concerning the lack of personal involvement for Kristine Ragaglia, Rogerio Lima, Sandra Liquindoli and Edward Federici; the claim of absolute immunity for activities related to the juvenile court proceedings on behalf of Murphy, Arnone and Federici or the state defendants' arguments on the state law claims.  Given the above analysis regarding the plaintiff's failure to refute the state defendants' entitlement to qualified immunity, the plaintiff's failure to address the other claims of the motion for summary judgment and the undisputed facts of this case, the motion for summary judgment should be granted in relation to all counts on behalf of all state defendants.

        DEFENDANTS,

        Kristine Ragaglia, Sandra Liquindoli, Robert
        Murphy, Roger Lima, Ralph Arnone, Edward
        Federici

        RICHARD BLUMENTHAL
        ATTORNEY GENERAL

BY:    _____
        Carolyn Signorelli
        Assistant Attorney General
        55 Elm St., Annex
        Hartford, CT 06106
        Juris no. ct17534
        Tel:  (860) 808-5160
        Fax:  (860) 808-5384

**CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed in accordance with Rule 5(b) of the Federal Rules of Civil Procedure on this 9th day of March, 2004, first class postage prepaid to:

Mr. John Ward
18 Garmella Boulevard
Danbury, CT 06810

James Williams, Esq.
Williams, Walsh & O'Connor
110 Washington Avenue, 2nd Fl.
North Haven, CT 06473

Stephen Fogerty, Esq.
Halloran & Sage, LLP
315 Post Road West
Westport, CT 06880

Heidi M. Cilano, Esq.
Garie J. Mulcahey, Esq.
Bai, Pollock, Blueweiss & Mulcahey, P.C.
10 Middle Street
Bridgeport, CT 06604

_____
Carolyn Signorelli
Assistant Attorney General