UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOHN WARD              :
  Plaintiff,         :
                      :
v.                     :    Civil No. 3:01CV01908(AVC)
                      :
ROBERT MURPHY, ET AL., :
  Defendants.        :

## RULING ON THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This is an action for damages and injunctive relief, which

alleges, _inter alia_, that various employees of the Connecticut

Department of Children and Families ("DCF") violated the

plaintiff's rights as secured by the Fourth, Fifth, Sixth and

Fourteenth Amendments to the United States Constitution when they

unlawfully removed the plaintiff's minor child from his custody.

It is brought pursuant to 42 U.S.C. § 1983, the Americans with

Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, and common

law tenets concerning intentional infliction of emotional

distress, defamation, slander and false imprisonment.  The

defendants, the DCF, Kristine Ragaglia, Ralph Arnone, Robert

Murphy, Susan Liquindoli and Roger Lima, have filed the within

motion for summary judgment (document no. 152), pursuant to Fed.

R. Civ. P. 56, contending that the plaintiff has failed to raise

an issue of material fact and therefore that they are entitled to

judgment as a matter of law.

The issues presented are: (1) whether the defendants are

entitled to qualified immunity with regard to the causes of

1

action that allege a violation of the plaintiff's procedural due

process rights; (2) whether the plaintiff has raised an issue of

fact with regard to the causes of action that allege a violation

of the plaintiff's fourth amendment rights; (3) whether the

defendants are entitled to qualified immunity with regard to the

causes of action that allege a violation of the plaintiff's fifth

and sixth amendment rights; (4) whether the eleventh amendment

bars the causes of action brought pursuant to 42 U.S.C. § 1983

asserted against the DCF and the individual defendants in their

official capacities; (5) whether the plaintiff has standing to

seek prospective injunctive relief; (6) whether the plaintiff has

raised an issue of fact that the defendants impermissibly

discriminated against him on the basis of his disability in

violation of the ADA; and (7) if judgment is granted in favor of

the defendants on the causes of action brought pursuant to

federal law, should the court exercise discretion over the causes

of action brought pursuant to state law.

For the reasons that hereinafter follow, the court concludes

that: (1) because the defendants actions were objectively

reasonable, the defendants are entitled to qualified immunity

with regard to the causes of action alleging a violation of the

plaintiff's procedural due process rights; (2) the plaintiff has

failed to raise an issue of fact with regard to the causes of

action alleging a violation of the plaintiff's fourth amendment

rights; (3) because the plaintiff has failed to allege a

2

constitutional violation, the defendants are entitled to qualified immunity with regard to the causes of action that purportedly allege a violation of the plaintiff's fifth and sixth amendment rights; (4) the eleventh amendment bars the causes of action brought pursuant to 42 U.S.C. § 1983 and asserted against the DCF and the individual defendants in their official capacities; (5) because the plaintiff has failed to allege an injury that is sufficiently real and immediate, the plaintiff lacks standing to seek prospective injunctive relief; (6) the plaintiff has failed to raise an issue of fact that the defendants impermissibly discriminated against him on the basis of his disability in violation of the ADA; and (7) having concluded that judgment should be granted in favor of the defendants with regard to the causes of action brought pursuant to federal law, the court declines to exercise its discretion over the state law causes of action and dismisses those claims without prejudice.

Consequently, the defendants' motion for summary judgment (document no. 152) is GRANTED.

**FACTS:**

Examination of the complaint, pleadings, Local Rule 56(a) statements, and exhibits accompanying the motion for summary judgment, and the responses thereto, discloses the following undisputed, material facts.

On October 6, 1999, Patricia Maruscak gave birth to a baby
girl, D. W.,[1] at the Danbury Hospital.  John Ward, the plaintiff,
is the acknowledged father of D.W.  Dr. Eitan Kilchevsky was
D.W.'s attending physician while she was a patient at the Danbury
Hospital.

During D.W.'s hospital stay, she lost five to eight per-cent
of her body weight and became jaundiced.  On October 8, 1999,
Kilchevsky discharged D.W. from the hospital.  However, because
of D.W.'s medical condition and Kilchevsky's assessment that "the
mother could benefit from post-discharge support," Kilchevsky
referred the family to the Danbury Visiting Nurse Association
("VNA").[2]  At the time of discharge, Ward agreed "to accept the
VNA service and a visit was scheduled for October 9, 1999."

On October 10, 1999, the VNA informed Kilchevsky that Ward
had cancelled the scheduled visit.  Based on the fact that D.W.
had lost weight and was jaundiced while at the hospital,
Kilchevsky "felt strongly that the baby should be seen."
Therefore, Kilchevsky requested that the matter be referred to
the Connecticut Department of Children and Families ("DCF"), and

---

[1]The plaintiff's complaint relates to matters that occurred
incident to an investigation regarding the alleged neglect of a minor
child.  Generally, records relating to such matters are sealed and
the identity of the minor child kept confidential.  See Connecticut
Practice Book § 35-5.  Accordingly, the court shall refer to the
minor child by using her initials.

[2]Kilchevsky states that such a referral was his "practice with
all such infants, and is in accordance with American Academy of
Pediatrics guidelines."

"requested that they, along with a [VNA] nurse, go out to the home."  On October 10, 1999, one Angela Crooke, an employee of Danbury Hospital, reported Kilchevsky's concerns about the welfare and safety of D.W. to the DCF.

A DCF employee, one Sandra Liquindoli, began an investigation of Crooke's report.  Based on her investigation, Liquindoli learned that Ward had cancelled the VNA home visit and that he had provided no explanation for the cancellation. Liquindoli also learned that Maruscak, D.W.'s mother, was "very slow and that . . . [Ward] was overbearing and would not allow the mother to speak."

On October 10, 1999, Liquindoli, accompanied by a VNA nurse and two members of the Danbury Police Department ("DPD"), went to Ward's apartment to "investigate the situation and make sure that the child was safe in light of the concerns expressed by the . . . [hospital.]"  Ward, who was home at the time of the visit, refused to answer the door, stated that the police had no legal right to open the door, and refused to permit the child to be examined.  In addition, Ward refused to permit Liquindoli, the nurse, or the police to speak with the mother of the child.

Ward eventually agreed to take the child to the Danbury Hospital and permit an examination of D.W. by Kilchevsky. Liquindoli called Kilchevsky to inform him of the situation. Kilchvesky informed Liquindoli that he would examine the child. Kilchevsky also told Liquindoli that the child should be examined

because "untreated jaundice can lead to dehydration and brain damage." Further, according to Kilchevsky, "the mother was not capable of caring for the child as she appeared to be extremely slow and might not be able to determine if the child was in distress."

Ward thereafter stated that he was no longer willing to take his child to the hospital. Ward did, however, permit the nurse to conduct a cursory examination of D.W. in the hallway outside of his apartment. Based on the examination, it was "Liquindoli's understanding that the child did not require any medical intervention at that time." The nurse informed Kilchevsky of the status of the baby, noting that, although dressed at the time that she was weighed, the baby appeared to have gained weight. Also the child did not appear to be jaundiced.

Nevertheless, Kilchevsky felt that, "given the fact that this was a young infant, who had experienced weight loss and jaundice, which are conditions that could lead to complications if the infant was not properly monitored and cared for, . . . it was imperative that [the child] be medically seen and that DCF remain involved to ensure [that] the appropriate follow-up was obtained by the parents." Kilchevsky communicated this concern to Liquindoli on October 10, 1999. Liquindoli thereafter spoke with her supervisor and reported what had occured.

On October 12, 1999, DCF personnel assigned Robert Murphy, an investigative social worker employed by the DCF, to perform a

follow up investigation on the report of suspected child neglect

in connection with D.W.  As part of his initial investigation,

Murphy learned of Kilchevsky's concern regarding the possible

effects of untreated jaundice, as well as his concern regarding

the mother's capacity to notice warning signs of possible

distress.  Murphy also learned that, on October 7, 1999, one Judy

Mills, a licensed clinical social worker at Danbury Hospital, had

made a report of suspected child neglect with regard to D.W.   In

her report, Mills stated:

> [M]uch difficulty [with] resistance to see social worker prior
> to [birth] at Women's Health Center . . . [with] John [Ward]
> speaking for [mother], answering questions asked to her,
> showing signs that [Ward] was controlling and manipulating
> [mother].  Plans changed regarding living alone or together
> several times, infant wanted by father and concern by staff
> [regarding whether mother] was being compliant against her
> wishes. . . .  [C]oncern [that Ward] appears paranoid
> suspicious, and refuses to let social worker speak to mother.
> . . .  Difficult communications with staff; many problems.
> [Ward] [r]efused to sign forms in hospital, i.e., condition of
> admission, until several people involved explaining especially
> around outside services.  Agree to Health Families prenatally
> and now refuses Health [Families].  Now is agreeing to MD
> order to follow up visit of VNA and concern will refuse their
> entry to check on infant after discharge.  The intent appears
> that he will be primary caregiver [and] mother [will] only
> breast feed[.]  Concern infant may not receive proper care
> medically.  Unable to assess situation and supports.

During his investigation, Murphy also became aware that

Kilchevsky considered Ward "overwhelming" and that Ward had been

uncooperative with Liquindoli when she went to his apartment on

October 10, 1999.  Although Murphy knew that the VNA nurse had

briefly examined D.W. in the hall, Murphy learned that Kilchevsky

"had recommended that the [DCF] conduct a further investigation

due to apparent problems with the family and that the child receive a medical examination within three days."

On October 13, 1999, Murphy met with Maruscak, D.W.'s mother, at her apartment.  Maruscak reported that she did not have the infant and that the child generally stayed with Ward. Maruscak stated, however, that she "babysat" for Ward while he went to work.  Maruscak stated that she was unaware of where Ward worked; who D.W.'s doctor was; or that the DCF had visited Ward's home on October 10, 1999.

On October 13, 1999, Murphy went to Ward's apartment. Murphy knocked on the apartment door, but there was no response. Murphy left his business card in the doorjamb with a note requesting that Ward contact him.  On October 14, 1999, Murphy returned to the apartment and the card was no longer there. Murphy thereafter sent a certified letter to Ward requesting that he contact him; Ward did not respond.

On October 18, 1999, Murphy, accompanied by one Roger Lima, a case aide employed by the DCF, went to Ward's apartment to make a home visit.  Ward, who was home at the time, informed Murphy and Lima that "he refused to speak to any agents of the government."  Murphy informed Ward that he and Lima were there to check on the health and well-being of D.W.  Ward apparently turned on an audio recording and stated that "the DCF would have to talk to his attorney."  Murphy asked for Ward's attorney's name, and Ward stated that the DCF was responsible for providing

him an attorney and that once an attorney was provided he would speak with Murphy.

Murphy left and returned in the early evening with several members of the Danbury Police Department.  Ward refused to answer the door unless the police produced a warrant.  According to police reports, Ward "was displaying what could be best be described as a survivalist attitude and [the police] feared that [Ward] might have weapons. . . . All the officers present felt uneasy about Ward and had a fear for [their] . . . safety, and the safety of the baby."  An ambulance was called to the scene to transport the baby to the hospital.

While these events were occurring, Murphy, via cell-phone, informed DCF Program Supervisor Ralph Arnone of the situation. Arnone was growing increasingly concerned regarding the situation.  Specifically, Arnone was concerned by Ward's paranoid behavoir and apparent refusal to accept outside help, particularly in light of the medical concerns of D.W.'s physician.  Therefore, "based on the concerns regarding the medical issues of the infant, the lack of cooperation and hostile demeanor of Ward, . . . and the apparent mental health issues of both parents," Arnone issued a 96-hour hold pursuant to Conn. Gen. Stat. 17a-101g(c).[3]

---

[3]Conn. Gen. Stat. 17a-101g(c) provides, in relevant part:
> If the Commissioner of Children and Families, or his designee, has probable cause to believe that the child or any other child in the household is in imminent risk of physical

Muprhy advised Ward of the 96-hour hold and Ward granted
Murphy, Lima and the police officers entry into his apartment.
Once inside the apartment, Murphy informed Ward that there were
two possible resolutions to the situation.  First, Ward could
agree to answer various questions relating to the care of the
child and accompany them and the baby to the hospital emergency
room where the baby would be examined.  If the examination
revealed no medical concerns, Ward was free to take the baby
home.  Alternatively, if Ward refused to cooperate and answer the
questions, then the DCF would take custody of the child.  Ward
refused to cooperate and Murphy removed the child.

On October 19, 1999, Murphy, accompanied by DCF psychiatric
social worker Nancy Turton-Creal, spoke with Maruscak, D.W.'s
mother.  Based on the conversation, Turton-Creal determined that
Maruscak's mental health disorders could impede the mother's
ability to care for the child and result in an inability to
"recognize distress in [D.W.]"  On October 20, 1999, Murphy spoke
with one Ginny Cameron of the Danbury Hospital Community Center
for Mental Health, who informed Murphy that Ward had been
diagnosed with personality disorder and anxiety disorder.  Also

---

harm from his surroundings and that immediate removal from
such surroundings is necessary to ensure the child's safety,
the commissioner, or his designee, shall authorize any
employee of the department or any law enforcement officer to
remove the child and any other child similarly situated from
such surroundings without the consent of the child's parent
or guardian.

on October 20, 1999, Murphy spoke to Mills, who once again stated
that Ward was paranoid, suspicious and uncooperative.  Mills was
also concerned that D.W. "may not receive proper medical
attention under her parents' care."

On October 21, 1999, Murphy filed a motion for temporary
custody and a neglect petition in the Connecticut superior court
for juvenile matters.  Murphy also filed an affidavit and summary
of facts reciting the various facts underlying the motion and the
neglect petition.  The affidavit stated that Kilchevsky had
warned that the child should be medically treated because her
conditions could lead to serious injury if not treated.  However,
the affidavit also indicated that the child had been examined at
a hospital after being removed from the home on October 18, 1999,
and that the examination indicated that jaundice and weight loss
were no longer a concern.  The affidavit also recited the various
reports Murphy had received with regard to both Ward's and
Maruscsak's mental conditions and the impact such conditions may
have on their ability to care for the infant child.  In addition,
the affidavit indicated that Ward had been uncooperative in his
dealings with various agencies.

On October 21, 1999, a Connecticut superior court granted
the motion for an order of temporary custody.  More specifically,
the court concluded that based on the submitted affidavit D.W.
was in "immediate physical danger from her surroundings and that
immediate removal from such surroundings is necessary to insure

11

[her] safety . . . ."

On November 3, 1999, the Connecticut superior court held an evidentiary hearing and heard argument on the order for temporary custody.  Following that hearing, the court vacated the order of temporary custody and returned D.W. to Ward's custody. Specifically, the court concluded that "based on a fair preponderance of the evidence," "the court is not convinced that the child is in immediate physical danger from the surroundings in . . . Ward's home."  The court's order, however, was subject to Ward's compliance with various conditions, including: (1) that Ward cooperate with the DCF; (2) that he attend psychological and psychiatric counseling; and (3) that he insure that the child is properly supervised and cared for by an appropriate caretaker. On December 14, 1999, the DCF withdrew the neglect petition.

This lawsuit followed.

## STANDARD:

Summary judgment is appropriately granted when the evidentiary record shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In determining whether the record presents genuine issues for trial, the court must view all inferences and ambiguities in a light most favorable to the non-moving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).  A

12

plaintiff raises a genuine issue of material fact if "the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rule 56 "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims... [and] it should be interpreted in a way that allows it to accomplish this purpose." Celotex v. Catrett, 477 U.S. 317, 323-324 (1986).

## DISCUSSION:

1. Federal Constitutional Claims:

  A. Causes of Action against the Defendants in their Individual Capacities

The individual defendants first contend that they are entitled to qualified immunity with regard to the causes of action alleging a constitutional violation brought pursuant to 42 U.S.C. § 1983,[4] which seek monetary damages.

  I. Procedural Due Process:

The defendants contend that they are entitled to summary

---

[4]Section 1983 provides a "cause of action to individuals who have been deprived by government officials acting under color of law 'of any rights, privileges, or immunities secured by the Constitution.'" Patel v. Searles, 305 F.3d 130, 135 (2d Cir. 2002) (quoting 42 U.S.C. § 1983).

judgment with regard to the procedural due process cause of action brought pursuant to 42 U.S.C. § 1983 because they are immune from suit pursuant to the doctrine of qualified immunity. Specifically, the defendants maintain that the removal of D.W. was objectively reasonable.

The plaintiff responds that the defendants are not entitled to qualified immunity because they "offer[] no objective evidence of abuse or neglect . . . ." Specifically, the plaintiff maintains that the defendants "concerns and characterizations are merely speculative of some future abuse or neglect and speculation about the abilities of parents with mental disabilities."

"[Q]ualified immunity, . . . shields a government official acting in an official capacity from suit for damages under § 1983 unless the official violated clearly established rights of which an objectively reasonable official would have known." Blouin ex rel. Estate of Pouliot v. Spitzer, 356 F.3d 348, 358 (2d Cir. 2004) (internal quotation marks omitted; citation omitted). The relevant test for whether qualified immunity applies requires a three step inquiry:

> First, [the court] must determine whether plaintiff has
> alleged a violation of a constitutional right. Then [the
> court] must consider if the violated right was clearly
> established at the time of the conduct. . . . Finally, if
> plaintiff had a clearly established, constitutionally
> protected right that was violated by the [defendants], [the
> plaintiff] must demonstrate that defendants' actions were not
> objectively reasonable. . . . This three step inquiry should
> typically be done in sequential order. . . . Defendants may

14

benefit from qualified immunity if the plaintiff is unable to establish any of these three steps.

Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 206, 211-12 (2d Cir. 2003) (internal citations omitted).

With regard to the first step, the plaintiff has alleged a constitutional violation. Specifically, the plaintiff alleges that the defendants improperly deprived him of the custody of his child without court intervention and that there was no emergency necessitating such action. These allegations are sufficient. See Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999) (parents "have a constitutionally protected interest in the . . .custody . . . of their children," which, absent an emergency, requires some form of due process, "ordinarily a court proceeding resulting in an order permitting removal," before the parents may be deprived of the custody of their children). In addition, with regard to the second step of the qualified immunity analysis, there is apparently no dispute that this right was established at the time the DCF took custody of D.W. See Tenenbaum v. Williams, 193 F.3d 581, 596 (2d Cir. 1999) (noting that before January 1990, "it was established as a general matter that 'exept where emergency circumstances exist' a parent 'cannot be deprived' of the custody of his child or her child 'without due process generally in the form of a predeprivation hearing").

The relevant qualified immunity inquiry therefore is whether the defendants' actions were objectively reasonable. In this

regard, and with particular relevance to the facts at hand, the

Second Circuit has stated that:

> [P]rotective services caseworkers [must] choose between
> difficult alternatives. . . . If they err in interrupting
> parental custody, they may be accused of infringing the
> parents' constitutional rights. If they err in not removing
> the child, they risk injury to the child and may be accused of
> infringing the child's rights. It is precisely the function of
> qualified immunity to protect state officials in choosing
> between such alternatives, provided that there is an
> objectively reasonable basis for their decision, whichever way
> they make it.

Tenenbaum v. Williams, 193 F.3d 581, 596-97 (2d Cir. 1999)

(quoting van Emrik v. Chemung County Dept. of Social Services,

911 F.2d 863, 866 (2d Cir. 1990)). More specifically, qualified

immunity provides "substantial protection for caseworkers,"

provided "it was objectively reasonable for them to believe that

their acts" would not violate clearly established rights.

Tenenbaum v. Williams, 193 F.3d 581, 596 (2d Cir. 1999) (quoting

Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995)). The test of

"objective reasonableness" is satisfied if "officers of

reasonable competence could disagree on the legality of the

defendant's actions." Tenenbaum v. Williams, 193 F.3d 581, 596-

97 (2d Cir. 1999) (quoting Lennon v. Miller, 66 F.3d 416, 420 (2d

Cir. 1995)) (internal quotation marks omitted). "In applying a

reasonableness standard in the abuse context, courts must be

especially sensitive to the pressurized circumstances routinely

confronting case workers, circumstances in which decisions

between 'difficult alternatives' often need to be made on the

basis of limited or conflicting information." Wilkinson ex rel
Wilkinson v. Russell, 182 F.3d 89, 105 (2d Cir. 1999) (quoting
van Emrik v. Chemung County Dept. of Social Services, 911 F.2d
863, 866 (2d Cir. 1990)).

   In the instant matter, the defendants maintain that,
regardless of the plaintiff's allegations, the removal of D.W. on
October 18, 1999 was objectively reasonable because the
circumstances surrounding the removal gave rise to an emergency.
It is well settled that in "emergency circumstances, a child may
be taken into custody by a responsible State official without
court authorization or parental consent." Tenenbaum v. Williams,
193 F.3d 581, 594 (2d Cir. 1999). However, "[i]f the danger to
the child is not so imminent that there is reasonably sufficient
time to seek prior judicial authorization, ex parte or otherwise,
for the child's removal, then the circumstances are not
emergent." Nicholson v. Scoppetta, 344 F.3d 154, 171 (2d Cir.
2003) (internal citations and quotation marks omitted).
Nevertheless, the fact that a state official did not act
immediately upon a report of abuse, "standing alone, proves
nothing." Tenenbaum v. Williams, 193 F.3d 581, 595 (2d Cir.
1999); see also Doe v. Connecticut Dep't of Child & Youth
Services, 911 F.2d 868, 870 (2d Cir. 1990) (concluding that delay
of three days in acting on report of abuse did not deprive
circumstances of emergency status). Rather, "[i]f at any time
[the child] should have been removed for her protection and there

17

was not then reasonably sufficient time to seek predeprivation
judicial authorization, there [is] . . ., as a matter of law, no
violation of [the parents'] due process rights." Tenenbaum v.
Williams, 193 F.3d 581, 595 (2d Cir. 1999). Consequently, a
delay between the report of imminent harm and the actual removal
does not deprive the removal of emergent status, see Doe v.
Connecticut Dep't of Child & Youth Services, 911 F.2d 868, 870
(2d Cir. 1990), provided that it was objectively reasonable for
the case workers to believe that an emergency existed at the time
of removal, Tenenbaum v. Williams, 193 F.3d 581, 595 (2d Cir.
1999).

Applying these principles, the court concludes that the
defendants are entitled to qualified immunity inasmuch as it was
objectively reasonable for the defendants to have concluded that
emergency circumstances necessitated D.W.'s removal on October
18, 1999. It is undisputed that at the time of D.W.'s removal,
the defendants had been informed by D.W.'s physician, Kilchevsky,
that D.W. was suffering from jaundice and weight loss. The
consequences of untreated jaundice, according to Kilchevsky, are
indeed grave. Specifically, as the defendants knew, if
untreated, jaundice can lead to brain injury and even death. In
fact, Kilchevsky informed the defendants that "it was imperative
that [D.W.] be medically seen and that DCF remain involved to
ensure the appropriate follow up" and that D.W.'s condition
required that she be seen within three days of the October 10,

1999 visit. (Emphasis added.)    Kilchevsky made this statement
even after D.W. had been examined by the visiting nurse on
October 10, 1999.  Thus, based on the medical advice and
diagnosis of Kilchevsky, it was objectively reasonable for the
defendants to conclude that D.W. was at grave medical risk on
October 18, 1999, some eight days after the earlier visit, if her
condition went untreated.  Cf. Wilkinson ex rel Wilkinson v.
Russell, 182 F.3d 89, 105-106 (2d Cir. 1999) (concluding that
social workers had reasonable cause to believe abuse was
occurring when they relied, in part, on doctor's assessment that
child was being abused)

Ward's behavior did nothing to quell the defendants' fears
that the child was at risk.  Ward's refusal to state whether the
child had seen a doctor after the October 10, 1999 visit
compounded the urgency of the situation because the defendants
were therefore unable to confirm whether the child had been
medically treated as Kilchevsky believed necessary.  Further,
Ward's refusal to cooperate and refusal to accompany the DCF
workers to the hospital came in the face of his knowledge that
medical personnel believed that his child was in danger.
Specifically, Kilchevsky had told Ward at the time of discharge
that D.W. should be seen by medical personnel because of her
medical condition.  In addition, it is undisputed that DCF showed
Ward the 96-hour hold, and that the 96-hour hold stated that the

"Danbury Hospital expressed serious concerns (medical) with respect to . . . [D.W.]."  In the face of this information, Ward nevertheless refused to accept the medical aid offered for his daughter.  There was therefore limited reason to believe that child would receive the necessary aid if she remained in Ward's custody.[5]

Further, on October 21, 1999, a Connecticut superior court granted the DCF's motion for an order of temporary custody finding that D.W. was in "immediate physical danger from [her] surroundings and that immediate removal from such surroundings is necessary to insure [her] safety."  Although this order was signed three days after the DCF removed D.W. from the home, it was based on similar facts relied on by the individual defendants at the time of D.W.'s removal.  This supports the conclusion that the DCF's actions were objectively reasonable.  See Taylor v. Evans, 72 F. Supp. 2d 298, 307 (S.D.N.Y. 1999) (subsequent court order finding that removal is necessary based on "imminent" danger to children supported social worker's contention that there was objectively reasonable basis for belief that emergency existed).  Indeed, the evidence relied on by the superior court was arguably less "urgent" than that relied on by the defendants at the time of removal.  Specifically, with regard to D.W.'s

---

[5]Ward contends that his behavior is explained by the fact that D.W. had been seen by a physician on October 14, 1999, and that she had been declared in good health.  The defendants, however, were unaware of this fact at the time of removal.

medical condition, the affidavit supplied to the superior court stated that the child had been examined by a doctor and that the doctor "reported that the jaundice was no longer a concern and that the child was gaining weight appropriately." Arguably, therefore, the medical condition of the child at the time of the superior court's decision was not as imminent as at the time of removal.[6] Based on these undisputed facts, and in light of the superior court's conclusion on arguably less urgent facts, "caseworkers 'of reasonable competence could disagree' on the legality of [the] defendants' actions." Tenenbaum v. Williams, 193 F.3d 581, 605 (2d Cir. 1999) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). Consequently, the court concludes that the defendants actions in removing D.W. based on the belief that an emergency existed were objectively reasonable and thus they are entitled to qualified immunity.

The plaintiff maintains, however, that the defendants fabricated the allegations regarding the D.W.'s medical state. Specifically, the plaintiff contends that "Murphy, Lima and

---

[6]The plaintiff contends that after a contested evidentiary hearing, the superior court ultimately reversed its decision and therefore the superior court's initial conclusion that the child was at risk of harm is irrelevant. This contention, however, misses the point. The issue is whether, *at the time of removal*, it was objectively reasonable for the defendants to conclude that their acts were constitutional. Whether the defendants' actions were reasonable in light of the evidence adduced after a contested evidentiary hearing is irrelevant. Cf. Maryland v. Garrison, 480 U.S. 79, 85 (1987) ("[t]hose items of evidence that emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued").

Arnone had to fabricate that [D.W.] was currently jaundiced and losing weight because they already knew that the police would not help them enter [the plaintiff's apartment] for a non-emergency . . . ."  The plaintiff's argument is not persuasive.  Put simply, the plaintiff has failed to adduce any evidence that at the time of removal the defendants fabricated the allegations of jaundice and weight loss or otherwise ignored overwhelming exculpatory information.  Indeed, the very opposite is true.  More specifically, the defendants have submitted sworn affidavits indicating that they had reports from D.W.'s physician that the child was jaundiced when released from the hospital and that untreated jaundice can lead to severe injuries.  Although the child had been examined on October 10, 1999, the child's physician renewed his concern that the child should be examined again within three days.  In the face of this evidence, the plaintiff presents only conclusory allegations that the defendants fabricated a medical emergency; such conclusory allegations are insufficient.  See Kia P. v. McIntyre, 235 F.3d 749, 763 (2d Cir. 2000) ("[a] plaintiff may not survive a properly asserted motion for summary judgment on the basis of conclusory allegations alone").

The court therefore concludes that the defendants are entitled to qualified immunity with regard to the cause of action

alleging a deprivation of the plaintiff's due process rights.[7]

## II.   Fourth Amendment Causes of Action:

The individual defendants next maintain that, to the extent that the plaintiff has alleged a violation of his fourth amendment rights, they are entitled to qualified immunity in connection with this claim.  Specifically, the defendants maintain that the plaintiff has failed to allege a constitutional violation because "there is no constitutional right to be free of a child welfare investigation."

The plaintiff does not specifically respond to this argument.

The plaintiff's fourth amendment claims apparently arise out of the defendants entry into his home on October 18, 1999.  More specifically, the plaintiff alleges that the DCF entry into his home was a warrantless search in violation of his fourth

---

[7]The plaintiff also apparently contends that the defendants violated his right to procedural due process by filing the motion for temporary custody and the neglect petition.  The investigation and institution of proceedings in connection with alleged child abuse or neglect pass constitutional muster "provided simply that case workers have a reasonable basis for their findings of abuse."  Wilkinson ex rel Wilkinson v. Russell, 182 F.3d 89, 104 (2d Cir. 1999).  In this case, the defendants had such a reasonable basis.  For example, based on Murphy's investigation it became apparent that the child spent the day with Maruscak who - according to various individuals - likely lacked the ability to determine whether the child was in medical danger.  Therefore the plaintiff has failed to allege a constitutional violation in connection with the investigation and subsequent institution of neglect proceedings.

amendment rights.[8]  "A warrantless search is per se unreasonable
under the Fourth Amendment, absent certain exceptions to the
warrant requirement."  <u>Koch v. Town of Brattleboro</u>, 287 F.3d 162,
167 (2d Cir. 2002).  One exception to the warrant requirement is
where a party consents to entry into his premises.  <u>Koch v. Town
of Brattleboro</u>, 287 F.3d 162, 167 (2d Cir. 2002).  Another
exception is where emergency or exigent circumstances necessitate
a warrantless entry.  <u>Tenenbaum v. Williams</u>, 193 F.3d 581, 604
(2d Cir. 1999).

Applying these principles, the court concludes that the
defendants are entitled to summary judgment with regard to the
plaintiff's fourth amendment claims.  It is undisputed that the
plaintiff granted the defendants entry into his home.  In other
words, the plaintiff consented to the defendant's entry into his
home.  There is no allegation that the defendants coerced this
consent.  Because the undisputed facts therefore establish that
the plaintiff consented to the entry into his home, the plaintiff
has failed to raise an issue of fact with regard to his fourth
amendment claim.  On this ground, therefore, summary judgment is
warranted.

---

[8]The plaintiff does not allege that the removal and subsequent
custody of D.W. was an unlawful seizure in violation of D.W.'s
rights.  Moreover, inasmuch as the plaintiff does not bring this
action on behalf of his minor daughter, the plaintiff is precluded
from maintaining such a claim.  <u>See Alderamn v. United States</u>, 394
U.S. 165, 174 (1969) ("Fourth Amendment rights are personal rights
which, like some other constitutional rights, may not be vicariously
asserted").

Further, even if the court were to assume that the plaintiff did not consent to the defendants' entry, the defendants are nevertheless entitled to qualified immunity on the plaintiff's claim. Specifically, the defendants' alleged warrantless entry was objectively reasonable inasmuch as they believed that the situation presented exigent circumstances. In the child welfare context, the question of whether a situation presents exigent circumstances sufficient to render a warrantless entry reasonable presents the same inquiry applicable to the issue of whether an emergency removal of a minor child passes procedural due process scrutiny. See Tenenbaum v. Williams, 193 F.3d 581, 604 (2d Cir. 1999). Consequently, because the defendants are entitled to qualified immunity on the plaintiff's due process cause of action, and because the fourth amendment inquiry presents the same issue, the court likewise concludes that the defendants are entitled to qualified immunity on the plaintiff's fourth amendment cause of action because, based on the undisputed facts, it was objectively reasonable for them to conclude that exigent circumstances justified a warrantless entry. The defendants' motion for summary judgment with regard to the plaintiff's fourth amendment causes of action is therefore granted.

III. <u>Fifth and Sixth Amendment Causes of Action</u>:

The individual defendants next contend that judgment should be granted in their favor with regard to the causes of action alleging violations of the Fifth and Sixth Amendment of the

25

United States Constitution because the defendants are entitled to qualified immunity.  Specifically, the defendants maintain that they are entitled to qualified immunity because the plaintiff has failed to allege a constitutional violation.

The plaintiff responds that "all DCF investigators [are] criminal law enforcement investigators, [and] all information gathered from civil child protection investigations [is] turned over to criminal investigators to use in . . . prosecuting child abuse and neglect [cases]."  Thus, according to the plaintiff, "the court should determine whether DCF investigators . . . were required to[: (1)] inform [the plaintiff of his] right to remain silent on . . . [October 10, 1999] and [October 18, 1999; and (2)] inform [the plaintiff of his] right to have an attorney present during questioning . . . ."

If a plaintiff fails to allege conduct that would violate a constitutional right, the officials are entitled to qualified immunity.  See Saucier v. Katz, 533 U.S. 194, 201 (2001).  In addition, regardless of whether the plaintiff has alleged a constitutional violation, if the constitutional right in question was not clearly established at the time the officials acted, the officials are entitled to qualified immunity.  See, e.g., Blouin ex rel. Estate of Pouliot v. Spitzer, 356 F.3d 348, 361 (2d Cir. 2004).

Applying these principles, the court concludes that the defendants are entitled to qualified immunity with regard to the

plaintiff's fifth and sixth amendment causes of action because
the plaintiff has failed to allege facts that give rise to a
constitutional violation.[9]  The gravamen of the plaintiff's fifth
amendment claim is that the defendants failed to advise him of
his right to remain silent and his right to legal counsel when
they came to his apartment on October 10, 1999 and October 18,
1999.  Thus, the plaintiff apparently contends that, in the
context of a DCF investigation, an individual has rights similar
to those articulated in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).
<u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 492 (1966) (holding that an
individual subjected to custodial interrogation must be advised
of his right to counsel and right to silence).  The plaintiff,
however, has failed to provide any legal authority for the
proposition that <u>Miranda</u> applies to DCF or similar agency
investigations.[10]  Moreover, the court's research has found no
case holding that <u>Miranda</u> applies in the context of such
investigations.  Nevertheless, even if the court were to assume
that <u>Miranda</u> applied, the plaintiff's claim would nonetheless

_____

[9]The plaintiff does not, in fact, invoke the fifth or sixth
amendment in his complaint or motion papers, but speaks more
generally regarding his right to silence and counsel.

[10]The plaintiff relies on <u>Ferguson v. City of Charleston</u>, 532
U.S. 67 (2001), <u>Lassiter v. Department of Social Services of Durham
City</u>, 452 U.S. 18 (1981), <u>In Re K.L.J.</u>, 813 P.2d 276 (Alaska 1991),
and <u>In Re. Ariel G.</u>, 837 A.2d 1044 (Md. Ct. Spec. App. 2003), cert.
granted, 846 A.2d 401 (Md. April 8, 2004), in support of his
contention that the defendants were required inform him of his right
to silence and right to counsel during its investigation of the
reported child abuse and neglect.  None of these cases support such a
proposition.

fail because "[t]he remedy for a <u>Miranda</u> violation is the
exclusion from evidence of any ensuing self-incriminating
statements. . . . The remedy is *not* a § 1983 action." <u>Neighbour</u>
<u>v. Covert</u>, 68 F.3d 1508, 1510 (2d Cir. 1995), cert denied, 516
U.S. 1174 (1996) (internal citations omitted and emphasis added).
Consequently, the plaintiff's causes of action premised on the
fifth amendment fail to allege a cause of action.

Likewise, the plaintiff's cause of action premised on the
sixth amendment also fails.  The plaintiff's sixth amendment
cause of action alleges that the state should have provided him
with an attorney when the DCF questioned him at his home on
October 10, 1999 and October 18, 1999.[11]  Again, the plaintiff
fails to provide any relevant authority for this purported right
to counsel, and again the court's research indicates that there
is no such right.  More specifically, the sixth amendment right
to counsel applies only to criminal proceedings.  <u>See</u> <u>Janvier v.</u>
<u>United States</u>, 793 F.2d 449, 451 (2d Cir. 1986) ("the Sixth
Amendment right to counsel attaches only to criminal
proceedings"); <u>cf.</u> <u>United States v. Cunningham</u>, 672 F.2d 1064,
1071 (2d Cir. 1982).  The investigation at issue in this case was
in connection with issues surrounding the alleged neglect, care
and ultimate custody of the defendant's daughter.  Such issues
are civil juvenile matters, <u>see</u> Conn. Gen. Stat. § 46b-121(a),

---

[11]To be sure, the plaintiff does not allege that he was denied
counsel at the hearings to determine custody.

28

and are not criminal in nature.  The only court proceedings
instituted against the plaintiff related to the care and custody
of his child.  No criminal charges were ever filed against the
defendant.  Therefore, inasmuch as the investigations at issue
were civil in nature and because there never was a criminal
prosecution, no sixth amendment rights could attach.  <u>See</u> <u>Janvier</u>
<u>v. United States</u>, 793 F.2d 449, 451 (2d Cir. 1986).  The
plaintiff therefore has failed to allege a constitutional
violation of his sixth amendment rights.[12]

Judgment is therefore granted in favor of the individual
defendants with regard to the causes of action brought pursuant
to the fifth and sixth amendment.

B.    <u>Causes of Action Against the DCF and the Individual
      Defendants in their Official Capacities</u>

The individual defendants next contend that they are
entitled to summary judgment with regard to any causes of action
alleging a constitutional violation, which are brought against
them in there official capacity because the Eleventh Amendment to
the United States Constitution bars such claims.  Similarly, the

---

[12]Even if the court were to assume a constitutional violation,
the defendants are entitled to qualified immunity because the
specific rights alleged by the plaintiff are not clearly established.
<u>See</u>, <u>e.g.</u>, <u>Tenenbaum v. Williams</u>, 193 F.3d 581, 596 (2d Cir. 1999)
(defendants entitled to qualified immunity because rights at issue
were not clearly defined).  Indeed, the plaintiff implicitly concedes
as much in his response to the motion to summary judgment wherein he
requests that the court "*determine whether* the DCF investigators . .
. were required to inform [him of his right to remain silent and
right to counsel.]" (Emphasis Added.)

DCF also contends that the eleventh amendment bars the causes of action asserted against the DCF.

The plaintiff does not respond to this argument.

It is well settled that the Eleventh Amendment to the United States constitution bars causes of action for money damages brought pursuant to 42 U.S.C. § 1983 against states and individual defendants in their official capacity. See, e.g., Board of Educ. of Pawling Central School Dist. v. Schutz, 290 F.3d 476, 480 (2d Cir. 2002) (citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)).  In addition, the eleventh amendment also generally bars causes of actions for damages asserted against state agencies.  See Santiago v. New York State Dept. Correctional Serv., 945 F.2d 25, 28 n.1 (2d Cir. 1991) ("[a]gencies of the state . . . are entitled to assert the state's eleventh amendment immunity where, for practical purposes, the agency is the alter ego of the state and the state is the real party in interest").

Pursuant to these principles, the court concludes that the causes of action asserted against the individual defendants in their official capacity, which seek money damages, are barred by the eleventh amendment.  See Carroll v. Ragaglia, 292 F. Supp. 2d 324, 342 (D. Conn. 2003) (dismissing claims against individual defendants in their official capacity pursuant to Eleventh Amendment).  Likewise, the court also concludes that the causes of action that seek monetary damages, which are asserted against

the DCF, a state agency, are barred by the eleventh amendment.
See Burgos v. Department of Children & Families, 83 F. Supp. 2d
313, 316 (D. Conn. 2000) (cause of action seeking monetary
damages asserted against DCF barred by the eleventh amendment).[13]
Judgment is therefore granted to the defendants with regard to
the federal constitutional causes of action brought pursuant to
42 U.S.C. § 1983 and asserted against the DCF and the individual
defendants in their official capacity.

   C.   Prospective Injunctive Relief

   The defendants next contend that judgment should be granted
in their favor with regard to the plaintiff's claims for
prospective injunctive relief because the plaintiff lacks
standing to assert such claims.  Specifically, the defendants
contend that the plaintiff lacks standing because "the
possibility of future abuse is . . . speculative."

   The plaintiff does not respond this argument.

   "It goes without saying that those who seek to invoke the
jurisdiction of the federal courts must satisfy the threshhold
requirement imposed by Article III of the Constitution by
alleging an actual case or controversy."  City of Los Angelas v.
Lyons, 461 U.S. 95, 103 (1983).  This requirement, known as

---

   [13]There are exceptions to the applicability of the eleventh
amendment.  Specifically, if the state waives its immunity, see
generally Edelman v. Jordon, 415 U.S. 651, 663 (1974), or if congress
abrogates such immunity, see generally Quern v. Jordon, 440 U.S. 332,
341 (1979), the eleventh amendment is inapplicable.  The plaintiff
has not alleged that such circumstances exist in this case.

constitutional standing, requires the plaintiff to allege "that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" City of Los Angelas v. Lyons, 461 U.S. 95, 103 (1983) (quoting Golden v. Zwickler, 394 U.S. 103, 109-110 (1969)).

Thus, in City of Los Angelas v. Lyons, 461 U.S. 95, 103 (1983), the United States Supreme Court held that the plaintiff lacked standing to pursue prospective injunctive relief because he had failed to allege a real and immediate threat of harm at the hands of the defendant.  In Lyons, Los Angeles police department personnel had allegedly administered an unlawful choke hold on the plaintiff.  City of Los Angelas v. Lyons, 461 U.S. 95, 99 (1983).  The plaintiff brought suit seeking, inter alia, an injunction barring the Los Angeles Police Department from using the hold in the future.  City of Los Angelas v. Lyons, 461 U.S. 95, 99 (1983).  The Supreme Court concluded that the plaintiff lacked standing to seek prospective injunctive relief because there was no allegation that he was likely to suffer future injury from the use of the choke hold.  Moreover, the Court rejected the plaintiff's contention that the use of the choke hold in the past was sufficient to establish standing. City of Los Angelas v. Lyons, 461 U.S. 95, 106 (1983).

Applying these principles, the court concludes that the

plaintiff lacks standing to seek injunctive relief.  The
plaintiffs' complaint is wholly devoid of any allegation that he
will likely be subject to future DCF action and thus "immediately
in danger of sustaining some direct injury."  City of Los Angelas
v. Lyons, 461 U.S. 95, 103 (1983).  There is no allegation that
the DCF is currently investigating Ward or that such an
investigation is imminent.  The only arguable evidence in support
of standing is the fact that the plaintiff has, as alleged in the
complaint, dealt with the DCF in the past.  Nevertheless, City of
Los Angelas v. Lyons, 461 U.S. 95, 106 (1983) makes clear that
such evidence is insufficient.  Therefore, the defendants' motion
for summary judgment in connection with the causes of action that
seek prospective injunctive relief is granted.

2.    Causes of Action Brought Pursuant to the ADA

    The defendants next contend that summary judgment should be
granted in their favor with regard to the cause of action brought
pursuant to the Americans with Disabilities Act ("ADA").

    The complaint alleges that the DCF's actions were in
violation of the ADA.  Although the plaintiff has filed two
amended complaints, the basis of the plaintiff's ADA claim
against the DCF remains, at best, unclear.  Apparently, the
plaintiff maintains that, insofar as the DCF considered his
mental disability in determining whether D.W. should remain in
his home, it violated the ADA.  Consideration of one's

33

disability, standing alone, is not a violation of the ADA.  <u>Cf.</u>

<u>Thompson v. Davis</u>, 295 F.3d 899, 898 n.4 (9th Cir. 2002)

(permissible under the ADA for parole board to consider inmate's

disability in making individualized determination as to whether

person is qualified for parole); <u>Adams v. Monroe County</u>

<u>Department of Social Services</u>, 21 F. Supp. 2d 235, 240-41

(W.D.N.Y. 1998) (permissible for foster child placement agency to

consider plaintiff's disability in determining whether child

should be placed in plaintiff's home).  Rather, the question is

whether the DCF discriminated against the plaintiff because of

his disability.  The plaintiff has failed to raise an issue of

fact in this regard.  Judgment in favor of the DCF is therefore

granted with respect to the cause of action alleging a violation

of the ADA.

3.    <u>State Law Causes of Action</u>

Having granted the defendants' motion for summary judgment

on the federal law causes of action, the court declines to

exercise its discretion to consider plaintiff's state law causes

of action.  <u>See</u> <u>Carnegie Mellon v. Cohill</u>, 484 U.S. 343, 350, 98

L. Ed. 2d 720, 108 S. Ct. 614 (1988); <u>accord</u> <u>In re Porges</u>, 44

F.3d 159, 162 (2d Cir. 1995) (stating that court is "not required

to dismiss [plaintiff's] state claims [but] dismissal of such

claims is the general rule").  The court therefore dismisses the

causes of action brought pursuant to Connecticut law without

prejudice.

## CONCLUSION:

For the foregoing reasons, the motion for summary judgment (document no. 152) is GRANTED.

It is so ordered this ___16TH___ day of August, 2004 at Hartford, Connecticut.

Alfred V. Covello
United States District Judge